# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | |
|---|---|
| M.B. by his next friend Ericka Eggemeyer; E.S. and Z.S. by their next friend Nina Schunck; K.C. by her next friend Kris Dadant; A.H. by her next friend Grey Endres, for themselves and those similarly situated, | ) ) ) ) No. _____ ) |
| Plaintiffs, | ) |
| v. | ) |
| Jennifer Tidball, in her official capacity as Interim Director of the Missouri Department of Social Services; Tim Decker, in his official capacity as Director of the Children's Division of the Missouri Department of Social Services, | ) ) ) ) ) |
| Defendants. | ) |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND REQUEST FOR CLASS ACTION

1. When the state acts to remove children into foster care due to circumstances of abuse or neglect, it assumes an affirmative duty to act *in loco parentis* to keep those children safe. Missouri is failing in this critical duty. Every day, the approximately 13,000 children in the foster care custody of the state of Missouri are exposed to an unreasonable risk of serious physical and psychological harm because the state fails to maintain an adequate oversight system to ensure that psychotropic drugs are administered safely and only when necessary. In contravention of its custodial obligations, the state routinely permits children in its care to be prescribed one or more of these potent medications without essential safeguards in place:

- The state fails to maintain and provide to foster caregivers, and prescribing physicians as needed, up-to-date medical records detailing the child's physical and mental health history, including current and prior medications

and any observed adverse effects, in order to facilitate fully informed and well-coordinated treatment;

- The state fails to ensure that informed consent and assent to the administration of a psychotropic medication to a child in foster care is obtained prior and throughout the time a child in foster care is administered a psychotropic medication;

- The state fails to operate a system to catch "red flags" and ensure high risk prescriptions of psychotropic medications – *e.g.* multiple drugs from the same class or drugs given to very young children – are promptly identified and a secondary review obtained by a qualified child psychiatrist to assure child safety.

2. Psychotropic medications are powerful drugs that directly affect the central nervous system. Antipsychotics are one of the most powerful and frequently prescribed classes of psychotropic drugs given to children in foster care. They are often administered as chemical straight-jackets, used to control the behavior of foster children. Yet for many, if not most, of these foster children, psychotropic drugs are being administered to treat a diagnosis – *e.g.* conduct disorder, ADHD – that the drug was never even designed to address. Serious, long-lasting adverse effects are common for children given psychotropic medications. Among children given antipsychotic drugs the incidence of type 2 diabetes is three times as high as children not medicated, condemning them to a debilitating and life-shortening disease. The medications sometimes cause other profound and, at times, permanent adverse effects including psychosis, seizures, irreversible movement disorders, suicidal thoughts, aggression, weight gain, organ damage, and other life-threatening conditions.

3. Many of these drugs have no or very limited uses for children and adolescents that are approved by the federal Food and Drug Administration ("FDA"). In the absence of FDA approval of a drug for use by children, there is no FDA dosage instruction. Although children in foster care are often administered these drugs for months or even years, there is little to no

2

research demonstrating their impact on the developing brains of children or adolescents. Close and continuing scrutiny of children given such medications is therefore critical. Of particular cause for concern and posing even more serious risks are instances where children are impacted by "outlier" prescribing practices: prescribed too many psychotropic medications, too much medication, or at too young an age.

4. The grave harms and risks to foster children related to the administration of psychotropic medications are exacerbated because they are often living with caretakers who do not have detailed knowledge of their trauma background, mental health needs, or medical history. These caretakers have not known the child their whole lives the way their biological parent would, so they are dependent on the child's health records to know their history and needs. Frequent changes in placement are often accompanied by changes in a foster child's health care provider and lead to disruptions in the child's health care. Maintaining and sharing an accurate and complete medical history with the child's foster parent and physician is critical to ensuring the child's health and safety but often does not occur. As a direct result, foster parents and physicians trying to care for a foster child are in the dark about the child's history, past treatments, and responses to treatment.

5. This civil rights class action is brought on behalf of a putative class of children under the age of eighteen who are or will be placed in the custody of the state of Missouri due to a report that they have suffered abuse or neglect in the homes of their parents, guardians, or other legal custodians ("the Plaintiff Class"). The suit names Jennifer Tidball, Acting Director of the Missouri Department of Social Services ("DSS"), and Tim Decker, Director of the Children's Division ("CD") of DSS, as Defendants solely in their official capacities (collectively, "Defendants"). The approximately 13,000 children in Missouri's foster care custody are placed

in foster homes, with relatives, in congregate care facilities, and other settings. The Plaintiff Class alleges, among other things, that they are or may be administered one or more psychotropic medications while in the state's custody and that the state fails to ensure that the medications administered are appropriate, safe, and adequately monitored. As a result of the state's failures, the Plaintiff Class has suffered or will suffer substantial and often irreversible harm to their physical, emotional, and/or mental health.

6. Defendants have long been aware that CD's failure to maintain a system of effective oversight and monitoring of the administration of psychotropic medications to children in its custody poses a substantial and ongoing risk of harm to these vulnerable wards. In 2011 Congress enacted the Child and Family Services Improvements and Innovation Act requiring all states to adopt and implement protocols to ensure the appropriate use and monitoring of foster children administered psychotropic medications. Yet CD failed to take action. Five years later, CD's own words to the federal government confirm its indifference to the health and well-being of children on psychotropic medications in its custody: "Many foster care children are prescribed multiple psychotropic medications without clear evidence of benefit and with inadequate safety data. The use of multiple medications (psychotropic or otherwise) creates the potential for serious drug interactions."

7. As legal custodian for the Plaintiff Class, Defendants are required by the United States Constitution and federal statutory law to provide for their safety and well-being, including the provision of adequate medical and mental health care. Under Defendants' management and direction, CD has failed to meet its critical obligations and presently subjects the Plaintiff Class to physical and psychological harm and the unreasonable risk of such harm in violation of their federal constitutional and statutory rights.

4

8. On behalf of the Plaintiff Class, Plaintiffs M.B., E.S., Z.S., K.C., and A.H., through their respective adult Next Friends, (collectively, "the Named Plaintiff Children") therefore seek declaratory and injunctive relief to abate the substantial, ongoing, and common risks of harm resulting from CD's longstanding failure to maintain an adequate oversight system to assure that psychotropic drugs are administered safely to foster children and only when necessary.

## JURISDICTION AND VENUE

9. This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the United States Constitution and federal statutory law. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this district and because Defendants maintain their principal offices within this district in Jefferson City, Missouri.

## PARTIES

A.     **The Named Plaintiffs**

**M.B.**

11. M.B. is a fourteen-year-old boy in the foster care custody of CD, currently placed in a residential facility, though as of the time of filing he was temporarily placed in a psychiatric hospital. M.B.'s case is brought by his adult Next Friend, Ericka Eggemeyer. Over at least the past three years that M.B. has been in Missouri foster care, CD has failed in its obligation to provide for his safety and well-being with respect to how psychotropic medications are being

5

administered. CD has allowed M.B. to be placed on more than six psychotropic drugs at once, failed to provide M.B. and his caregivers with updated medical and mental health records, failed to maintain a consistent informed consent process to ensure individual attention to his treatment, and failed to institute an effective mechanism for reviewing dangerous prescription practices. As a result, he has been harmed and put at further risk of harm.

12. It is not clear exactly when M.B. began taking psychotropic medications (though he reports being on these drugs since he was three years old), but by January 2015, at age twelve and in the custody of CD, he was already being given a combination of six such drugs, including lithium and two atypical antipsychotics.

13. Over the course of the next two and a half years in CD custody, M.B. was moved among eight different placements, including at least two psychiatric hospitalizations. With each changed placement, M.B.'s regimen of psychotropic medications fluctuated, with medications being rapidly added, removed, and dosages changing. In some cases, M.B. was placed on a medication for a single month, only to have it removed the next month. In other instances, drugs were tried that had already been tried and discontinued in the past. For example, between January 5 and January 26, 2015, M.B.'s medication regimen reflected that at least one of the six drugs he was taking was discontinued, and two more were added.

