**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

M.B. by his next friend Ericka   )
Eggemeyer; E.S. by her next friend A.S.; )
Z.S. by her next friend S.H.; K.C.  )
by her next friend Kris Dadant;   )
A.H. by her next friend Kealey   )
Williams, for themselves and those  )
similarly situated,        )
     Plaintiffs,     )
             )
  v.          )  No. 2:17-cv-04102-NKL
             )
Steve Corsi in his official    )
capacity as Acting Director of   )
the Missouri Department of    )
Social Services; Tim Decker, in his  )
official capacity as Director of the Children's )
Division of the Missouri    )
Department of Social Services,   )
             )
     Defendants.    )

**ORDER**

   Plaintiffs, children in foster care, claim that Defendants, the Acting Director of the

Missouri Department of Social Services and the Director of the Children's Division of the

Missouri Department of Social Services ("CD"), have failed to implement a system of safeguards

and oversight with respect to the administration of psychotropic drugs to Plaintiffs. These drugs

leave the children vulnerable to various serious adverse effects, including hallucinations, self-

harm and suicidal thoughts, and such life-shortening illnesses as type 2 diabetes, and therefore

should be administered only when necessary. However, according to Plaintiffs, psychotropic

drugs often are administered not with the best interests of a child in mind, but instead,

unnecessarily and inappropriately, sometimes simply to make the children less troublesome. CD

itself has acknowledged that "[t]he use of multiple medications (psychotropic or otherwise)

1

creates the potential for serious drug interactions." It also is aware that the lack of a reasonable system of oversight and monitoring of the administration of psychotropic medications to children in its custody poses a substantial and ongoing risk of harm to the children. Yet, according to the Plaintiffs, Defendants have failed to address this substantial and ongoing risk of harm to children in foster care.

Plaintiffs allege that the state fails in three specific regards to ensure that psychotropic medications are appropriately and safely administered and adequately monitored. First, Defendants fail to maintain, and to furnish to caregivers and prescribing physicians, up-to-date medical records detailing each child's physical and mental health history, including current and prior medications and observed adverse effects—information necessary to ensure that the prescribing physicians and caretakers are fully informed and that treatment is well-coordinated. Second, Defendants fail to ensure informed consent to the administration of psychotropic medication to each child in foster care, both at the outset and as treatment continues. Finally, Defendants fail to ensure that high-risk prescriptions of psychotropic medications, such as multiple drugs from the same class, too high a dosage, or drugs given to very young children, are promptly identified and presented to an independent, qualified child psychiatrist for secondary review. As a result of the administration of psychotropic medication without adequate safeguards or oversight, Plaintiffs have suffered or are at grave risk of suffering "substantial and often irreversible harm to their physical, emotional, and/or mental health."

Plaintiffs bring this action on behalf of themselves and of a putative class of children who are or will be placed in the custody of the state of Missouri due to abuse or neglect by their parents, guardians, or other legal custodians. Plaintiffs bring claims for (i) violation of their substantive due process rights under the Fourteenth Amendment to the U.S. Constitution; (ii)

violation of their procedural due process rights, specifically, deprivation, without due process, of the right to be free from the unnecessary and inappropriate administration of psychotropic medication; and (iii) violation of rights under the Federal Adoption Assistance and Child Welfare Act. Plaintiffs seek only declaratory and injunctive relief.

Defendants move to dismiss this action for failure to state a claim. For the reasons discussed below, the motion is granted in part and denied in part.

## I. <u>THE ALLEGED FACTS</u>[1]

When the state removes children into foster care, it assumes an affirmative duty to act *in loco parentis* to keep those children safe. Yet, according to the plaintiffs, children in Missouri's foster care custody are exposed to a grave risk of severe physical and psychological harm because the state fails to oversee the administration of psychotropic drugs to them.

### a. <u>Psychotropic Drugs and Children</u>

Psychotropic drugs are powerful medications that directly affect the central nervous system. They are particularly potent when administered to children. Children administered psychotropic medications are at particularly serious risk of long-lasting adverse effects. They are more vulnerable to psychosis, seizures, irreversible movement disorders, suicidal thoughts, aggression, weight gain, organ damage, and other life-threatening conditions.

Children given two subclasses of psychotropic drugs, antipsychotics and antidepressants, are particularly vulnerable. For example, children administered antipsychotic drugs are three times as likely as other children to develop type 2 diabetes.

---

[1] In deciding the motion to dismiss, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiffs. *See Stodghill v. Wellston Sch. Dist.,* 512 F.3d 472, 476 (8th Cir. 2008).

The full risk posed to children by psychotropic drugs is not yet even fully understood. As the Administration of Children and Families ("ACF"), the office within the U.S. Department of Health and Human Services charged with administering the federal Title IV-E foster care program, has noted, "research on the safe and appropriate pediatric use of psychotropic medications lags behind prescribing trends . . . . In the absence of such research, it is not possible to know all of the short- and long-term effects, both positive and negative, of psychotropic medications on young minds and bodies." Doc. 22, ¶ 80.

Risks to children are compounded when children are subject to "outlier" prescribing practices—receiving too many psychotropic drugs or too high a dosage, or receiving drugs at too young an age (commonly described as "too many, and too much, too young"). The number of adverse effects increases with the number of medications being used. On average, those taking two psychotropic drugs report 17% more adverse effects, and those taking three or more, 38% more adverse effects, than those taking one. Suicidality and the urge to harm oneself increase with increasing numbers of medication. Increased appetite, sleepiness/fatigue, and tics and tremors are 200 to 300% more prevalent among children taking three or more medications than among those taking one drug alone.

The ACF has noted that outlier practices "may signal that factors other than clinical need are impacting the prescription of psychotropic medications." *Id.*, ¶ 86. Indeed, for many, if not most, of the affected children, psychotropic drugs are administered to treat a diagnosis that the drugs were never designed to address.

The longer a child is on a given psychotropic medication, the greater the number of adverse effects. Some psychotropic medications, including some antipsychotics and SSRI antidepressants, even come with "black box" warning labels, indicating "their use requires

4

particular attention and caution regarding potentially dangerous or life threatening side effects."

*Id.*, ¶ 83. Thus, due to the serious risks associated with psychotropic drugs, they should be administered to children only when necessary, and safely, and accordingly it is critical that children being administered these drugs are closely monitored.

**b.  Unique Risks for Children in Foster Care**

More than a decade ago, a study including data from Missouri and 16 other states found that the rate of use of antipsychotics (one of the most powerful classes of psychotropic drugs) was 12.37% for children in foster care, compared with 1.4% for children receiving Medicaid who were *not* in foster care. The study further found that one in five children was prescribed two different antipsychotics, and at least one in ten children was prescribed four or more psychotropic medications. The Missouri Initiative for Children in Foster Care, looking at data from 2011, showed that 28% of children in state foster care were on psychotropic medication. 20% of those children were subject to an outlier prescription (too much, and too many, too young), including 6.65% who were prescribed five or more psychotropic medications at once and 3.03% who were prescribed two or more antipsychotics at once. A January 2015 Missourian article reported MOHealthNet data from 2012 showing that more than 30% of Missouri's foster children were prescribed at least one psychotropic medication. It was further reported based on this data that children as young as two years old (like plaintiff Z.S.) had been prescribed an antipsychotic drug. In addition, at least 20% of Missouri's foster youth were taking an average of two or more psychotropic medications, with some foster children prescribed as many as seven psychotropic medications at one time.