14. As of November 2015, M.B. had been placed in a residential facility for almost a year. His Next Friend, Ms. Eggemeyer, was a newly licensed therapeutic foster parent at this time, and CD determined that M.B. would be the first child placed in her home. Ms. Eggemeyer attended one meeting at the residential facility with M.B. and his assigned CD and residential workers. No one discussed M.B.'s medications at this meeting. Ms. Eggemeyer next drove to the residential placement to pick M.B. up from the locked unit. No one discussed M.B.'s

medications with Ms. Eggemeyer at this time either, despite the fact that he was then taking a combination of five powerful psychotropic drugs with well-documented adverse effects, including suicidality and aggression. Rather, Ms. Eggemeyer was handed a brown grocery bag full of M.B.'s medications by one of the residential staff members. There was no discussion of M.B.'s history with these drugs, the proper methods for administering them, or possible adverse effects. Ms. Eggemeyer was not provided a medical record or history for M.B., nor was she given an opportunity to ask questions about M.B.'s drug regimen.

15. Ms. Eggemeyer did her best to follow the labels on the pill bottles and monitor for adverse effects, guided by the child's own instructions of what he should take in the morning and evening. Ms. Eggemeyer began to notice significant adverse effects. In the evening, after dispensing M.B.'s drugs, he once told her, "I feel like I have knives in my eyes" and he was often scared to go to sleep. She would see him "twitch" and "tweak" and wondered if it was the medication causing these movements. He described himself to Ms. Eggemeyer as having a "tic." She observed his "eyeballs roll back in his head."

16. After just three weeks, the placement disrupted after a brief visit to a respite foster home, when M.B. became agitated and threatened Ms. Eggemeyer's life. M.B. was hospitalized and would never be returned to Ms. Eggemeyer's home, despite her desire and intention to care for M.B. Ms. Eggemeyer continues to act as a visiting resource and stays actively involved in M.B.'s care.

17. Over the next two years, M.B. was moved through four different residential placements, with medication changes each time. Powerful medications, such as the antipsychotic Paliperidome, were abruptly discontinued and then added back into his regimen. One constant: the dosages and total number of medications steadily increased. By January 2017,

7

M.B. was taking a total of <u>seven</u> psychotropic medications, including <u>three</u> antipsychotics at the same time. Doses of some of the drugs, including the antipsychotic Quetiapine, had nearly doubled over the course of the past two years.

18. In addition to the psychotropic drugs M.B. was taking in January 2017, his medication regimen also included Benzotropine, a drug commonly used to treat the involuntary movements associated with Parkinson's Disease. Ms. Eggemeyer had seen M.B. exhibit such motions, including tics and twitches, all well-documented adverse effects of psychotropic medications.

19. Around this time, M.B. was also prescribed Levothyroxine, a drug used to treat hypothyroidism. "Lithium-induced hypothyroidism" is one of the documented adverse effects of long-term Lithium use. M.B. had been taking Lithium at daily doses of 600 mg for at least two years, with only brief pauses as his medication regimen changed.

20. In early 2017, still on the same extensive medication regimen, M.B. was moved to a facility hundreds of miles away from Ms. Eggemeyer, the only constant adult presence in his life, reportedly because the prior facility could not accommodate his mental health needs. After M.B. attempted to run away from that facility in April 2017, Ms. Eggemeyer visited M.B. and observed him to be an entirely changed child. Once a child who was hyperactive, energetic and had great difficulty sleeping, M.B. was now lethargic, slurring his speech, and falling asleep in broad daylight as he sat with Ms. Eggemeyer. These behaviors are all documented adverse effects of high dosages of a number of different psychotropic drugs.

21. M.B. was recently moved again to a residential facility outside St. Louis. After living in this facility for just a few days, M.B. was again removed to a psychiatric hospital, where he remained as of the date of filing, after reports of self-harming, aggression, and hearing

voices telling him to hurt himself. M.B. confirmed to Ms. Eggemeyer that he had been hearing voices telling him to kill himself.

22. Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate M.B.'s constitutional and federal statutory rights. Defendants have failed to protect him from harm and risk of harm while in their care by subjecting him to harmful psychotropic medication regimens without adequate oversight, failing to ensure a consistent informed consent process, and failing to provide his caregivers with updated medical and mental health records.

23. M.B. continues to be at risk of injury as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**E.S. and Z.S.**

24. Plaintiffs E.S., age three, and Z.S., age two, are siblings whose cases are brought through their adult Next Friend, Nina Schunck. They are both in the foster care custody of CD. CD has allowed E.S. and Z.S. to be placed on psychotropic medications as toddlers in the absence of any effective mechanism for reviewing this troubling prescription practice. As a result, they have been harmed and put at further risk of harm.

25. Despite their young ages, since CD was granted legal custody of E.S. and Z.S., they have been placed in multiple foster homes.

26. While in the care of CD, E.S. and Z.S. were placed on atypical antipsychotics, specifically Risperdal, and may have also been prescribed an alpha agonist.

27. Risperdal is not FDA approved for pediatric patients less than five years of age for the treatment of any disorder. Specifically, Risperdal's safety and effectiveness has not been established for schizophrenia less than thirteen years of age, for bipolar mania less than ten years

9

of age, and for autistic disorder less than five years of age. Adverse reactions can include somnolence, increased appetite, fatigue, insomnia, sedation, Parkinsonism, akathisia, vomiting, cough, constipation, nasopharyngitis, drooling, rhinorrhea, dry mouth, abdominal pain, dizziness, nausea, anxiety, headache, nasal congestion, rhinitis, tremor, and rash.

28. Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate E.S. and Z.S.'s constitutional and federal statutory rights. Defendants have failed to protect them from harm and risk of harm while in their care by subjecting them to harmful psychotropic medications without adequate oversight and, upon information and belief, failing to ensure a consistent informed consent process, and failing to provide their caregivers with updated medical and mental health records.

29. E.S. and Z.S. continue to be at risk of injury as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**K.C.**

30. K.C. is a twelve-year-old girl who was brought into the foster care custody of CD as a result of abuse and neglect she suffered in her home. K.C.'s case is brought by her adult Next Friend, Kris Dadant.

31. During K.C.'s last three years in foster care, CD has allowed her to be placed on daily doses of multiple psychotropic medications, as many as five at a time, failed to provide K.C. and her caregivers with updated medical and mental health records, failed to maintain a consistent informed consent process to ensure individual attention to her treatment, and failed to institute an effective mechanism for reviewing troubling prescription practices. As a result, she has been harmed and put at further risk of harm.

32. Comprehensive, updated, and accurate mental health and medication records have

not followed K.C. as CD has moved her through several placements. As a result, pertinent information has not been available to K.C.'s caregivers or medical consenters to facilitate informed decision-making on her behalf, and physicians have not had access to complete medical records or history when prescribing medications to K.C.

33. For example, earlier this year, those responsible for caring for K.C. had three different understandings of what daily dose of a particular psychotropic medication K.C. was to be administered. Neither CD nor the caregivers had medical records that could be used to resolve the confusion about the dosage. Significantly, this confusion was only brought to light due to questions raised by a volunteer advocate.

34. CD has also permitted K.C. to be placed on multiple psychotropic medications without first obtaining proper informed consent, which requires ongoing monitoring and dialogue so that any adverse effects of these medications may be timely addressed.

35. For example, at one residential facility, it was reported several times that K.C. was visibly involuntarily shaking. CD and the staff at its privately contracted residential treatment center did not address the issue. Eventually, the center staff firmly denied that any shaking was occurring even though a volunteer visiting resource had been noting it for weeks, and the child twice complained of the shaking.

36. During the period that K.C. was observed to be involuntarily shaking, she was taking the antipsychotic Abilify. The warning label for Abilify provides, in part: "Stop using Abilify and call your doctor at once if you have the following symptoms: . . . uncontrolled muscle movements; . . ."

37. Eventually, without facility staff ever admitting that the shaking was occurring due to medication, and only after the visiting resource repeatedly raised an alarm, K.C.'s

psychotropic medications were changed to cut the dosage of Abilify in half.