Children in foster care are at increased risk of being improperly or unnecessarily administered psychotropic drugs. Often, those who care for foster children do not have detailed

knowledge of their trauma background, mental health needs, or medical history. Unlike biological parents, the foster caregivers must rely on a child's health records to know her history and needs. At the same time, frequent changes in placement often are accompanied by changes in a foster child's health care provider and cause disruptions in the child's health care. Thus, the sharing of accurate and complete medical information with both the child's foster parent and physician is critical to the child's health and safety. Yet, all too often, it does not occur. Moreover, the state has no system in place to avoid subjecting children to "outlier"—too much, and too many, too young—prescriptions.

### c. The Plaintiffs

***M.B.*** Plaintiff M.B., a fourteen-year old boy, has been administered up to seven psychotropic drugs at once, including lithium and two atypical antipsychotics. Over the course of two-and-a-half years in CD custody, as he has been moved through eight different placements, his regimen of psychotropic medications has fluctuated, with medications being rapidly added or removed, and dosages changing. At times, M.B. was placed on a medication for a month, only to have it removed the next month, and drugs that had already been tried and discontinued were tried again. Yet, neither he nor any of his caregivers has been provided updated medical and mental health records, and Missouri has not maintained "a consistent informed consent process to ensure individual attention to his treatment" or "institute[d] an effective mechanism for reviewing dangerous prescription practices," placing him at further risk of harm. *Id.*, ¶ 11. M.B. has exhibited several conditions known to be among the serious adverse effects of the psychotropic medications he has been administered, including hypothyroidism, hearing voices, and suicidal thoughts.

***E.S. and Z.S.*** Plaintiffs E.S. and Z.S., siblings aged three years and two years, respectively, already are being administered psychotropic medications, including "atypical antipsychotics." They have been placed in multiple foster homes. One of their prescribed medications, Risperdal, has not been approved for children under the age of five years. Adverse reactions to that medication can include somnolence, increased appetite, fatigue, insomnia, sedation, Parkinsonism, feelings of muscular quivering and inability to remain seated, vomiting, cough, constipation, nasopharyngitis, drooling, runny nose, dry mouth, abdominal pain, dizziness, nausea, anxiety, headache, nasal congestion, inflammation of the mucus membrane, tremor, and rash.

***K.C.*** Plaintiff K.C., a twelve-year-old girl, has been placed on as many as five psychotropic medications at one time. Although she has been placed in several foster care situations, neither she nor any of her caregivers has been provided with comprehensive, up-to-date, and accurate medical and mental health records. Indeed, earlier this year, K.C.'s caregivers had three different understandings of what daily dose of a particular psychotropic medication she was to receive, and they had no medical records to resolve the confusion. The confusion may not even have come to light had a volunteer advocate not raised questions about it. Her physicians have not had access to complete medical records or history when prescribing her medications. CD also failed to ensure that proper informed consent was given when K.C. was placed on multiple psychotropic medications, despite the fact that the drugs require ongoing monitoring to permit adverse effects to be addressed promptly. At one residential facility, K.C. was reported on multiple occasions to be "visibly involuntarily shaking." *Id.*, ¶ 37. At that time, K.C. was taking the antipsychotic Abilify, the label for which warns, "Stop using . . . and call your doctor at once if you have . . . uncontrolled muscle movements." *Id.*, ¶ 38. Neither CD nor

the staff at the private residential treatment center housing K.C. addressed the issue. In fact, the treatment center staff denied that K.C. had been shaking at all. Eventually, after the visitor who had noted the shaking repeatedly raised an alarm, K.C.'s Abilify dosage was cut in half. K.C. also has been prescribed Strattera, purportedly for Attention-Deficit Hyperactivity Disorder ("ADHD"), although at least one formal assessment and observation of K.C. indicated that she does not have ADHD. Strattera's label warns that "[c]ommon side effects in children and teenagers include upset stomach, a decreased appetite, nausea, or vomiting, dizziness, tiredness, and mood swings," and "Strattera increases the risk of suicidal thoughts or actions." *Id.*, ¶ 41. In response to K.C.'s high number and doses of psychotropic medications, concerned persons outside CD who have observed K.C. have for months sought an independent second opinion as to whether her psychotropic medication regimen is appropriate, but to no avail.

In October 2016, K.C. suddenly began acting angry, aggressive, and violent, and repeatedly became involved in altercations. Staff at her facility placed her in physical holds numerous times—including once for an hour and forty-five minutes—to keep her from fighting. Around the time that her behavior changed in this fashion, K.C. had been newly administered the strong psychotropic drug Seroquel. Seroquel's label advises: "Call a healthcare professional right away if you or your family member has any of the following symptoms, especially if they are new, worse, or worry you: . . . acting aggressive, being angry, or violent. . . ." *Id.*, ¶ 45. Seroquel is not FDA-approved for use by children. The drug's labeling notes that Seroquel nonetheless is prescribed to some children at least thirteen years old—but K.C. had reached twelve years of age only shortly before the introduction of Seroquel.

CD and its private contractor failed to note the correlation between her behavior and the medication change. Once again, a volunteer visiting resource raised the issue. CD and the

private contractor took no action.  Eventually, the volunteer contacted the prescribing doctor, asking whether Seroquel should have been prescribed given that the child had not been diagnosed with bipolar disorder, and in light of her changed behavior.  That night, the doctor made note of a bipolar disorder diagnosis in K.C.'s records.

Eventually, K.C. ceased taking Seroquel, and her aggressive behavior ceased.

K.C. is "sad or angry much of the time."  *Id.*, ¶ 48.  She has experienced rapid weight gain since being placed on psychotropic medications, including a gain of more than fifteen pounds over a three-month period.  She also has experienced hallucinations since she commenced taking psychotropic drugs.  Hallucinations are among the known adverse effects of two new medications being given to K.C.