38. CD's failure to obtain informed consent for K.C.'s medications has not been limited to her Abilify prescription. She has also been placed on Strattera, another powerful psychotropic medication, without informed consent. At least one formal assessment and observation of K.C. indicate that she does not have Attention-Deficit Hyperactivity Disorder ("ADHD"), yet she has been given a formal diagnosis of ADHD. Despite the indications that she does not have ADHD, K.C. has been prescribed and administered Strattera for ADHD. She has complained that the medication does not help her.

39. The warning label for Strattera provides, in part: "Common side effects in children and teenagers include upset stomach, a decreased appetite, nausea, or vomiting, dizziness, tiredness, and mood swings." Also, the label notes: "Strattera increases the risk of suicidal thoughts or actions."

40. Beyond these examples, K.C.'s psychotropic medications have been changed frequently and erratically with little to no input from informed or knowledgeable medical consenters.

41. In response to K.C.'s high number and doses of psychotropic medications, concerned individuals outside CD observing the treatment of K.C. have sought for months an independent second opinion as to whether her psychotropic medications are harmful or appropriate. These efforts have failed.

42. K.C. has suffered harm as a result of the lack of a second opinion mechanism to review her medications. For example, in October 2016, K.C. suddenly began acting generally aggressive, being angry and violent, and getting into repeated altercations. Facility staff placed K.C. in numerous physical holds to try to stop these fights. One restraint lasted one hour and

forty-five minutes. Over one ten-day stretch K.C. was held six times. Along with four other previously administered prescriptions, a strong psychotropic medication, Seroquel, had begun being given to K.C. at the time the aggression began. CD and its private contractor did not note the correlation or raise concern about the number of medications. Once again, a volunteer visiting resource did raise concerns and asked the caseworker to address the issue. CD and the contractor were slow to respond to the concerns about the medication. The volunteer persisted and eventually contacted the prescribing doctor. She mentioned that the child was not diagnosed with bipolar disorder and questioned whether Seroquel should be prescribed, especially in light of the increased aggression and numerous other medications. Later that night, the doctor noted a bipolar disorder diagnosis in K.C.'s records. Eventually, the Seroquel prescription was discontinued. When K.C. stopped taking Seroquel, her aggression ceased.

43. The warning label for Seroquel provides: "Call a healthcare professional right away if you or your family member has any of the following symptoms, especially if they are new, worse, or worry you: . . . acting aggressive, being angry, or violent. . . ." Seroquel is not FDA approved for use by children. The drug's labeling notes that Seroquel is nevertheless prescribed to some children at least thirteen years old; however, K.C. has only recently turned twelve years old. CD failed to provide a safety check in this instance. An automatic second opinion triggered by the addition of a fifth or contra-indicated psychotropic medication could have served to protect K.C. from a profoundly traumatic period.

44. K.C. has experienced rapid weight gain since being placed on psychotropic medications, including a gain of more than fifteen pounds over a two to three month period.

45. K.C. also has begun hallucinating since being placed on psychotropic medications. Two new medications being administered to K.C. have hallucinations as a known adverse effect.

46. K.C. is sad or angry much of the time. She is routinely given five different powerful medications which keep her sedated and controllable. She has shown little or no progress toward achieving good mental health even after being subjected to years of institutional care and strong psychotropic medications.

47. Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate K.C.'s constitutional and federal statutory rights. Defendants have failed to protect her from harm and risk of harm while in their care by subjecting her to harmful psychotropic medication regimens without adequate oversight, failing to ensure a consistent informed consent process, failing to institute a protective mechanism for reviewing troubling prescription practices, and failing to provide her caregivers with updated medical and mental health records. K.C. has suffered numerous harmful adverse effects and other consequences associated with the psychotropic medications she has been prescribed as a result of Defendants' failures.

48. K.C. continues to be at risk of injury as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**A.H.**

49. A.H. is a twelve-year-old girl who has spent approximately six years in the foster care custody of CD. A.H.'s case is brought by her adult Next Friend, Grey Endres. Over the course of A.H.'s six years in foster care, CD has failed in its obligation to provide for her safety and well-being with respect to how psychotropic medications are being administered. In particular, CD has failed to adequately monitor the dosage of psychotropic medications she has been given, failed to provide A.H. and her caregivers with updated medical and mental health records, and failed to maintain a consistent informed consent process to ensure individual

14

attention to her treatment.  As a result, she has been harmed and put at further risk of harm.

50.  A.H. has experienced numerous placement moves such that knowledge of her medical and mental health history, in the absence of reliable recordkeeping practices, has become fragmented and dispersed between her assigned caseworker, foster caretakers, and health providers.

51. One example of the harm that results from such fragmented health care occurred in or about November 2016.  At that time, C.D. hospitalized A.H. after she tried to physically harm herself.  At the psychiatric hospital, she was prescribed *two* pills of Latuda and *two* pills of Remeron each day.  CD did not involve A.H.'s legal parents in the decision to prescribe and administer these psychotropic medications to her.

52. Upon discharge from the psychiatric hospital, C.D. moved A.H. into the home of a non-kinship foster parent.  After placing A.H. in this non-kinship home for a few months, CD transferred A.H. to the home of a kinship resource.  Although A.H. remained in CD custody at the time of the transfer, her non-kinship foster parent transported A.H. to her new kinship resource's home, not the assigned CD caseworker.

53. Upon arriving at the new kinship home, A.H.'s former foster parent handed A.H.'s psychotropic medications, wrapped in tissue paper, to the new kinship resource parent.  The former foster parent also informed the kinship resource parent that A.H. was to be administered just *one* pill of Latuda and *one* pill of Remeron each day.  No medical records or pill bottles were provided to the kinship resource parent documenting the instructions for administration of these drugs or their prescribed dosages.  As a result, A.H. was given the wrong dosages of these psychotropic medications and experienced a severe reaction, resulting in a six-day hospitalization.

15

54. Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate A.H.'s constitutional and federal statutory rights. Defendants have failed to protect her from harm and risk of harm while in their care by subjecting her to harmful psychotropic medications without adequate oversight, failing to ensure a consistent informed consent process, and failing to provide her caregivers with updated medical and mental health records.

55. A.H. continues to be at risk of injury as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**B.     The Next Friends**

56. Pursuant to Fed. R. Civ. P. 17(c)(2), Plaintiff M.B. appears through his Next Friend, Ericka Eggemeyer.  Ms. Eggemeyer has been a licensed therapeutic foster parent in the state of Missouri since 2015 and was a previous foster care placement for M.B.  Ms. Eggemeyer knows M.B. personally and continues to be a visiting resource and a constant presence in his life. Ms. Eggemeyer has personally observed the state agency's failure to adequately oversee the administration of prescription drugs to M.B.

57. Pursuant to Fed. R. Civ. P. 17(c)(2), Plaintiffs E.S. and Z.S. appear through their Next Friend, Nina Schunck.  Ms. Schunck has been working in mental health services for thirty years.  She is a licensed clinical social worker and has provided individual therapy to foster and adoptive children in Missouri since 1995.  Ms. Schunck holds a Master of Sciences in Psychology: Mental Health Services from Avila University.

58. Pursuant to Fed. R. Civ. P. 17(c)(2), Plaintiff K.C. appears through her Next Friend, Kris Dadant.  Ms. Dadant has had a career as a Title I teaching specialist, instructing high needs young children in the elementary public schools of Columbia, Missouri.  She encounters

16

numerous foster children in her role as a Title I teacher and is a keen observer of the emotional, developmental, intellectual, and psychological behavior of children. As a visiting resource and non-legal advocate for K.C., Ms. Dadant has observed CD's failure to provide effective management and oversight of K.C.'s mental health care, including the administration of psychotropic medications.