***A.H.***   A.H., a twelve-year-old girl, has spent approximately six years in CD's custody.  As a result of being placed in numerous different living situations, "knowledge of her medical and mental health history, in the absence of reliable recordkeeping practices, has become fragmented and dispersed between her assigned caseworker, foster caretakers, and health providers."  *Id.*, ¶ 53.  In or about November 2016, A.H. tried to physically harm herself and was hospitalized.  At the psychiatric hospital, she was prescribed two pills of Latuda and two pills of Remeron each day. CD did not involve A.H.'s legal parents in the decision to administer these psychotropic medications to her.  After she was discharged, A.H. moved into the home of a non-kinship foster parent for a few months, and then was moved to the home of a kinship resource.  The non-kinship foster parent transferred A.H. to the kinship resource home, and provided A.H.'s medications wrapped only in tissue paper.  The foster parent advised the kinship resource that A.H. was to take just one pill of Latuda and one pill of Remeron each day.  The kinship resource parent received no medical records, no pill bottles, and no written instructions for

9

administering the medication. Consequently, A.H. was given incorrect dosages of the psychotropic medications and experienced a severe reaction that resulted in her being hospitalized for six-days.

## II. DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). A claim is "plausible on its face" when the allegations allow the court to draw the reasonable inference that the defendants are liable for the misconduct alleged. *Id*. (citation omitted). There must be more than "a sheer possibility" that the defendants acted unlawfully. *Id*. (citation omitted).

### a. The *Younger* Abstention Doctrine

Defendants argue that all of Plaintiff's claims are barred by the *Younger* abstention doctrine, which requires a federal court to abstain, on principles of comity and federalism, from exercising jurisdiction over certain actions seeking injunctive or declaratory relief. *See Younger v. Harris*, 401 U.S. 37, 41 & n.2 (1971).

The general rule is that a federal court should not abstain merely because there is a state court action which concerns the same matter pending in the federal court. *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013). The Supreme Court has "cautioned . . . that federal courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not refuse to decide a case in deference to the States." *Id.* (quotation marks and citation omitted).

The *Younger* abstention doctrine is an exception to this general rule, applicable in exceptional circumstances. Those circumstances are: state criminal prosecutions, civil

enforcement proceedings, and civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions. *Sprint*, 134 S. Ct. at 588); *see also New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 368 (1989) ("*NOPSI*").

Contrary to the teachings of *Sprint,* Defendants argue that abstention is appropriate here if the three so-called *Middlesex* conditions are met: "(1) there are ongoing state proceedings, (2) that implicate important state interests, and (3) that provide adequate opportunities to raise any relevant federal questions presented in that action." Doc. 35, at 14 (citing *Tony Alamo Christian Ministries v. Selig*, 664 F.3d 1245, 1249 (8th Cir. 2012)). But the *Middlesex* factors preceded *Sprint,* and the Eighth Circuit has acknowledged that the limited exceptions identified in *Sprint* control. *See Banks v. Slay,* 789 F.3d, 919, 923 (8th Cir. 2014)

Defendants also argue that *NOPSI* and *Sprint* do not apply because they concerned "public utility rates and telecommunication access fees (respectively)," rather than "children in state custody" (Doc. 67, at 3), but to the contrary, *NOPSI* and *Sprint* "define *Younger*'s scope," without exception. *Sprint*, 134 S. Ct. at 591 ("This Court has not applied *Younger* outside these three 'exceptional' categories, and rules, in accord with *NOPSI,* that they define *Younger*'s scope."). Thus, for the *Younger* abstention doctrine to apply, there must be "state criminal prosecutions, civil enforcement proceedings, [or] civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 134 S. Ct. at 588 (quotation marks and citation omitted).

There is no dispute that this case does not concern either a state criminal prosecution or civil enforcement proceedings. Defendants argue, however, that *Younger* abstention is appropriate here under the third *Sprint* category: civil proceedings involving certain orders that

11

are uniquely in furtherance of the state courts' ability to perform their judicial functions. In *Sprint,* the Supreme Court cited two cases to illustrate this third exception, *Juidice v. Vail,* 430 U.S. 327 (1977) and *Pennzoil Co. v. Texaco, Inc.,* 481 U.S 1 (1987). *Juidice* concerned the state court's use of its contempt power to enforce its orders. 430 U.S. at 335. In *Pennzoil,* the question was whether the federal court should abstain from enjoining the state process for obtaining a property lien to enforce a state court judgment. 481 U.S. at 13. Both cases illustrate the very narrow reach of the third exception. Critical to both cases was an effort by the plaintiffs to interfere with state procedures necessary to enforce the orders of a state court.

Defendants, however, contend that this exception applies "because each Plaintiff and putative class member is subject to juvenile court proceedings that include within their ambit decisions concerning medical care," and this case therefore touches on orders that are "part and parcel of the Juvenile Court's essential enforcement function . . . ." Doc. 35, at 18; Doc. 67, at 4. Defendants point out that "[t]he authority to care for and treat children in foster care" commences with "the Juvenile Court's decision to bring the child into care, not the State agency charged with carrying out its orders." *Id.* But the operative fact here is not that the juvenile court *placed* a given child into CD's custody, but that CD *has custody* over the child: Plaintiffs complain not about the placement of children in foster care, but instead about the care, or lack thereof, the children receive while in CD's custody. It is the executive's actions that are being questioned, not the power of the juvenile court. *See NOPSI*, 491 U.S. at 368 ("[I]t has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.").

12

Furthermore, there is not even a parallel action in a Missouri state court, juvenile or otherwise, dealing with the administration of psychotropic drugs. There is no remedy sought by the Plaintiffs that would interfere with any order that has been entered by the juvenile court. It would be absurd to conclude that because a juvenile court might someday enter an order related to some subject in this federal lawsuit, the *Younger* abstention applies. To so hold would mean that a federal court would always have to abstain on any dispute related to a foster child because the juvenile court has continuing jurisdiction over the child. This would indeed be a "mockery of the rule that only exceptional circumstances justify" *Younger* abstention. *Id. at* 368.

The Court therefore concludes that the *Younger* abstention doctrine does not apply here. *See also Doe v. Piper*, 165 F. Supp. 3d 789, 806 (D. Minn. 2016) (finding that "state court adoption proceeding was undeniably not . . . a civil proceeding involving the enforcement of a state court judgment," and therefore "Younger abstention does not apply"); *Oglala Sioux Tribe v. Van Hunnik*, 993 F. Supp. 2d 1017, 1024 (D. S.D. 2014) (holding that where "Plaintiffs' complaint seeks prospective relief" and does not "seek[] to interfere with any ongoing state judicial function or challenge[] any previous state court ruling," abstention "would be inappropriate"); *Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1038-39 and 1040 (D. Ariz. 2015) (concluding that, where juvenile courts were "responsible for approving motions for psychiatric assessments and residential treatment services," but defendant state agencies were "obligated to provide 'comprehensive medical and dental care' for foster children [or] to collaborate . . . to find the most effective way of delivering that care as well as behavioral health services," "[t]he requested relief[,] concern[ing] the systems for facilitating the provision of care" did "not involve or interfere with the interest of the state in enforcing the orders and judgments of state courts").