59. Pursuant to Fed. R. Civ. P. 17(c)(2), Plaintiff A.H. appears through her Next Friend, Grey Endres. Mr. Endres has been working in child welfare in the state of Missouri for thirty years and supervises A.H.'s therapist in his role as co-founding partner at Lifeworks Family Treatment Group. In addition to overseeing a team of therapists at Lifeworks, Mr. Endres supervises social work students in his role as adjunct professor in the School of Social Work at the University of Missouri-Kansas City and also at Kansas University. Previously, Mr. Endres was the Clinical Director at Gillis Center, a residential treatment center in Kansas City, Missouri, which served foster children with mental health needs.

**C.     The Defendants**

60. Defendant Jennifer Tidball is the Acting Director of DSS. Acting Director Tidball maintains her principal office at the Department of Social Services, Broadway State Office Building, Room 240, P.O. Box 1527, Jefferson City, Missouri 65102. Acting Director Tidball is mandated under state law to carry out the purposes of DSS, including the coordination of the state's programs devoted to those unable to provide for themselves and the rehabilitation of victims of social disadvantage. Missouri state law requires Acting Director Tidball to "use the resources provided to the department to provide comprehensive programs and leadership striking at the roots of dependency, disability and abuse of the society's rules with the purpose of improving service and economical operations."

61. Defendant Tim Decker is the Director of the CD, an office within DSS. Director Decker maintains his principal office at the Jefferson State Office Building, 10th Floor, 205 Jefferson Street, Jefferson City, Missouri, 65101. As head of the state of Missouri's designated Title IV-E agency, Director Decker has the day-to-day responsibility to ensure the safety and well-being of children in state foster care.

## CLASS ACTION ALLEGATIONS

62. This action is properly maintained as a class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

63. The class is defined as all children under the age of eighteen who are or will be placed in the foster care custody of the state of Missouri following reports that they have suffered child abuse or neglect.

64. The class is sufficiently numerous to make joinder impracticable. As of April 2017, an estimated 13,534 children under eighteen years old were in the legal custody of CD in foster care.

65. The Named Plaintiffs will fairly and adequately protect the interests of the entire class of Plaintiff Children.

66. The violations of law and resulting harms averred by the Named Plaintiffs are typical of the legal violations and harms suffered by all class members.

67. Each Named Plaintiff appears by a Next Friend, and each Next Friend has sufficient knowledge of the common systemic deficiencies underlying this complaint to represent the best interests of the Named Plaintiff on whose behalf they appear and the best interests of the putative class.

18

68. Plaintiff Children are represented by John Ammann, a Missouri attorney with over thirty years of experience in civil rights litigation and supervisor of the litigation clinic at St. Louis University School of Law; attorneys employed by Children's Rights, a non-profit legal organization whose attorneys have substantial experience and expertise in child welfare institutional reform class actions; and attorneys employed by the National Center for Youth Law, a non-profit organization specializing in representing children and adolescents in child welfare, mental health, education and juvenile justice reform class actions and impact litigation.

69. Plaintiff Children's attorneys have identified and thoroughly investigated all claims in this action, and have committed sufficient resources to represent the class.

70. Defendants have acted or failed to act on grounds generally applicable to all Plaintiff Children, necessitating declaratory and injunctive relief for the class. Plaintiff Children's counsel knows of no conflicts among class members.

71. The questions of fact and law raised by Named Plaintiffs' claims are common to and typical of those raised by the putative class of children they seek to represent. Each child relies on Defendants for their safety and well-being, including their physical and mental health. Longstanding and well-known systemic deficiencies within Missouri's child welfare system in relation to the administration and oversight of psychotropic medications place all children in CD custody at a common and ongoing risk of harm.

72. Defendants have acted or failed to act on grounds generally applicable to all members of the putative Class, necessitating class-wide declaratory and injunctive relief.

73. Questions of fact common to the Class include:

  (i) Whether Defendants, through their actions and inactions, have demonstrated a policy, pattern, custom and/or practice of inadequately monitoring and

overseeing the administration of psychotropic medications to children in the custody of CD by failing to: (a) ensure that informed consent is obtained prior to and throughout the time that children in foster care are administered psychotropic medications; (b) maintain complete and current medical records, including medication history, for children in foster care and to provide these records to foster caregivers and health care providers to facilitate the effective delivery of services; and (c) operate a statewide secondary review system to identify and address outlier prescribing practices to assure the safe administration of drugs to children; and

(ii) Whether these failures result in unreasonable harm and the risk of harm to children in CD custody.

74. Questions of law common to the class include:

(i) Whether Defendants' actions and inactions, policies, patterns, customs, and/or practices violate Plaintiff Children's substantive due process rights to be reasonably free from harm and the unreasonable risk of harm while in state custody, as guaranteed by the Fourteenth Amendment to the United States Constitution;

(ii) Whether Defendants' actions and inactions, policies, patterns, customs, and/or practices violate Plaintiff Children's rights under the Adoption Assistance and Child Welfare Act of 1980 ("AACWA") to case plans containing up-to-date medical records and timely delivery of medical histories to their foster caretakers upon placement in their home; and

(iii)   Whether the class members are entitled to declaratory and injunctive relief

to vindicate the rights they have been denied.


## FACTUAL ALLEGATIONS

**DEFENDANTS' FAILURE TO EFFECTIVELY MONITOR AND OVERSEE THE
ADMINISTRATION OF PSYCHOTROPIC MEDICATIONS TO CHILDREN IN CD
CUSTODY RESULTS IN HARM AND A SUBSTANTIAL RISK OF HARM**

### A. Serious risks attend the use of psychotropic medications in children

75.   Psychotropic medications are powerful drugs that act on the central nervous

system and can affect cognition, emotions, and behavior.  These medications are to be prescribed

for specifically diagnosed psychiatric illnesses and mental health disorders.  Most psychotropic

medications have not been approved by the FDA as safe and effective to treat children's mental

health disorders.  Those drugs with an FDA-approved use with children or adolescents are

usually limited to certain age groups and specific mental health diagnoses.  For example, none of

the atypical antipsychotics (such as Aripiprazole/Abilify, Risperidone/Risperdal,

Quetiapine/Seroquel, and Paliperidone/Invega) are approved for children under age five.  The

limited FDA-approved diagnoses for older children are restricted to schizophrenia, bipolar

disorder, Tourette's disorder, and autistic disorder with irritability.

76. As noted by one expert in a publication by the American Bar Association's Center

on Children and the Law, "[l]ittle is known about how [psychotropic] medications impact

children and adolescents in the short or long term.  Children are not just 'mini adults'; they

cannot just be given a smaller dose because they have smaller bodies."  Moreover, as observed

by the Administration of Children and Families ("ACF"), the office within the U.S. Department

of Health and Human Services charged with administering the federal Title IV-E foster care

program, "research on the safe and appropriate pediatric use of psychotropic medications lags behind prescribing trends. . . .  In the absence of such research, it is not possible to know all of the short- and long-term effects, both positive and negative, of psychotropic medications on young minds and bodies."  This fact has not stopped the practice of physicians prescribing these drugs to children "off-label," a term the FDA defines as the "unapproved use of an approved drug."  At least one study has shown that approximately 45% of medications used for the treatment of emotional or behavioral disturbances in children or adolescents are prescribed off-label.

77. While some of the risks to children may not be well understood, psychotropic drugs are known to cause serious and sometimes irreversible adverse effects in adults.  These well-documented adverse effects include:

- Psychosis, suicidal thoughts, and agitation
- Blurred vision
- Nightmares and hallucinations
- Drowsiness and dizziness
- Irreversible movement disorders (such as tardive dyskinesia), rigidity, tremor and tics
- Seizures
- Weight gain, diabetes, and high cholesterol
- Kidney, thyroid, liver, and pancreas damage

78. In the developing brain and body of a child these medications may induce these adverse effects more frequently with greater severity.  A recent study gathering information about adverse effects from parents of children given one or more psychotropic medications found:

- The number of adverse effects increased with the number of medications being used.  In comparison with children taking one medication, those taking two drugs reported on average 17% more adverse effects while those taking three or more medications reported on average 38% more adverse effects.
- The side effect profile shifted for children depending upon the number of medications taken.  Suicidality and self-harm became more frequent with

increasing numbers of medication. Increased appetite, sleepiness/fatigue, and tics and tremors were 200 to 300% more prevalent among children taking three or more medications than those taking only one drug.