13

### b. **Substantive Due Process Claim**

The state indisputably has an obligation to protect children in foster care, including by providing adequate medical care. *James ex rel. James v. Friend*, 458 F.3d 726, 730 (8th Cir. 2006) ("The state is required . . . to protect individuals who are in its custody or are subjected to a state-created danger. A custodial relationship is created when a child is placed in foster care.") (citations omitted); *Norfleet By & Through Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993) ("It cannot be seriously doubted that the state assumed an obligation to provide adequate medical care for [the child]; the reason [he] was placed in foster care was precisely because he was not able to take care of himself and needed the supervision and attention of an adult caregiver. We thus conclude that, in light of . . . the undeniable nature of the state's relationship with and corresponding obligations to [the child], . . . the state had an obligation to provide adequate medical care, protection and supervision.").

However, in the custodial context, "a substantive due process violation will be found to have occurred only if the official conduct or inaction is so egregious or outrageous that it is conscience-shocking." *James*, 458 F.3d at 730. In *James*, the Eighth Circuit held that "officials' conduct will not be found to be conscience-shocking unless the officials acted with deliberate indifference." *Id.* In other words, the defendants must have been "aware of facts from which an inference could be drawn that a substantial risk of serious harm existed" and they must "actually [have] dr[a]w[n] that inference." *Id.*

Plaintiffs have alleged that Defendants are aware that Missouri foster children are being administered psychotropic drugs without adequate oversight and therefore are subject to a serious risk of substantial harm. According to Plaintiffs, "CD has repeatedly acknowledged its awareness of these standards and the compelling need to implement a robust system to protect children in foster care from unsafe medication practices and ensure appropriate use and oversight

14

of psychotropic medication." Doc. 22, ¶ 98. Indeed, CD admitted to the federal government that "[m]any foster care children are prescribed multiple psychotropic medications without clear evidence of benefit and with inadequate safety data," even though "[t]he use of multiple medications (psychotropic or otherwise) creates the potential for serious drug interactions." *Id.*, ¶ 6.

The complaint also states that federal law requires CD to "develop 'a plan for the ongoing oversight and coordination of health care services for any child in a foster care placement,' which must include 'an outline of . . . the oversight of prescription medicines, including protocols for the appropriate use and monitoring of psychotropic medications.'" *Id.*, ¶ 96 (citing 42 U.S.C. § 622(b)(15)(A), 622(b)(15)(A)(v)). In addition, the federal agency "ACF has stated that '[s]trengthened oversight of psychotropic medication use is necessary in order to responsibly and effectively attend to the clinical needs of children who have experienced maltreatment,'" and has "urged 'close supervision and monitoring . . . [and] careful management and oversight' in the use of psychotropic medications for children." *Id.* Furthermore, the American Academy of Child and Adolescent Psychiatry ("AACAP") "has published recommended practices for child welfare agencies in overseeing the mental health treatment of children in foster care, including active monitoring to assure safe utilization of psychotropic medications," explaining that "children in state custody 'often have no consistent interested party to provide informed consent for their treatment, to coordinate treatment planning and clinical care, or to provide longitudinal oversight of their treatment.'" *Id.*, ¶ 97.

Plaintiffs identify three systemic shortcomings in the administration of psychotropic drugs to children in Missouri foster care:

- *Medical Records.* According to Plaintiffs, the maintenance and provision of up-to-date and complete medical records is required not only by "widely[ ]accepted standards

promulgated by the Child Welfare League of America" and AACAP, but also federal law and even state policy. *See id.,* ¶¶ 99-104. "The case plan requirements of Title IV-E of the Social Security Act require child welfare agencies to maintain up-to-date medical records as part of a written case plan for each child in care," including "the child's known medical problems" and "the child's medications." *Id.,* ¶ 99. The agencies "also must have a procedure for ensuring that a copy of this record is supplied to the foster parent or placement provider 'at the time of each placement.'" *Id.* Moreover, "CD's own policy requires that 'the child's Children's Service Worker . . . establish and maintain a medical record . . . on each child in care.'" *Id., at* 100. CD's policy also "requires that the worker 'ensure initial medical information is obtained from the parent/physician and given to the resource provider within 72 hours." *Id.* Missouri's Foster Parents' Bill of Rights likewise provides that CD and its contractors "shall provide to foster parents and potential adoptive parents, prior to placement, all pertinent information, including but not limited to full disclosure of all medical, psychological, and psychiatric conditions of the child." *Id.* Yet, CD has not procured or maintained complete medical records for the foster children in its care, or at least, does not provide that information to foster caregivers. *See id.,* ¶¶ 105-110. Indeed, CD's 2016 Health Plan acknowledged that "[f]oster care providers and others assisting the child or family do not always have updated health information to make decisions related to the child's health care." *Id.,* ¶ 110. CD's consent policy and procedures are deficient because they are unclear and, partially as a result, ignored. *Id.,* ¶¶ 115-117.

- *Informed Consent.* According to AACAP, informed consent is "particularly important at the time of psychotropic medication initiation," but also should be an "ongoing process[]," involving "discussion of target symptoms, likely benefits of a potential treatment, potential risks of treatment, and risks of not pursuing the treatment in question." *Id.,* ¶ 112. The federal government stated in 2012 that, in the administration of psychotropic drugs to children in foster care, there is a "need for written policies" with provisions for "[i]nformed and shared decision-making (consent and assent) and methods for on-going communication between the prescriber, the child, his/her caregivers, other healthcare workers, [and] the child welfare worker . . . ." *Id.* CD itself has recognized the importance of an informed consent process in this context. "In a September 2013 memorandum to staff addressing the agency's informed consent policy, CD management instructed that adherence to the informed consent policy is required "in order for children in the custody of the Children's Division (CD) to receive appropriate health or mental health services." *Id.,* ¶ 113. Indeed, CD promulgated an informed consent policy with respect to psychotropic medications, which provides that, where psychotropic drugs are concerned, "the parent(s) should be engaged in all medication decisions and appointments for the child, unless parental rights have been terminated or the court has issued an order restricting the parent's participation in the decision making process." *Id.,* ¶ 114. The policy also provides that "the Children's Service Worker should obtain information regarding the benefits and side effects of the medication to help make an informed decision," and "[i]f the child's parent(s) is unavailable for consultation regarding treatment, the child's Children's Service Worker or the resource parent are authorized to give consent." *Id.* The Children's Service Worker also should approve the administration of drugs to the child, and "should notify the parents regarding treatment." *Id.* Nonetheless, CD does not track information concerning consent—who gives it,

whether the caseworkers are apprised of consent decisions, whether the youth consents, and whether CD overrides the lack of consent by a child or parent. *Id.,* ¶ 119. Furthermore, absent complete medical records, consent arguably cannot be informed. *See id.,* ¶ 120 ("Medications may be approved without the benefit of knowing a child's health history, which could include allergies to medication, documented adverse effects to medications, or failed previous attempts with that very same drug.").