- The number of adverse effects increased the longer the child was on the medication.
- Polypharmacy regimens including SSRI antidepressants or antipsychotics were especially associated with adverse effects.

79. Some psychotropic medications, including some antipsychotics and SSRI antidepressants, even come with "black box" warning labels, indicating "their use requires particular attention and caution regarding potentially dangerous or life threatening side effects." It is recognized that these drugs may increase the risk of "suicidal thinking and behavior (suicidality) in children, adolescents and young adults," and that patients starting these drugs should be "monitored appropriately and observed closely for clinical worsening, suicidality, or unusual changes in behavior."

80. The American Academy of Child and Adolescent Psychiatry ("AACAP"), the leading professional organization dedicated to promoting psychiatric care and healthy development of children and adolescents, posits that "best practice does not involve psychotropic medication as the sole intervention for youth with complex mental health needs. Psychosocial interventions, particularly those that are evidence-based and systematically monitored, are also essential." Children in foster care nevertheless are often at heightened risk of persistent mental health issues because of the "frequent absence of effective psychosocial interventions, including various forms of psychotherapy" provided along with psychotropic medications. Too frequently, psychotropic medications are administered to achieve behavioral control rather than to treat an underlying trauma. For some disorders, including Reactive Attachment Disorder and Disinhibited Social Engagement Disorder, no psychopharmacological intervention trials have been conducted, nor are there any indications for medication for the treatment of these disorders.

81. Children in foster care are also particularly vulnerable to high risk prescriptions because, as ACF explains, "the majority of physicians responsible for prescribing psychotropic medication to foster children are pediatricians or general psychiatrists without formal training in child and adolescent psychiatry and may not have an abundance of exposure to concerns specific to children in foster care." AACAP practice guidelines makes clear that a comprehensive psychiatric evaluation of a child should be completed before any pharmacological intervention is considered. Such an evaluation "increases the likelihood that medication interventions will be well conceptualized and hopefully reduces the likelihood of treatment failure and poor adherence." In Missouri, due to shortages of child psychiatrists, children are often prescribed psychotropic medications by their pediatrician, a general psychiatrist, or a doctor who sees them for just a few minutes or via tele-medicine.

82. Given the lack of research on the safe and appropriate use of psychotropic medications in children, and the inherent vulnerabilities of this population, it is of particular concern when children in foster care are exposed to "outlier" prescribing practices. In 2012, ACF issued guidance to states on implementing effective oversight of psychotropic medications for youth in foster care. ACF defined "outlier practices" as "patterns that may signal that factors other than clinical need are impacting the prescription of psychotropic medications" and identified the following three areas of concern that should trigger heightened scrutiny: "instances where children are prescribed too many psychotropic medications, too much medication, or at too young an age," commonly referred to as "too many, and too much, too young."

83. **Too many.** Polypharmacy (the use of multiple psychotropic medications at once) is increasingly prevalent in the foster care population, despite long-standing awareness of "the lack of supporting evidence and the potential for adverse effects (e.g., side effects, drug

24

interactions, metabolic effects, and potential that some medications may alter nervous system development)." There is "scant evidence" that using multiple psychotropic medications at once is effective and safe in children. Experts report that "increasing the number of drugs used concurrently increases the likelihood of adverse reactions and long-term side effects, such as high cholesterol or diabetes, and limits the ability to assess which of multiple drugs are related to a particular treatment goal." Research looking at the incidence of type 2 diabetes among children administered an antipsychotic medication found that children given an antipsychotic were 50% more likely than non-medicated children to suffer from diabetes. The same research found the risk of developing diabetes was even greater for children given an antidepressant concurrently with the antipsychotic. Children in foster care are frequently administered an antidepressant and a stimulant concurrently. Data to substantiate the safety and efficacy of this combination of drugs is lacking.

84. **Too much.** Because the majority of pediatric psychotropic medication use is done off-label, there are very few research-based guidelines for medication dosages, which would typically be supplied by FDA prescription labels. For this reason, it is a cause for concern when children are prescribed these medications at dosages that exceed recommendations. Experts report that this practice "increases the risk of adverse side effects and does not typically increase the efficacy of the drugs to any significant extent."

85. **Too young.** Very young children are particularly vulnerable to the possible adverse effects of psychotropic medications. Experts have reported that there is "no established use [for psychotropic medications] for mental health conditions in infants [under age one]; providing them these drugs could result in serious adverse effects." Moreover, it is generally

understood that drugs in the class of atypical antipsychotics, one of the most powerful

psychotropic drug categories, should not be administered to children below the age of five.

**B. CD has long been aware that large numbers of children in its foster care custody are regularly being administered powerful psychotropic drugs.**

86. On any given day, substantial numbers of children in CD foster care custody are

being administered one or more psychotropic medications.  Indeed, CD acknowledged "high

psychotropic medication utilization rates for children in out-of-home care" in its 2016 Title IV-B

Annual Progress and Service Report ("APSR"), submitted to the federal government.

87. CD has long been aware that large numbers of children in foster care are being

administered psychotropic drugs.  More than a decade ago, Missouri participated with fifteen

other states in a study of Antipsychotic Medication Use in Medicaid Children and Adolescents

("*16-State Study*").  The purpose of the study was, among other things, to gather information

about antipsychotic utilization rates and trends among children on Medicaid, including foster

children, to flag prescribing practices that raised concerns about the safety of children, and to

foster prescribing patterns for children that are supported by the evidence.

88. Each of the states participating in the *16-State Study*, including Missouri, collected

and reported data on five core safety measures:

- Use of antipsychotic medication in children five years of age and younger
- Use of high doses of antipsychotic medication
- Use of multiple antipsychotic medications
- Use of multiple (four or more) psychotropic medications
- Gap in days between filling antipsychotic prescriptions

89. Missouri was one of the thirteen states to collect and report separate data on

children in foster care.

90. The *16-State Study* found that the rate of antipsychotic medication use for children

in foster care in those states was almost nine times the rate for children not in foster care

(12.37% versus 1.4%). It further found that one in five children were prescribed two different antipsychotics, and more than one in ten children received four or more psychotropic medications.

91. Years later, in or about 2012, a review of psychotropic medication utilization in the foster care population conducted as part of the Missouri Initiative for Children in Foster Care, looking at the prior year's data, showed that 28% of children in state foster care were on a psychotropic medication. Of these children, fully 20% were subject to an outlier prescription (too much, too many, too young), including 6.65% who were prescribed five or more psychotropic medications in tandem and 3.03% who were prescribed two or more antipsychotics. A January 2015 *Missourian* article, entitled "Missouri foster children are given higher-than-average amounts of psychiatric drugs," reported MOHealthNet data from 2012 indicating that more than 30% of Missouri's foster children were prescribed at least one psychotropic medication. It was further reported based on this data that children as young as two years old had been prescribed an antipsychotic drug. In addition, at least 20% of Missouri's foster youth were taking an average of two or more psychotropic medications, with some foster children prescribed as many as seven psychotropic medications at one time.

**C. Federal law and professional standards require that states have in place a system to oversee the administration of psychotropic medications to children in foster care**.

92. The vital need for rigorous and effective oversight of psychotropic medication use for children in foster care is well established. Under federal law, CD is required to develop "a plan for the ongoing oversight and coordination of health care services for any child in a foster care placement," which must include "an outline of . . . the oversight of prescription medicines, including protocols for the appropriate use and monitoring of psychotropic medications." *See*, 42 U.S.C. § 622(b)(15)(A), 622(b)(15)(A)(v). ACF has stated that "[s]trengthened oversight of

27

psychotropic medication use is necessary in order to responsibly and effectively attend to the clinical needs of children who have experienced maltreatment" and urged "close supervision and monitoring . . . [and] careful management and oversight" in the use of psychotropic medications for children.