- *System for Flagging Outlying Prescriptions*. Plaintiffs also allege that CD has acknowledged the need for a "monitoring protocol for psychotropic medications"—a system recommended by both AACAP and ACF. *See id.,* ¶ 122. CD reported to ACF that, in 2008, it began coordinating with the Missouri Department of Mental Health ("DMH") to develop a system to "identify multiple psychotropic drugs and or contraindicated medications automatically and [with] alerts provided to staff to address." *Id.* CD since has repeatedly recognized the need for such a system, but has failed to develop one. *See id.,* ¶¶ 123-129 (quoting CD as acknowledging that "oversight is necessary when addressing the needs of children who have experienced maltreatment"). Still, CD purportedly has no system for catching "red flags," such as too many different drugs, too much of any given drug, or the administration of drugs to those who are too young. *See id.*, ¶¶ 122-129.

Relying solely on the complaint, Defendants argue that the conduct alleged in the complaint does not rise to the level of deliberate indifference. They first argue that they have made various efforts to address the three aforementioned shortcomings. They point to the complaint itself which states that, "[i]n the absence of a system to maintain comprehensive medical records for all children in care, CD has resorted to giving its caseworkers electronic access to the state's Medicaid claims data through a web-based tool known as CyberAccess as a proxy for tracking a child's prescription drug history." *Id.,* ¶ 106. However, the complaint also alleges that this system "is not an adequate replacement for a comprehensive medical record." *Id.* "Simply viewing Medicaid claims data does not provide the CD caseworker with critical information, such as whether a prescribed drug was ever actually administered, what diagnoses or behavior a particular drug has been prescribed to treat, or whether the child previously experienced any adverse effects from a medication." *Id.,* ¶ 107.

The complaint also alleges that CD "met with [the Missouri Department of Mental Health] to discuss th[e] [red flag] issue and identify a protocol for monitoring the utilization of

17

psychotropic medication. The examination consisted of exploring age counts, medication counts and costs, diagnosis counts and costs, and prescriber information," and "next steps" involving determining "which combination of medications is most problematic and mak[ing] practice decisions as a result of the findings." *Id.,* ¶¶ 123-129.[2] In 2013, CD also contemplated a "second opinion process" that would "take a close look at those children being prescribed two or more antipsychotics or five or more psychotropic medications and elicit trends." *Id.,* ¶ 126. To begin, CD was to review ten child case files. *Id.* But the medical records for eight of those ten cases were "too incomplete to [permit CD to] perform a thorough and meaningful review." *Id.,* ¶ 127. In 2016, CD again failed to implement the secondary review process for lack of complete health records. *Id.* Purportedly because obtaining the files "required extensive follow up," CD is "not currently implementing this second opinion process." *Id.,* ¶ 128.

Defendants argue that these allegations show that there are no reasonable means for CD to procure the medical records for the children in foster care, and therefore no reasonable means to implement a "second opinion process," that the CyberAccess system is an adequate substitute for complete medical records, and that given these actions, the Defendants cannot be found to be deliberately indifferent to a serious risk of harm to foster children. However, based on the allegations in the complaint as a whole, it is possible that the defendants' decisions to stop trying to procure medical records and to not implement the long-contemplated second opinion process demonstrate deliberate indifference to a serious risk that Plaintiffs are facing.

There are clearly plausible allegations that Defendants were "aware of facts from which an inference could be drawn that a substantial risk of serious harm exist[s]," *James,* 458 F.3d at

---

[2] The complaint does not state whether any protocol was developed or implemented as a result of these efforts or whether a decision was reached about which combination of medications was most problematic.

730, and that they actually knew of the serious risk of harm. Yet they have not adopted any systematic administrative review because Defendants can't find the medical records of the children. But the absence of the medical records itself creates an unreasonable risk of harm and the Defendants are aware of that risk as well.[3] Also, the fact that the federal government, child welfare experts, and Missouri's own policy require the maintenance of medical records for foster children, suggests that there is a reasonable method for getting a meaningful portion of those records. All of that information is contained in the complaint, so drawing every reasonable inference in Plaintiffs' favor, the Court concludes that the allegations concerning the medical records and system for catching red flags plausibly allege a deliberate indifference claim.

Defendants also argue their conduct was "*per se* constitutional because they rely on the professional judgment of physicians to diagnose and prescribe psychotropics" (Doc. 67, at 10). But this argument fails to address the underlying risk that Plaintiffs have alleged. The complaint states that drugs are being prescribed for children who are too young, that doses are too high, and too many different psychotropic drugs are being given to the same child. Even CD has admitted that "[m]any foster children are prescribed multiple psychiatric medications without clear evidence of benefit and with inadequate safety data . . . ." Doc. 22, ¶ 6. Plaintiffs effectively allege that systematic administrative review is needed because doctors may not be acting, or may lack sufficient medical records to act, in the best interests of the children. It is the Defendants' failure to implement specific administrative safeguards that puts Plaintiffs at a substantially higher risk of serious harm. This risk is aggravated for foster children because psychotropic drugs may be prescribed to benefit social workers or foster parents, rather than for the interest of the child.

---

[3] Indeed, even a lay parent understands that risk.

The argument that Plaintiffs' substantive due process claim is deficient because Defendants are not alleged to have exposed the plaintiffs to risks greater than those to which they otherwise would have been exposed also fails. In both of the cases that Defendants cite in support of this argument, the children were harmed while in the custody of family members with whom they had resided prior to the state agency's involvement. *S.S. v. McMullen*, 225 F.3d 960, 965 (8th Cir. 2000); *Burton v. Richmond*, 370 F.3d 723, 729 (8th Cir. 2004). The same was true in the Supreme Court case upon which *McMullen* relies. *Deshaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989) ("Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor."). In *Deshaney*, the Supreme Court expressly stated that it might have reached a different conclusion "[h]ad the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents . . . ." *Id., at* 201, n.9. These cases do not limit the state's well established obligation to protect a child within its custody. *See, e.g., James*, 458 F.3d at 730.

The Court thus concludes that Plaintiffs have stated a plausible substantive due process claim as to the medical records and the system for flagging outlying prescriptions. This conclusion is reinforced by similar decisions by other courts. *See Henry A. v. Willden*, 678 F.3d 991, 1004–05 (9th Cir. 2012) (denying motion to dismiss due process claims under deliberate indifference standard, noting, *inter alia*, "that there may be a causal connection between the State defendants' failure to share these medical records and the injuries suffered by plaintiffs such as Henry, who received a dangerous combination of prescription drugs because his medical records were not given to his treatment providers"); *see also Thomas S. by Brooks v. Flaherty*, 902 F.2d 250, 252 (4th Cir. 1990) (affirming trial court decision that found that government official's

decision "to administer antipsychotic drugs at the levels and under the conditions found to exist in the state psychiatric hospitals . . . substantially departed from accepted professional standards") (quotation marks and citation omitted); *Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543, 555–56 (S.D. Miss. 2004) (finding that plaintiff foster children alleging, *inter alia*, state's failure to "provide them with necessary medical . . . and mental health services" stated claim for substantive due process violation under both the "professional judgment" and "deliberate indifference" standards); *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 507 (D.N.J. 2000) (denying motion to dismiss substantive due process claim regarding "the right to receive care, treatment and services consistent with competent professional judgment").