93. Additionally, AACAP has published recommended practices to be applied by child welfare agencies in overseeing the mental health treatment of children in foster care, including active monitoring to assure safe utilization of psychotropic medications. AACAP explained that children in state custody "often have no consistent interested party to provide informed consent for their treatment, to coordinate treatment planning and clinical care, or to provide longitudinal oversight of their treatment." Thus, "[t]he state has a duty to perform this protective role for children in state custody."

94. Over the past several years, CD has repeatedly acknowledged its awareness of these standards and the compelling need to implement a robust system to protect children in foster care from unsafe medication practices and ensure appropriate use and oversight of psychotropic medication. Shockingly, despite the inherent and widely recognized risks associated with the use of psychotropic medications in children, CD has failed to implement such a system.

**D. Defendants fail to maintain complete and current medical records for Plaintiff Children and to provide these records to caregivers.**

95. Ready access to a child's full medical history is critical to ensuring effective medical and mental health care, including the safe and appropriate administration of psychotropic drugs. Accordingly, the case plan requirements of Title IV-E of the Social Security Act require child welfare agencies to maintain up-to-date medical records as part of a written case plan for each child in care. The case plan must contain updated health care records

28

including: "the child's known medical problems" and "the child's medications." Child welfare agencies also must have a procedure for ensuring that a copy of this record is supplied to the foster parent or placement provider "at the time of each placement."

96. CD's own policy requires that "the child's Children's Service Worker shall establish and maintain a medical record (separate and distinct section in the file or separate record) on each child in care." Upon entry into care, CD policy requires that the worker "ensure initial medical information is obtained from the parent/physician and given to the resource provider within 72 hours." Similarly, Missouri's Foster Parents' Bill of Rights requires that "the children's division and its contractors shall provide to foster parents and potential adoptive parents, prior to placement, all pertinent information, including but not limited to full disclosure of all medical, psychological, and psychiatric conditions of the child."

97. Likewise, widely-accepted standards promulgated by the Child Welfare League of America ("CWLA") require the public child welfare agency to develop "an abbreviated health record, such as a medical passport, that accompanies the child throughout the child's stay in out-of-home care." This record is to include, among other things: "[t]he child's health history prior to placement . . . and immediately before entering care . . . [a]ny medical, dental, mental health, or developmental problems . . . current medications . . . [and] allergies . . . [It] should prominently identify . . . any medication allergies." CWLA standards further provide that the agency should update this record "in a timely manner, entering information about the child's health status, services, and needs as soon as [it] becomes available."

98. AACAP similarly recommends maintenance of "an ongoing record of diagnoses, height and weight, allergies, medical history, ongoing medical problem list, psychotropic medications, and adverse medication reactions that are easily available to treating clinicians 24

29

hours a day."  Review of these records "to assess past successful and unsuccessful treatments can

. . . reduce the chance that previously ineffective treatments will be used again."

99. CD acknowledged the importance of a centralized medical record in the 2016 "Health Oversight and Coordination Plan" (the "2016 Health Plan") submitted to the federal government:

> At a minimum, every child in foster care should have a centralized medical record that is updated regularly.  The record should contain historical information obtained from birth families, immunization records, notes and recommendations from primary care physicians, notes and recommendations of subspecialty providers that evaluated the child, pertinent test results, medication history, and school records.

100. Three years earlier, CD expounded upon why these records are of *particular* importance to the vulnerable children in its custody and the direct linkage between current medical records and adequate oversight of psychotropic medications:

> When a child in foster care experiences a placement change, the child may also have new medical providers who are not familiar with their history.  The lack of shared access to health records can limit the practitioner's ability to make the most informed clinical decisions possible.  The intended purpose of [a centralized health record] is to track health care information of foster children so health providers, case managers and caregivers may have a comprehensive understanding of a child's medical history. Additionally, [a centralized health record] will provide all foster children with a personal health record which belongs to them forever, reducing the fragmentation of their medical history while in care, after reunification, or when the child ages out of foster care . . . Because foster children may be relocated frequently, physicians may be unaware of a child's existing medication regimen and often prescribe another treatment beyond current therapy.  **An additional targeted outcome for [a centralized health record] is to better track prescribing habits and to reduce the overuse of psychotropic medications in this population**.

101. Notwithstanding the above laws, policies, standards, and acknowledgements, CD, by its own admission, currently maintains no centralized medical record for the children in its

30

custody.  Indeed, it identified "fragmented care" and "inadequate medical record management" as challenges in its 2016 Health Plan and candidly reported:

> There is a lack of health care information about children as they enter care, and once a child has entered care there are significant difficulties retaining accrued information in a form readily accessible to staff.  No central database or communication system exists for children in foster care.  Children in foster care typically have numerous individuals involved in their health care, yet an effective means of communication and record management does not exist.

102.  In the absence of a system to maintain comprehensive medical records for all children in care, CD has resorted to giving its caseworkers electronic access to the state's Medicaid claims data through a web-based tool known as CyberAccess as a proxy for tracking a child's prescription drug history.  Professionals in the human services field, however, warn that Medicaid claims data is not an adequate replacement for a comprehensive medical record.  In a 2015 letter to the federal government, the American Public Human Services Association strongly advised against relying on data contained in the state's Medicaid Management Information System ("MMIS") as a proxy for a child's complete medical file, stating:

> [A] client's Medicaid medical history is typically not captured by, nor housed within, the state's MMIS.  The MMIS is essentially a claims processing system for fee-for-service (FFS) care, as well as a provider payment system. . . . The FFS claim history data that does reside within the MMIS is a payment history file cross-walked to a diagnosis code but **in no way is an accurate portrayal of the child's medical history** . . . In addition, the data contained within the typical MMIS is often incomplete and considerably out-of-date. Claim history data is based on when the claim for payment is settled, not when the claim was originally submitted.

103.  Simply viewing Medicaid claims data does not provide the CD caseworker with critical information, such as whether a prescribed drug was ever actually administered, what

diagnoses or behavior a particular drug has been prescribed to treat, or whether the child previously experienced any adverse effects from a medication.

104. CD similarly fails to ensure that every child has a written case plan including the required medical records, as mandated by federal law. In 2003 and again in 2010, the federal government's Child and Family Services Review of Missouri's child welfare system found that the state's process of ensuring "that each child has a written case plan to be developed jointly with the child's parent(s) that includes the required provisions" was an "area needing improvement." Moreover, Missouri's 2016 APSR reported the results of a case record review finding that more than a quarter of child case files reviewed did not contain a current written case plan. Even where a case plan did exist in the child's file, the file was often incomplete with respect to medical and mental health records.

105. Even if CD were maintaining medical records or current case plans for children, they are of no utility if they are not provided to the individuals charged with caring for and, in some cases, providing informed consent for medications being given to those children. Yet CD routinely fails to provide the required medical records to foster caregivers, as required by law and policy. Foster parents are regularly provided incomplete health records and medication histories for children in their care, and very often no health information at all.

106. CD has long been aware of this failure. The 2016 Health Plan acknowledged that "[f]oster care providers and others assisting the child or family do not always have updated health information to make decisions related to the child's health care." In the absence of any system to ensure that this information is consistently provided to caretakers, foster parents are often forced to wing it, cobbling together what health information they can glean about the child

32

and exercising an educated guess as to what medications to administer, when and how, potential risks and adverse effects, and how to respond when a child experiences those effects.

**E. Defendants fail to assure a meaningful informed consent process.**

107. Informed consent is a prerequisite to the administration of any medical treatment to a child. Ordinarily, a child's parent or guardian is authorized to consent and the child must assent to the treatment. But the administration of psychotropic drugs is not an ordinary medical treatment. As noted earlier in paragraphs 75 to 85, these drugs can have extraordinary and life-altering adverse effects that are irreversible. Their effects on the mind and body of a child can be profound. Moreover, additional safeguards must be in place for children in foster care due to the fragmented nature of the health care they receive while in state custody. Consequently, decisions about whether or not to administer a psychotropic medication to a child in foster care require a more rigorous decision-making process.