The allegations concerning consent, on the other hand, do not fare as well. Plaintiffs' complaints regarding CD's policy are that: (i) it is not phrased in mandatory terms; (ii) when the parent is not available, it is not clear whether the caseworker or the foster parent has decision-making authority; (iii) it is unclear what it means for a parent to not be available; (iv) it is silent as to the role of a group care provider; (v) it does not require periodic review; (vi) it does not provide for procuring input from the foster child to be administered the drugs; (vii) any parental or youth refusal can be overridden by CD in its sole discretion, without explanation; (viii) it is so vague and ambiguous that it is frequently misunderstood, misapplied, or ignored; and (ix) compliance with the policy is not tracked in any way. *Id., ¶¶* 115-117, 119. The allegation that the policy is not mandatory is undercut by the allegation that in a September 2013 memorandum, CD advised its staff "that adherence to the informed consent policy is required 'in order for children in the custody of the Children's Division (CD) to receive appropriate health or mental health services.'" *Id., ¶* 113. In any event, even when viewed in the light most favorable to

Plaintiffs, these allegations cannot be said to rise to the level of deliberate indifference because of the vagueness of the allegations.

### c. Procedural Due Process

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Determining whether Plaintiffs have stated a procedural due process claim "requires consideration of three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional procedural safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail. *Id., at* 321.

### 1. Private Interest

Defendants concede that "Plaintiffs have a substantial liberty interest in avoiding the unnecessary administration of medical treatment." Doc. 67, at 12. Indeed, the Supreme Court has recognized that prisoners have "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221–22 (1990). "[F]orcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness." *Riggins v. Nevada*, 504 U.S. 127, 135 (1992) (holding that "[t]he Fourteenth Amendment affords at least as much protection to persons the State detains for trial"). The Supreme Court also has found that "a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment . . . ."

22

*Parham v. J. R.*, 442 U.S. 584, 600 (1979); *see also id., at* 601 (holding that "a child has a protectible interest not only in being free of unnecessary bodily restraints but also in not being labeled erroneously by some persons because of an improper decision by the state hospital superintendent").  It follows from these precedents that Plaintiffs possess a strong liberty interest in not being unnecessarily administered psychotropic drugs.

## 2.  Adequacy of Existing Procedural Protections

Plaintiffs argue that the want of complete medical records, failure to implement an effective process for informed consent, and failure to implement a system to flag outlier prescriptions for secondary review create an unduly high risk of erroneous deprivation of Plaintiffs' right to be free from the unnecessary administration of psychotropic drugs. Defendants insist that existing procedural protections are adequate.  In their initial suggestions, Defendants argue that a physician's prescription of psychotropic drugs is by itself a "proper procedure" under the Constitution, and that Missouri's juvenile courts have "intrinsic authority to facilitate [Plaintiffs'] care, protection, and discipline," which "adds an additional layer of procedural protections."  Doc. 35, at 29.  On reply, Defendants raise the additional argument that children in foster care are entitled to fewer protections than prisoners.[4]

Defendants' argument that a physician's prescription of a given medication itself affords sufficient procedural protection to the Plaintiffs cannot defeat the procedural due process claim at this stage.  As a preliminary matter, Plaintiffs allege that the physicians prescribing medications to foster children in Missouri are not provided with complete medical records for those children, and that the foster care givers or case workers presenting the children to the

---

[4] The Court ordinarily would not consider arguments made for the first time on reply, but because Plaintiffs had the opportunity to present counter-arguments at oral argument, the Court will consider this argument.

Case 2:17-cv-04102-NKL   Document 91   Filed 01/08/18   Page 23 of 33

doctors often lack adequate knowledge concerning the child's social and medical history. Thus, even if a fully informed physician's assessment that a child should be medicated might constitute sufficient process, it arguably cannot be sufficient in the absence of a full picture of the child's medical history and social profile.

Moreover, as Plaintiffs point out, Supreme Court decisions concerning the administration of psychotropic drugs to prisoners and the commitment of children to state mental health care facilities suggest that the state's decision to administer psychotropic drugs to children should not rest on the treating physician's prescription alone. In *Parham*, which concerned the commitment of children to state mental health facilities, the Supreme Court found that there was a risk that the parents "may at times be acting against the interest of their children . . . ." *Parham*, 442 U.S. at 602. Here, similarly, there is a risk that the foster care giver or case worker will push for a child to be medicated in order to make their job easier, rather than to address real medical needs. *See* Doc. 22, ¶¶ 2, 84. Indeed, the risk of the care giver acting against the child's best interest is greater in this case than it was in *Parham*, as the "natural bonds of affection [that] lead parents to act in the best interests of their children" may not exist in the foster care system, particularly where children's placements often change, and the exigencies of accommodating numerous children with limited resources may incentivize medically unnecessary medication of children. *Parham*, 442 U.S. at 602.

In *Parham*, the Supreme Court "conclude[d] that the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a 'neutral factfinder' to determine whether the statutory requirements for admission are satisfied." *Id.*, at 606. The process envisioned by the Supreme Court required only that the decision be made by a "neutral and detached trier of fact"—not

necessarily a judicial or administrative officer—"a staff physician will suffice, so long as he or she is free to evaluate independently the child's mental and emotional condition and need for treatment." *Id., at* 607. No "formal or quasi-formal" hearing was required. *Id.*

Critically, however, the Supreme Court in Parham noted that the procedures at issue in that case did not leave "a single physician or other professional" with "the unbridled discretion" to commit a child. *Id., at* 615 (quotation marks omitted). Likewise, in *Porter v. Knickrehm*, which Defendants cite, the Eighth Circuit noted that commitment was preceded by "pre-placement reviews by independent professionals" as well as "adversarial administrative proceedings to determine proper treatment and placement." 457 F.3d 794, 797 (8th Cir. 2006).[5] Similarly, in *Harper*, which concerned the administration of psychotropic drugs to objecting prisoners, the Supreme Court required that the ultimate decision-maker(s) not "be involved in the inmate's current treatment or diagnosis." *Harper*, 494 U.S. at 233.