108. In a 2012 Information Memorandum, the federal government identified the "need for written policies" with provisions for "[i]nformed and shared decision-making (consent and assent) and methods for on-going communication between the prescriber, the child, his/her caregivers, other healthcare workers, [and] the child welfare worker" as an element that is consistently included in guidelines and recommendations for the systemic monitoring and oversight of psychotropic medications in the foster care context. AACAP standards further clarify that "[a]lthough particularly important at the time of psychotropic medication initiation, informed consent and assent are ongoing processes. Informed consent involves discussion of target symptoms, likely benefits of a potential treatment, potential risks of treatment, and risks of *not* pursuing the treatment in question. Documentation of the discussion is essential, to provide clear evidence of what occurred."

109. CD has acknowledged the importance of the informed consent process in delivering and assuring safe and appropriate care to children. In a September 2013 memorandum to staff addressing the agency's informed consent policy, CD management instructed that adherence to the informed consent policy is required "in order for children in the custody of the Children's Division (CD) to receive appropriate health or mental health services."

110. CD has promulgated an informed consent policy with respect to psychotropic medications, which provides:

> When the need for psychotropic medication arises, the parent(s) should be engaged in all medication decisions and appointments for the child, unless parental rights have been terminated or the court has issued an order restricting the parent's participation in the decision making process. . . . When a psychotropic medication is prescribed, the child's Children's Service Worker should obtain information regarding the benefits and side effects of the medication to help make an informed decision. . . . If the child's parent(s) is unavailable for consultation regarding treatment, the child's Children's Service Worker or the resource parent are authorized to give consent. Prior to administering the medication, the resource parent must notify the child's Children's Service Worker to obtain approval for the child to begin the medication. The child's Children's Service Worker should notify the parents regarding treatment.

111. CD's informed consent policy is deficient on its face in at least the following ways:

- The policy is subject to inconsistent interpretation and application because of its repeated use of the conditional or contingent term "should" rather than the obligatory term "must"[1] in delineating the role of the caseworker.
- In situations where the parent is considered unavailable, either the foster parent or the caseworker may have authority to consent but the circumstances under which one over the other is empowered to consent are unclear.
- There is no description of what is necessary for a parent to be considered unavailable.

---

[1] "Must" is used only in reference to the obligation of the resource parents to notify the caseworker before actually administering a psychotropic drug to a child.

- Many foster children administered psychotropic medications are placed in congregate care facilities. The policy is silent on the role, if any, that the group care provider plays in the consent process.
- The policy does not provide for or require any periodic review of the initial consent nor set forth factors that require a reconsideration of initial consent. The result is that foster children may continue on a regimen of medications for months or years without review.
- The policy fails to clearly delineate a mandatory process for offering youth the opportunity to provide "informed assent" before undergoing a course of psychotropic medication treatment.

112. While appearing to require some consultation or engagement with the parent, the policy does not actually vest the parent or youth with the decision to grant or withhold consent, but rather sets forth a scenario where any parental or youth refusal can be overridden by CD. The policy provides that "[i]n cases of refusal, the child's Children's Service Worker will consult with the prescribing healthcare provider." The policy directs that, after the consultation, "the child's Children's Service Worker should revisit the discussion with the parent(s)," but does not even suggest further engagement with the youth themselves. If a "parent or youth still disagree with the treatment," the policy states that ultimately "CD will make the decision under its authority as the legal custodian."

113. The result of this policy is that a youth may be required to take a medication that they or their parent have explicitly refused. Nothing in policy would even require the caseworker to discuss the refusal with the parents before disregarding it, inform the youth or parent of the reasons why their refusal has been overridden, or explain the basis for the caseworker's decision.

114. Finally, because the policy is so vague and ambiguous it is all too frequently either misunderstood, misapplied, or wholly ignored by caseworkers and resource parents in securing mental health treatment for children in CD custody.

35

115. Despite the critical importance of obtaining proper informed consent, CD management has no system to track compliance with the agency's informed consent policy across all children in care, betraying the widely recognized principle that "you cannot manage what you cannot measure." CD has no system for tracking in the aggregate whether (a) the child's parents are engaged in medical decision-making when available, (b) the assigned caseworker is notified by the resource parents before they administer medication to a child for which the resource parents provided informed consent to the prescriber, (c) youth are given the opportunity for informed assent before going on a psychotropic medication regimen, or (d) when medication is refused, whether the appropriate procedures are followed and documented before CD overrides this refusal. Absent this aggregate data, CD management is unable to identify and timely correct areas of non-compliance with this important policy, leaving children at risk.

116. Notwithstanding CD's failure to promulgate and enforce a clear, unambiguous, and effective informed consent policy, the lack of comprehensive and up-to-date health records for all children in care, in any event, materially impedes caseworkers and caregivers from giving truly informed consent. Medications may be approved without the benefit of knowing a child's health history, which could include allergies to medication, documented adverse effects to medications, or failed previous attempts with that very same drug.

**F. Defendants fail to operate a monitoring and oversight system that promptly flags outlier prescriptions and subjects them to secondary review.**

117. In the absence of comprehensive medical records and effective informed consent for children in state foster care, it is crucial for the safety of these children that CD have a system to make sure that particularly risky prescription practices are identified and reviewed. The 2015 AACAP recommendations, as well as guidance from ACF and professional organizations, call for child welfare agencies, Medicaid agencies, and mental health agencies to collaborate in

36

creating systems to monitor the safety of psychotropic medication utilization among children in foster care. The AACAP standards in particular call for the systemic capacity to identify "red flag criteria triggering external reviews." ACF guidance directs that these systems be designed to flag outlier prescriptions including "instances where children are prescribed too many psychotropic medications, too much medication, or at too young an age: too many, and too much, too young." The AACAP recommendations further call for "[m]andatory consultations with an identified child and adolescent reviewer" in response to identified red flags.

118. CD currently has no system in place to identify and address "red flag" or "outlier" prescriptions of psychotropic medications to safeguard children in its custody. Instead, over the last decade, CD has essentially paid lip service to this critical systemic element, repeatedly advising the federal government that it is in the process of "development . . . of an agency monitoring protocol for psychotropic medications."

119. In its 2010 APSR, CD reported to ACF that it had begun coordinating with the Missouri Department of Mental Health ("DMH") in 2008 to develop a system able to "identify multiple psychotropic drugs and or contraindicated medications automatically and [with] alerts provided to staff to address."

120. Two years later, CD submitted its 2012 APSR advising that it was "still in the exploration phase for psychotropic medications," and describing CD's "early" stage collaboration with DMH to develop a suitable monitoring system:

> The Children's Division in conjunction with DMH is exploring the use of psychotropic medications among children in foster care. While medication can be an important component of treatment, oversight is necessary when addressing the needs of children who have experienced maltreatment. This work is in the early stages of discovery. The Children's Division has met with DMH to discuss this issue and identify a protocol for monitoring the utilization of psychotropic medication. The examination consisted of exploring

37

age counts, medication counts and costs, diagnosis counts and costs, and prescriber information. The next steps will be to determine which combination of medications is most problematic and make practice decisions as a result of the findings.

121. In its 2013 APSR, CD once again advised ACF that it was "still in the exploration phase for psychotropic medications." CD additionally described a contemplated "second opinion process" which would "take a close look at those children being prescribed two or more antipsychotics or five or more psychotropic medications and elicit trends." CD reported that 200 children in foster care custody fit this criteria for a secondary review, but that only ten child case files would be reviewed to "begin this process."

122. Subsequent efforts undertaken in 2013 to review these ten cases proved an abject failure. As averred herein at paragraphs 95 to 106, CD to this day fails to maintain a system of comprehensive medical records for the children in its care. This persistent, yet curable, systemic deficiency imposes a substantial barrier to CD's implementation of an effective secondary review process. Because CD was not in possession of comprehensive, up-to-date medical files for these ten children, letters were sent to their prescribing physicians requesting copies of their files. For eight of those ten cases, the medical records obtained were "too incomplete to perform a thorough and meaningful review." The secondary review process, therefore, stalled. CD made no efforts to initiate the process again until three years later, in 2016, when CD again failed to implement it as a result of not having complete health records.