In an effort to avoid the implications of *Harper*, Defendants argue that Plaintiffs are entitled to fewer procedural protections than the Constitution affords to prisoners. Yet, the Supreme Court has stated that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982). Defendants argue that the administration of psychotropic drugs to children is "*per se* voluntary" because children by law cannot make medical decisions "by virtue of their minority." Doc. 67,

---

[5] Defendants acknowledge that "the institutionalization of incompetents into mental health treatment facilities" is "analogous" to the administration of psychotropic drugs to children in foster care. Doc. 67 at 12. Indeed, the Supreme Court has concluded that the forcible administration of psychotropic drugs, particularly antipsychotics, is "particularly severe . . . ." *Riggins v. Nevada*, 504 U.S. 127, 134 (1992). Justice Stevens found that the "interest in refusing mind-altering drugs with potentially permanent and fatal side effects" is "far" greater than the interesting in avoiding physical restraints and institutionalization. *Harper*, 494 U.S. at 250 n.19.

at 13.  Even if a meaningful comparison could be drawn between CD here, on the one hand, and the parents in *Parham* and the legal guardian in *Porter* on the other hand,[6] both *Parham* and *Porter* suggest, as discussed above, that additional procedural protections are required here.[7]

In light of these precedents, the Court cannot say on the basis of the allegations in the complaint that a physician's prescription of psychotropic drugs to a child in foster care by itself constitutes sufficient procedural protection.

Finally, the Court rejects Defendants' argument that the juvenile court's authority with regard to foster children provides an additional layer of protection that warrants dismissing the due process claim.  As discussed more fully in Section II(a) above, it is CD, and not the juvenile court, that is responsible for ordinary medical care for foster children.   Mo. Rev. Stat. § 207.020.1(17).  Defendants provide no legal authority supporting their claim that the juvenile court provides procedural protections with respect to the administration of psychotropic drugs to children in foster care, and their bald assertion that it does contradicts the facts as pleaded and must be rejected on this motion to dismiss.

At this stage, the Court cannot find as a matter of law that either "the risk of an erroneous deprivation" of the plaintiffs' liberty interest by existing procedures or the value of "additional

---

[6] Given Plaintiffs' allegations concerning informed consent—which paint a picture of a confused array of legal parents, foster care givers, and case workers without adequate medical or social knowledge or clearly delegated authority making the critical decision of whether to administer psychotropic drugs to a child—a factfinder may conclude that the administration of psychotropic drugs to the Plaintiffs is not "voluntary."

[7] In *Parham*, the parents retained "a substantial, if not the dominant, role in the decision" to commit a child, in light of the "traditional presumption that the parents act in the best interests of their child . . . ."  442 U.S. at 604.  Even still, the parental decision to institutionalize a child was "subject to a physician's independent examination and medical judgment."  *Id.*  Here, the state is charged with acting *in loco parentis*.  Yet, in arguing that the state should be allowed to rely entirely on the treating physician's prescription, Defendants seek to abdicate the responsibility that the parents in *Parham* had.

procedural safeguards" is so minimal as to warrant dismissal of the procedural due process claim.

### 3. Government Interest

Both Plaintiffs and Defendants assert that government interests support their own positions. Plaintiffs note that there is "compelling governmental interest in the protection of minor children," and that here, unlike in prisoner or pre-trial detainee cases, there is no countervailing government interest in prison safety or bringing an accused to trial. Doc. 57, at 21 (quoting *K.D. v. Cty. of Crow Wing*, 434 F.3d 1051, 155-56 (8th Cir. 2006)). Defendants counter that the state has an interest in allowing medical professionals to focus on practicing medicine, rather than participating in unnecessary hearings, and that many of the procedural protections Plaintiffs seek would render the foster care system inefficient and are simply unworkable. However, as the Court in *Parham* noted, a formal or even quasi-formal hearing may not be necessary—informal medical procedures may confer adequate procedural protections, and Defendants' professed fear of intensive hearings may be baseless. 442 U.S. at 607.

As there are important governmental interests on both sides, this factor does not weigh in favor of dismissing the procedural due process claim.

\*       \*       \*

For these reasons, Defendants' motion to dismiss the procedural due process claim is denied.

### d. Private Right of Action Pursuant to the Child Welfare Act

Plaintiffs' final claim is for violation of certain portions of the Adoption Assistance and Child Welfare Act (the "CWA"). Defendants argue that the relevant CWA provisions confer no

27

federal rights on Plaintiffs.  Plaintiffs, on the other hand, contend that the "majority" of courts have concluded that 42 U.S.C. Sections 622(a), 622(b)(8)(A)(ii), 671(a)(16), and 675(1) and (5) create judicially enforceable rights, the violation of which can be remedied through a Section 1983 action.  *See* 42 U.S.C. § 1983.

The question of whether sections 622(a), 622(b)(8)(A)(ii), 671(a)(16), and 675(1) and (5) confer a private right of enforcement is one of first impression within this Circuit, although the Eighth Circuit has concluded that certain other provisions of the CWA (sections 672(a) and 675(4)(A)) do not confer a privately enforceable right to receive payments from the state sufficient to cover certain statutorily enumerated foster care costs.  *Midwest Foster Care and Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1202 (8th Cir. 2013).

"Section 1983 provides a cause of action against any person who, under color of law, subjects a citizen to the deprivation of any rights secured by the laws of the United States."  *Does v. Gillespie*, 867 F.3d 1034, 1039 (8th Cir. 2017).  Importantly, a Section 1983 action supplies a remedy for violation of federal *rights*, and not merely violation of federal *law*.  *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).  Thus, "[t]o support an action under § 1983, a plaintiff relying on a federal law must establish that Congress clearly intended to create an enforceable federal right."  *Does*, 867 F.3d at 1039 (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002)).  "[N]othing short of an unambiguously conferred right will support a cause of action under § 1983."  *Does*, 867 F.3d at 1040 (quotation marks and citation omitted).

To determine whether Congress intended that the provisions at issue benefit the plaintiffs, the Court must weigh three factors:  (a) whether the provisions are phrased "in terms of the individuals who benefit, rather than the persons or institutions that are regulated"; (b) "whether the contested statutory language manifest[s] an aggregate focus, instead of being concerned with

whether the needs of any particular person have been satisfied;" and (c) "whether Congress provided a federal review mechanism." *Midwest Foster Care*, 712 F.3d at 1196-97 (quotation marks and citations omitted).

### 1. **Rights-Creating Language**

The statutory language in *Midwest Foster Care*, *Gonzaga*, and *Does* was twice removed from the party seeking enforcement. *See Midwest Foster Care*, 712 F.3d at 1197 (finding that the sections at issue "speak to the states as regulated participants in the CWA and enumerate limitations on when the states expenditures will be matched with federal dollars; they do not speak directly to the interests of the Providers"); *Gonzaga*, 536 U.S. at 274-75 ("FERPA's provisions speak only to the Secretary, directing that '[n]o funds shall be made available' to any 'educational . . . institution' which has a prohibited 'policy or practice,' . . . ."); *Does*, 867 F.3d at 1041 ("[T]he focus of the Act is two steps removed from the interests of the patients who seek services from a Medicaid provider. . . . '[I]t is phrased as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid.'") (citation omitted).