123. CD's renewed effort in 2016 to conduct secondary reviews on two sets of twenty-five child case files once again confronted documentation obstacles. CD reported in its 2016 APSR that "[t]he lack of timely compliance from prescribers providing the requested documentation, as well as the quality of the documentation received, has required extensive

38

follow up." Not surprisingly, CD's most recent 2016 Health Plan states that the Division is "not currently implementing this second opinion process."

124. Fully nine years after CD began collaborating with DMH to develop a monitoring and oversight system, CD still has no credible and functioning system in place to ensure that it does not go unnoticed when a child in CD custody is prescribed a potentially dangerous combination or dosage of psychotropic medications, and to require a professional to review that child's case. CD's demonstrated lack of urgency in implementing a monitoring system reflects a deliberate and conscience shocking indifference toward the safety of children it has a duty to protect.

## FIRST CAUSE OF ACTION – VIOLATION OF PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE U.S. CONSTITUTION

### (Asserted on behalf of all Named Plaintiffs and the putative class and against all Defendants)

125. Paragraphs 1 – 124 above are repeated and re-alleged as if fully set forth herein.

126. A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from an unreasonable risk of harm once it takes that child into its foster care custody.

127. The foregoing policies and practices of Defendants Tidball and Decker, in their official capacities, constitute a failure to meet the affirmative duty to protect the Plaintiff Children and class members from an unreasonable risk of harm. These failures are a substantial factor leading to, and proximate cause of, the ongoing violation of the Plaintiff Children's and class members' constitutionally-protected liberty interests conferred upon them by the Fourteenth Amendment to the United States Constitution.

128. Defendants are well aware of the policies and practices that constitute a failure to protect Plaintiff Children and class members from an unreasonable risk of harm.

129. The foregoing actions and inactions of the Defendants, in their official capacities, constitute policies, patterns, practices and/or customs that are contrary to law and are substantial departures from any accepted professional judgment such that they are outside of that judgment. Defendants' actions and inactions are also in deliberate indifference to their awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists for Plaintiff Children and class members, and they have drawn that inference. As a result of Defendants' actions and inactions, Plaintiff Children and class members have been harmed or are at continuing and imminent risk of harm, and have been deprived of their substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

130. These substantive due process rights include, but are not limited to: the right to protection from harm and unreasonable risk of harm while in state foster care custody; the right to necessary treatment, care, and services to prevent class members from deteriorating or being harmed physically, psychologically, developmentally, or otherwise while in state foster care; and the right to adequate supervision and monitoring of class members' health and safety.

**SECOND CAUSE OF ACTION – VIOLATION OF PLAINTIFFS' RIGHTS UNDER THE FEDERAL ADOPTION ASSISTANCE AND CHILD WELFARE ACT, 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.*

(Asserted on behalf of all Named Plaintiffs and the putative class and against all Defendants)**

131. Paragraphs 1 – 124 above are repeated and re-alleged as if fully set forth herein.

132. The foregoing actions and inactions of the Defendants, in their official capacities, constitute policies, patterns, practices and/or customs that violate the statutory rights of the Plaintiff Children and class members under the federal Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.*, and the regulations promulgated under the Act, 45 C.F.R. Parts 1355-1357.

133. These rights include, but are not limited to, (a) the right of the Plaintiff Children and class members to have a written case plan that contains, *inter alia*, the health records of the child, including the child's most recent health information available regarding the names and addresses of the child's health providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information concerning the child determined to be appropriate by the State agency; and (b) the right of the Plaintiff Children and class members to have his or her health records reviewed, updated, and supplied to foster care providers with whom the child is placed before or at the time of placement. 42 U.S.C. §§ 622(b)(8)(A)(ii), 671(a)(16), 675(1) & (5).

134. These rights are clearly intended to benefit the Plaintiff Children and class members; the rights are neither vague nor amorphous such to strain judicial competence; and the statutory provisions noted above impose a binding obligation on the states.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Children, on behalf of the putative class they represent, respectfully request that this Court exercise its legal and equitable powers and award classwide relief as follows:

a.  Assert subject matter jurisdiction over this action;

41

b.  Order that this action be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2);

c.  Declare pursuant to Federal Rule of Civil Procedure 57 that:

    (i)  Defendants' failure to maintain a minimally adequate oversight system in relation to the administration of psychotropic medications to the class of children in CD foster care custody violates Plaintiffs' substantive due process rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be protected from harm and the unreasonable risk of harm while in state custody; and

    (ii)  Defendants' failure to (1) maintain complete and updated medical records, including, but not limited to, medication history and any history of adverse reactions and side effects, in the case plans of each child in the class of children in CD foster care custody; and (2) deliver such medical records to Plaintiffs' foster caretakers upon placement violates Plaintiffs' statutory rights under the Adoption Assistance and Child Welfare Act to (a) a written case plan that contains, *inter alia*, the health records of the child, including the child's most recent health information available regarding the names and addresses of the child's health providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information concerning the child determined to be appropriate by the State agency; and (b) to have his or her health records reviewed, updated, and supplied to foster care providers with whom the child is placed before or at the time of placement.

d.  Permanently enjoin Defendants from subjecting the class of children in CD custody to policies and practices that violate Plaintiffs' constitutional and statutory rights as set forth in subparagraph (c) above as follows:

    (i)  **Medical Records**: Order Defendants to (1) implement and maintain a comprehensive and updated electronic healthcare record for all children in CD foster care custody; and (2) deliver to each child's foster caretaker upon placement of the child in the caretaker's home or licensed facility a complete medical history for the child including, but not limited to, the child's prescription medication history and any history of adverse reactions and side effects;

    (ii)  **Informed Consent Policy**: Order Defendants to (1) promulgate a clear, unambiguous and effective informed consent policy; (2) develop and maintain a system of records that facilitates the tracking of aggregate compliance with the above informed consent policy; and (3) develop and implement a mandatory training program for all social workers and foster caretakers regarding the safe administration of psychotropic medications to children and compliance with CD policy in relation to these medications; and

    (iii)  **Secondary Review System**: Order Defendants to develop and implement a secondary review system that (1) establishes and tracks "red flag" criteria designating outlier or elevated risk prescription practices in relation to the administration of one or more psychotropic or antipsychotic medications to children in CD foster care custody; and (2) requires secondary review by a

43

qualified child psychiatrist of all "red flag" prescription regimens to children

in CD foster care custody and a feedback mechanism to the prescribing

doctor and the adult authorized to provide informed consent on behalf of the

child regarding the findings of the secondary review and any need for

revision of the prescription;

e. Award to the Plaintiff Children the reasonable costs and expenses incurred in the

prosecution of this action, including reasonable attorneys' fees pursuant to 28 U.S.C.

§§ 1920 and 1988 and Federal Rules of Civil Procedure 23(e) and (h); and

f. Grant such further equitable relief as the Court deems just, necessary, and proper to abate

the ongoing risk of harm to the class of children in CD foster care custody.

DATED: June 12, 2017

Respectfully Submitted,

 /s/  John J. Ammann, Mo. Bar #34308
Attorney for the Plaintiffs
Saint Louis University Legal Clinic
100 N. Tucker Blvd., Suite 704
Saint Louis, MO 63101-1911
(314) 977-2778
(314) 977-1180 (fax)
ammannjj@slu.edu

CHILDREN'S RIGHTS, INC.

Sara M. Bartosz
Elizabeth Pitman Gretter
Stephen Dixon
Catherine Frizell
88 Pine Street, Suite 800
New York, New York 10005
(212) 683-2210
(212) 683-4015 (fax)
sbartosz@childrensrights.org
egretter@childrensrights.org
sdixon@childrensrights.org
cfrizell@childrensrights.org


NATIONAL CENTER FOR YOUTH LAW

William Grimm
Leecia Welch
Poonam Juneja
405 14th Street, 15th Floor
Oakland, California 94612
(510) 835-8098
(510) 835-8099 (fax)
billgrimm@youthlaw.org
lwelch@youthlaw.org
pjuneja@youthlaw.org


ATTORNEYS FOR PLAINTIFFS