Here, the statutes specifically concern the interests of children in foster care. Section 622(a) provides that the state "must have a plan for child welfare services" meeting the requirements of subsection (b). The relevant portion of subsection (b) in turn provides that each plan shall "provide assurances that the State--(A) is operating . . . (ii) a case review system (as defined in section 675(5) . . .) *for each child receiving foster care* under the supervision of the State . . . ." 42 U.S.C. § 622(b)(8)(A)(ii) (emphasis added). Section 675(5) defines "case review system" as "a procedure for assuring that," *inter alia*, "(D) *a child's* health and education record . . . is reviewed and updated, and a copy of the record is supplied to the foster parent or foster care

29

provider with whom *the child* is placed, at the time of each placement of the child in foster care . . . ." *Id.*, § 675(5)(D) (emphases added).  Section 671(a)(16) requires the state to "have a plan . . . which . . . provides for the development of a case plan (as defined in section 675(1) of this title . . . ) for *each child* receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in sections 675(5) and 675a of this title *with respect to each such child* . . . ." *Id.*, § 671(a)(16) (emphases added).  Section 675(1) defines "case plan" as "a written document which . . . includes at least the following: . . . (C) The health and education records of *the child*, including the most recent information available regarding . . . (v) *the child's* known medical problems; (vi) *the child's* medications; and (vii) any other relevant health . . . information concerning *the child* . . . ."  *Id.*, § 675(1) (emphases added).[8]

Nevertheless, the Court is obligated to discern congressional intent not "by considering merely a portion of a statutory provision in isolation, but rather by reading the complete provision in the context of the statute as a whole."  *Does*, 867 F.3d at 1043.  Here, as in *Does*, the

---

[8] Defendants rely heavily on *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003), which concluded that sections 671(a) and 675(5)(D) and (E) did not permit a privately enforceable right.  However, that case does not end our inquiry as it concerned a different version of section 671(a)(16).  The Eleventh Circuit stated that while another section "conditions receipt of federal funds on the existence of a state plan that, among other things, provides for 'a case review system which meets the requirements described in section 675(5)(B) . . . with respect to each such child' . . . , Section 671(a)(16) does not go beyond that and explicitly require a plan to meet the requirements described in §§ 675(5)(D) and (E)."  329 F.3d at 1271.  However, the current version of section 671(a)(16) explicitly requires the plan to meet §675(5) in full.  *See* 42 U.S.C. § 671(a)(16) (requiring provision of "case review system which meets the requirements described in section[] 675(5)").  Section 671 was amended to reference section 675(5) in its entirety on September 29, 2014.  *See* PREVENTING SEX TRAFFICKING AND STRENGTHENING FAMILIES ACT, PL 113-183, September 29, 2014, 128 Stat 1919.  Thus, *31 Foster Children*'s reason for finding no "rights-creating" language in sections 671(a)(16) and 675(5) no longer applies.  *See 31 Foster Children*, 329 F.3d at 1271-72 (noting that "42 U.S.C. § 671(a)(16) . . . does not say that a plan's case review system must meet the requirements of §§ 675(5)(D) and (E)").

30

language specific to "each" child is "nested within one of [several] subsections and is two steps removed from the [statute]'s focus on which state plans *the Secretary* 'shall approve.'" *Does*, 867 F.3d at 1042; *see* 42 U.S.C. § 622.

### 2. <u>Aggregate or Individual Focus</u>

The Court next considers whether the statutory provisions have an aggregate or individual focus.

"[W]hen a statute links funding to substantial compliance with its conditions—including forming and adhering to a state plan with specified features"—as the CWA indisputably does (*see* 42 U.S.C. § 1320a–2a)—"this counsels against the creation of individually enforceable rights." *Midwest Foster Care*, 712 F.3d at 1200.

A statute that "triggers a funding prohibition" also may show an aggregate focus. *Id., at* 1202. Plaintiffs argue that the provisions at issue here "are not concerned with the triggering of specific funding prohibitions," but instead "set forth entitlements that a state is required to give to foster youth, once a state has decided to participate in a federal matching program." Doc. 57, at 27. But the statutory language in *Midwest Foster Care*, like the statutory language here, concerned "eligibility" for payments. *Compare* 42 U.S.C. § 672(a) (containing three subsections with "eligibility" in their title) *with id.* § 622(a) (providing that state must "have a plan" in order "to be eligible for" payment) *and id.* § 671(a)(16) (same). This language indicates an "aggregate focus."

Furthermore, although the subsections at issue focus on the individual child in foster care, the broader provisions focus primarily on the state's plan. Federal law provides that, "[i]n an action brought to enforce a provision of this chapter [including the CWA], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State

31

plan or specifying the required contents of a State plan." 42 U.S.C.A. § 1320a-2. The Eighth

Circuit accordingly previously held that "a statute could not be considered to have an aggregate

focus simply because, as here, it requires states to engineer a plan governing their participation in

a federal matching program that inures to the advantage of an entire group of beneficiaries."

*Midwest Foster Care*, 712 F.3d at 1200. But more recently, the Eighth Circuit clarified that

"[t]his does not mean that we should ignore . . . the structure of the statute and its focus . . . .

Where a provision is included in a section of the Act requiring a state plan or specifying the

required contents of a state plan, Congress still must create new rights in clear terms that show

unambiguous intent before they are enforceable under § 1983." *Does*, 867 F.3d at 1045.

### 3. Federal Review Mechanism

The Eighth Circuit previously concluded that the mechanism for federal review in the

CWA is "limited" and not "direct":

> [A]lthough the CWA "provides for oversight and funding restrictions that may be
> imposed by the Secretary" on the participating states, there is no direct federal
> review of the claims of individual providers. [*Mo. Child Care Ass'n v.*] *Cross*,
> 294 F.3d [1034,] 1038 [(8th Cir. 2002)]. Instead, the CWA delegates oversight of
> individual grievances to the states. . . . Federal review is limited to auditing
> states for substantial compliance with these and other requirements. *See* § 1320a–
> 2a.

*Midwest Foster Care*, 712 F.3d at 1202. However, in the more recent *Does* case, the Eighth

Circuit held that "the withholding of federal funds by the Secretary" is "another means of

enforcing a State's compliance" that weighs against finding that a statute confers a private right

of action. *Does*, 867 F.3d at 1041.

*             *             *

Under *Does*, the three factors discussed above "give mixed signals about legislative

intent," which means that "Congress has not spoken—as required by *Gonzaga*, 536 U.S. at 280,

32

122 S.Ct. 2268—with a clear voice that manifests an unambiguous intent to confer individual rights." *Does*, 867 F.3d at 1043 (quotation marks and citation omitted). Accordingly, the Court concludes that the statutes at issue do not confer a private right of action, and Plaintiffs' third cause of action must be dismissed.

### III.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is denied as to the substantive due process claim, except that claims relating to informed consent are dismissed without prejudice, and denied as to the procedural due process claim. The motion to dismiss is granted with prejudice as to the claim alleging violation of the Child Welfare Act.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  January 8, 2018
        Jefferson City, Missouri

33