IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| M.B. by his next friend Ericka Eggemeyer; K.C. by her next friend Kris Dadant; A.H. by her next friend Kealey Williams, for themselves and those similarly situated, <br>    Plaintiffs, <br> <br>v. <br> <br>Steve Corsi in his official capacity as Acting Director of the Missouri Department of Social Services; Tim Decker, in his official capacity as Director of the Children's Division of the Missouri Department of Social Services, <br> <br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 2:17-cv-04102-NKL |

**ORDER**

Plaintiffs, children in foster care, allege that Defendants, the Acting Director of the Missouri Department of Social Services and the Director of the Children's Division of the Missouri Department of Social Services ("CD"), have failed to implement a system of safeguards and oversight with respect to the administration of psychotropic drugs to Plaintiffs. These drugs leave the children vulnerable to various serious adverse effects, including hallucinations, self-harm and suicidal thoughts, and such life-shortening illnesses as type 2 diabetes, and therefore should be administered only when necessary. CD itself is aware that the lack of a reasonable system of oversight and monitoring of the administration of psychotropic medications to children in its custody poses a substantial and ongoing risk of harm to the children. Yet, according to the Plaintiffs, Defendants have failed to address this substantial and ongoing risk of harm.

1

Plaintiffs assert claims for violation of their substantive and procedural due process rights under the Fourteenth Amendment to the U.S. Constitution and seek declaratory and injunctive relief. They now move for certification of a class of plaintiffs consisting of "[a]ll children in Children's Division foster care custody who presently are, or in the future will be, prescribed or administered one or more psychotropic medications while in state care." Doc. 154, at 1 n.2.[1] For the reasons discussed below, the Court grants the motion for class certification.

I. **BACKGROUND**

When the state removes children into foster care, it assumes an affirmative duty to act *in loco parentis* to keep those children safe. Yet, according to the plaintiffs, children in Missouri's foster care custody who are prescribed or administered psychotropic drugs are exposed to a grave risk of severe physical and psychological harm because of the state's policies and practices.

   a. **Psychotropic Drugs and Children**

Psychotropic drugs are powerful medications that directly affect the central nervous system. They are particularly potent when administered to children. Children administered psychotropic medications are more vulnerable to psychosis, seizures, irreversible movement disorders, suicidal thoughts, aggression, weight gain, organ damage, and other life-threatening conditions. The full risk posed to children by psychotropic drugs is not even fully understood as yet. As the Administration of Children and Families ("ACF"), the office within the U.S. Department of Health and Human Services charged with administering the federal Title IV-E

---

[1] Plaintiffs originally moved for certification of a class consisting of "[a]ll children under the age of eighteen who are or will be placed in the foster care custody of the state of Missouri following reports that they have suffered child abuse or neglect." Doc. 113, at 3. However, in their reply papers and at oral argument, Plaintiffs adopted the more narrow class definition set forth above.

foster care program, has noted, "research on the safe and appropriate pediatric use of psychotropic medications lags behind prescribing trends . . . . In the absence of such research, it is not possible to know all of the short- and long-term effects, both positive and negative, of psychotropic medications on young minds and bodies." Doc. 22, ¶ 80.

Risks to children are compounded when children are subject to "outlier" prescribing practices—receiving too many psychotropic drugs or too high a dosage, or receiving drugs at too young an age (commonly described as "too many, and too much, too young"). The number of adverse effects increases with the number of medications being used. On average, those taking two psychotropic drugs report 17% more adverse effects, and those taking three or more, 38% more adverse effects, than those taking one. *Id.*, ¶ 82. Suicidality and the urge to harm oneself increase with increasing numbers of medications. *Id.* Increased appetite, sleepiness/fatigue, and tics and tremors are 200 to 300% more prevalent among children taking three or more medications than among those taking one drug alone. *Id.*

The ACF has noted that outlier practices "may signal that factors other than clinical need are impacting the prescription of psychotropic medications." *Id.*, ¶ 86. Indeed, for many, if not most, of the affected children, psychotropic drugs are administered to treat a diagnosis that the drugs were never designed to address.

The longer a child is on a given psychotropic medication, the greater the number of adverse effects. *Id.*, ¶ 82. Some psychotropic medications, including some antipsychotics and SSRI antidepressants, even come with warning labels indicating that "their use requires particular attention and caution regarding potentially dangerous or life threatening side effects." *Id.*, ¶ 83.

### b. Unique Risks for Children in Foster Care

More than a decade ago, a study including data from Missouri and 16 other states found that the rate of use of antipsychotics (one of the most powerful classes of psychotropic drugs) was 12.37% for children in foster care, compared with 1.4% for children receiving Medicaid who were *not* in foster care. *Id.*, ¶ 94. The study further found that one in five children was prescribed two different antipsychotics, and at least one in ten children was prescribed four or more psychotropic medications. *Id.* The Missouri Initiative for Children in Foster Care, looking at data from 2011, showed that 28% of children in state foster care were on psychotropic medication. 20% of those children were subject to an outlier prescription (too much, and too many, too young), including 6.65% who were prescribed five or more psychotropic medications at once and 3.03% who were prescribed two or more antipsychotics at once. *Id.*, ¶ 95. A January 2015 Missourian article reported MOHealthNet data from 2012 showing that more than 30% of Missouri's foster children were prescribed at least one psychotropic medication. *Id.* It was further reported based on this data that children as young as two years of age had been prescribed an antipsychotic drug. *Id.* In addition, at least 20% of Missouri's foster youth were taking an average of two or more psychotropic medications, with some foster children prescribed as many as seven at one time. *Id.*

Children in foster care are at increased risk of being improperly or unnecessarily administered psychotropic drugs. Often, those who care for foster children do not have detailed knowledge of their trauma background, mental health needs, or medical history. Unlike biological parents, the foster caregivers must rely on a child's health records to know her history and needs. At the same time, frequent changes in placement often are accompanied by changes in a foster child's health care provider and cause disruptions in the child's health care. *Id.*, ¶ 4. Yet, all too often, accurate and complete medical information is not shared with either foster parents or treating

physicians. *Id.* Moreover, the state has no system in place to avoid subjecting children to "outlier"—too much, and too many, too young—prescriptions. *Id.*, ¶¶ 123-29.

### c. The Plaintiffs

***M.B.*** Plaintiff M.B., a fourteen-year old boy, has been administered more than six psychotropic drugs at once, including lithium and two atypical antipsychotics. *Id.*, ¶ 11. Over the course of two-and-a-half years in CD custody, as he has been moved through eight different placements, his regimen of psychotropic medications has fluctuated, with medications being rapidly added or removed, and dosages changing. *Id.*, ¶ 13. At times, M.B. was placed on a medication for a month, only to have it removed the next month, and drugs that had already been tried and discontinued were tried again. *Id.* Yet, neither he nor any of his caregivers has been provided updated medical and mental health records, and Missouri has not maintained "a consistent informed consent process to ensure individual attention to his treatment" or "institute[d] an effective mechanism for reviewing dangerous prescription practices," placing him at further risk of harm. *Id.*, ¶ 11. M.B. has exhibited several conditions known to be among the serious adverse effects of the psychotropic medications he has been administered, including hypothyroidism, hearing voices, and suicidal thoughts. *Id.*, ¶ 14.

***K.C.*** Plaintiff K.C., a twelve-year-old girl, has been placed on as many as five psychotropic medications at one time. *Id.*, ¶¶ 32-33. Although she has been placed in several foster care situations, neither she nor any of her caregivers has been provided with comprehensive, up-to-date, and accurate medical and mental health records. *Id.*, ¶ 33. Indeed, earlier this year, K.C.'s caregivers had three different understandings of what daily dose of a particular psychotropic medication she was to receive, and they had no medical records to resolve the confusion. *Id.*, ¶ 35. The confusion may not even have come to light had a volunteer advocate not raised questions

about it. *Id.* Her physicians have not had access to complete medical records or history when prescribing her medications. *Id.*, ¶ 34. CD also failed to ensure that proper informed consent was given when K.C. was placed on multiple psychotropic medications, despite the fact that the drugs require ongoing monitoring to permit adverse effects to be addressed promptly. *Id.*, ¶ 36. At one residential facility, K.C. was reported on multiple occasions to be "visibly involuntarily shaking." *Id.*, ¶ 37. At that time, K.C. was taking the antipsychotic Abilify, the label for which warns, "Stop using . . . and call your doctor at once if you have . . . uncontrolled muscle movements." *Id.*, ¶ 38. After a visitor who had noted the shaking repeatedly raised an alarm, K.C.'s Abilify dosage was cut in half. *Id.*, ¶ 39. K.C. also has been prescribed Strattera, purportedly for Attention-Deficit Hyperactivity Disorder ("ADHD"), although at least one formal assessment and observation of K.C. indicated that she does not have ADHD. *Id.*, ¶ 40. Strattera's label warns that "[c]ommon side effects in children and teenagers include upset stomach, a decreased appetite, nausea, or vomiting, dizziness, tiredness, and mood swings," and "Strattera increases the risk of suicidal thoughts or actions." *Id.*, ¶ 41. In response to K.C.'s high number and doses of psychotropic medications, concerned persons outside CD who have observed K.C. have for months sought an independent second opinion as to whether her psychotropic medication regimen is appropriate, but to no avail. *Id.*, ¶ 43.

In October 2016, K.C. suddenly began acting angry, aggressive, and violent, and repeatedly became involved in altercations. *Id.*, ¶ 44. Staff at her facility placed her in physical holds numerous times—including once for an hour and forty-five minutes—to keep her from fighting. *Id.* Around the time that her behavior changed in this fashion, K.C. had been newly administered the strong psychotropic drug Seroquel. *Id.* Seroquel's label advises: "Call a healthcare professional right away if you or your family member has any of the following symptoms,

6

especially if they are new, worse, or worry you: . . . acting aggressive, being angry, or violent. . . ." *Id.*, ¶ 45. Seroquel is not FDA-approved for use by children. *Id.*, ¶ 45. The drug's labeling notes that Seroquel nonetheless is prescribed to some children at least thirteen years old—but K.C. had reached twelve years of age only shortly before the introduction of Seroquel. *Id.*

CD and its private contractor failed to note the correlation between her behavior and the medication change. *Id.*, ¶ 44. Once again, a volunteer visiting resource raised the issue, but CD and the private contractor took no action. *Id.* Eventually, the volunteer contacted the prescribing doctor, asking whether Seroquel should have been prescribed given that the child had not been diagnosed with bipolar disorder, and in light of her changed behavior. *Id.* That night, the doctor made note of a bipolar disorder diagnosis in K.C.'s records. *Id.*

Eventually, K.C. ceased taking Seroquel, and her aggressive behavior ceased. *Id.*

K.C. is "sad or angry much of the time." *Id.*, ¶ 48. She has experienced rapid weight gain since being placed on psychotropic medications, including a gain of more than fifteen pounds over a three-month period. *Id.*, ¶ 46. She also has experienced hallucinations since she commenced taking psychotropic drugs. *Id.*, ¶ 47. Hallucinations are among the known adverse effects of two new medications being given to K.C. *Id.*

**A.H.** A.H., a twelve-year-old girl, has spent approximately six years in CD's custody. *Id.*, ¶ 52. As a result of being placed in numerous different living situations, "knowledge of her medical and mental health history, in the absence of reliable recordkeeping practices, has become fragmented and dispersed between her assigned caseworker, foster caretakers, and health providers." *Id.*, ¶ 53. In or about November 2016, A.H. tried to physically harm herself and was hospitalized. *Id.*, ¶ 54. At the psychiatric hospital, she was prescribed two pills of Latuda and two pills of Remeron each day. *Id.* CD did not involve A.H.'s legal parents in the decision to

7

administer these psychotropic medications to her. *Id.* After she was discharged, A.H. moved into the home of a non-kinship foster parent for a few months, and then was moved to the home of a kinship resource. *Id.*, ¶ 55. When the non-kinship foster parent transferred A.H. to the kinship resource home, the foster parent provided A.H.'s medications wrapped only in tissue paper. *Id.*, ¶ 56. The foster parent advised the kinship resource that A.H. was to take just one pill of Latuda and one pill of Remeron each day. *Id.* The kinship resource received no medical records, no pill bottles, and no written instructions for administering the medication. *Id.* Consequently, A.H. was given incorrect dosages of the psychotropic medications and experienced a severe reaction that resulted in her being hospitalized for six days. *Id.*

## II. <u>CLASS CERTIFICATION STANDARD</u>

Under Federal Rule of Civil Procedure 23, a motion for class certification involves a two-part analysis. First, under Rule 23(a), the proposed class must satisfy the requirements of "numerosity, commonality, typicality, and fair and adequate representation." *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013). Second, the proposed class must meet at least one of the three requirements of Rule 23(b). *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432 (2013).

The burden of showing that the class should be certified rests on Plaintiffs. *Luiken,* 705 F.3d at 372. They will meet this burden only if, "after a rigorous analysis," the Court is convinced that the Rule 23 requirements are satisfied. *Comcast*, 133 S. Ct. at 1432 (quotation marks and citation omitted). The Court has broad discretion in deciding whether class certification is appropriate. *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski,* 678 F.3d 640, 645 (8th Cir. 2012) (citation omitted).

In determining a class certification motion, the Court may consider "[m]erits questions . . . only to the extent[ ]that they are relevant to determining whether the Rule 23 prerequisites for class

certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 133 S. Ct. 1184, 1194-95 (2013). The Court's inquiry on a motion for class certification therefore is "tentative," "preliminary," and "limited." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011).

### III. DISCUSSION

#### a. Rule 23(a)

##### 1. Numerosity

Rule 23(a)(1) requires that a class be sufficiently numerous to render joinder of all members impracticable. In assessing whether the numerosity requirement has been met, courts examine factors such as the number of persons in the proposed class, the nature of the action, the size of the individual claims, and the inconvenience of trying individual claims. *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561 (8th Cir. 1982).

As of December 2017, there were more than 13,500 children in CD's legal custody. *See* Mo. Dep't of Social Services, *DSS Caseload Counter*, https://dss.mo.gov/mis/clcounter/history.htm (last accessed June 13, 2018). Defendants argue that approximately 77% of the children in the Missouri foster care system are not taking psychotropic medications. Doc. 145, at 7; Doc. 144-1, Transcript of Deposition of Christy Collins, Vol. I, at 278:25-279:20. 23% of 13,500 is 3,105. Thus, approximately 3,105 children in CD's foster care custody are being administered psychotropic medications.

Joinder of more than 3,000 children would be impracticable and unduly burdensome. *See Van Orden v. Meyers*, No. 09-00971 AGF, 2011 WL 4600688, *6 (E.D. Mo. Sept. 30, 2011) (finding numerosity requirement satisfied where proposed class consisted of 150 members, noting that "joining each of the putative plaintiffs individually and trying separate suits for each would

9

be wasteful, duplicative, and time consuming," as "much of the evidence and many of the witnesses would be the same in each case"). This is particularly the case because the proposed class includes both present and future children in the foster care custody of the State of Missouri who are or will be prescribed or administered psychotropic medications, and future members of the putative class are necessarily unidentifiable. *See Barrett v. Claycomb*, No. 11-CV-04242-NKL, 2011 WL 5822382, at *2 (W.D. Mo. Nov. 15, 2011) (finding numerosity requirement satisfied in light of not only the "large initial number of potential plaintiffs," 1,100, but also "the fluid nature of this class," which included "an unknown number of future students"); *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 944 (D. Minn. 2018) (finding numerosity requirement satisfied for class including over 4,000 current students as well as future students, noting, "courts in this circuit have found numerosity where an unknown group may in the future suffer harm").

The Court finds that the numerosity requirement has been satisfied.

### 2. **Commonality**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs must show that their class claims "depend upon a common contention" that "is capable of class wide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541 (2011). Commonality "'does not require that every question of law or fact be common to every member of the class . . . and may be satisfied, for example, where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated.'" *Downing v. Goldman Phipps PLLC*, No. 13-206 CDP, 2015 WL 4255342, at *4 (E.D. Mo. July 14, 2015) (quoting *Paxton,* 688 F.2d at 561); *see also Ebert v. General Mills, Inc.*, 823 F.3d 472,

478 (8th Cir. 2016) ("[A] single common question 'will do' for purposes of Rule 23(a)(2).") (citing *Dukes*, 131 S. Ct. at 2556). Commonality is easily satisfied in most cases. *Wineland v. Casey's General Stores, Inc.*, 267 F.R.D. 669, 674 (S.D. Iowa 2009) ("The burden imposed by [the commonality] requirement is light and easily met in most cases.") (citing *In re Hartford Sales Practices Litig.*, 192 F.R.D. 592, 603 (D. Minn. 1999); Newberg on Class Actions § 3:10 (4th ed.)).

Plaintiffs challenge system-wide policies and practices that place all members of the proposed class at substantial risk of harm. With respect to the substantive due process claim (Count I), Plaintiffs raise the following questions of fact common to all potential class members:

- Whether Defendants have a policy or practice of inadequately monitoring the administration of psychotropic medications to children in CD's foster care custody by failing to maintain complete, current, and reasonably accessible medical records, including medication history, for those children and to provide these records to foster caregivers and health care providers to facilitate the effective delivery of health services; and

- Whether Defendants have a policy or practice of inadequately monitoring the administration of psychotropic medications to children in CD's foster care custody by failing to operate a secondary review system capable of timely identifying and addressing outlier prescribing practices for purposes of assuring the safety of those children.

If the foregoing questions are answered in the affirmative, the Court will be presented with a common question of law, whether these policies or practices subject the children in CD's foster care custody who are or will be prescribed or administered psychotropic drugs to an unreasonable risk of harm in violation of their substantive due process rights under the Fourteenth Amendment.

With respect to the procedural due process claim (Count II), Plaintiffs present at least the following common factual questions:

- Whether Defendants fail to maintain a policy or practice for the provision of adequate notice and a meaningful opportunity to be heard before children in foster care are administered psychotropic medications.

- Whether Defendants' fail to maintain a policy and practice providing for periodic review or reconsideration of the prescription and administration of psychotropic medications to children in foster care.

If these questions are answered in the affirmative, the Court will need to determine the common legal question of whether these policies or practices infringe upon the procedural due process rights of the children in CD's foster care custody who are or will be prescribed or administered psychotropic drugs.

Plaintiffs have presented evidence that CD is supposed to maintain medical records for children in foster care, but in fact does not. *See, e.g.,* Mo. Rev. Stat. § 210.760; Doc. 113-4, State of Missouri, Office of Administration, Division of Purchasing Materials and Management, Request for Proposal, Internet-Based Health Records System for Foster Children, at 7 (noting that "[t]he lack of shared access to health records can limit the practitioner's ability to make the most informed clinical decisions possible"). Plaintiffs have presented evidence that CD has found that oversight of the administration of psychotropic medications to children is necessary, but that CD does not provide such oversight. *See, e.g.,* Doc. 113-5 (Ex. E), Health Oversight and Coordination Plan, Strategic Plan for Children in State Custody, 2015-2019, at 11 (acknowledging that "oversight [of psychotropic medications] is necessary when addressing the needs of children who have experienced maltreatment," but that CD "is not currently implementing this second opinion practice"). Finally, Plaintiffs have presented evidence that CD fails to maintain informed consent policies and procedures capable of assuring that children in CD's foster care custody are administered psychotropic drugs only when a neutral decision-maker, in consultation with the prescribing physician, determines that is a safe and necessary treatment. *See, e.g.,* Doc. 123-1, Deposition of Christy Collins, Vol. I, at 223:2-19 (acknowledging that a foster parent might find it "much easier . . . to seek out medications than to try other non-medication-based treatment to

resolve" issues with respect to a child's behavior) and 194:5-9 (noting that a foster parent "could have a kid on medication for several weeks before [CD] even know[s] about it").

Defendants' argument that the likelihood that not all children in CD's foster care custody will be administered psychotropic drugs means that Plaintiffs have alleged only a "mere *possibility*" of injury is, as a preliminary matter, addressed by the narrowed class definition that Plaintiffs have adopted. Moreover, the possibility that not all children in the putative class may actually suffer harm as a result of the policies and practices at issue does not defeat commonality. The commonality requirement is satisfied where, as Plaintiffs allege here, Defendants' policies and practices uniformly subject members of the putative class to a *substantial risk of serious harm*. *See Postawko v. Missouri Dep't of Corr.*, No. 16-4219-NKL, 2017 WL 3185155, at *8 (W.D. Mo. July 26, 2017) (holding that every individual in a putative class "suffers exactly the same constitutional injury when he is exposed to a single statewide . . . policy or practice that creates a substantial risk of serious harm," even if "a presently existing risk may ultimately result in different future harm for different [class members] ranging from no harm at all to death") (quoting *Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014));[2] *see also DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171,

---

[2] The Court has previously rejected the "contention that *Parsons* somehow erroneously departs from long-standing Eighth Amendment precedent." *Postawko*, 2017 WL 3185155, at *8 n.8 (quotation marks omitted). Moreover, the only other federal appellate courts to have discussed *Parsons* cite it approvingly. *See Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 552–57 (7th Cir. 2016), *reh'g and suggestion for reh'g en banc denied* (Aug. 3, 2016) (noting that, "[a]s *Parsons* suggests, a class action probably could be brought where plaintiffs presented some evidence that a prison had a policy that regularly and systemically impeded timely examinations" or "where evidence suggested that a prison had such a consistent pattern of egregious delays in medical treatment that a trier of fact might infer a systemic unconstitutional practice"); *In re D.C.*, 792 F.3d 96, 102 (D.C. Cir. 2015) (denying petition to permit appeal of class certification, noting that "Rule 23(b)(2) was intended for civil rights cases") (citing, *inter alia*, *Parsons*, 754 F.3d at 686); *see also Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1105 (9th Cir. 2017) (distinguishing *Parsons* because it involved "a common policy or practice" whereas the plaintiff in the case before that court had not alleged "[i]ntentional noncompliance"). The Court therefore rejects Defendants' argument that the Court should not rely on the "logic" of *Parsons*.

1174 (8th Cir. 1995) (holding that claims of differing strengths do not preclude a finding of commonality where, although class members may face differing circumstances, they nonetheless are interested in a "satisfactory common course of conduct").

The Court also is not convinced that the "near term policy or practice changes" that Defendants claim they "are poised to make" should defeat class certification. Defendants' anticipated implementation of an electronic tool "to collect, aggregate, and analyze medication data," an initiative in partnership with the University of Missouri's Psychiatric Center to "enhance [CD's] clinical infrastructure by providing access to additional child psychiatrists, psychologists, nurses, or case managers with foster care expertise to evaluate psychotropic prescriptions for children," an electronic health record system that "will pull medical data on foster children, including data on psychotropic medications, directly from the records of physicians and other sources," or a revised policy on informed consent (Doc. 145, at 10) may go to the merits of this case. But these potential changes—none of which apparently has been implemented as yet—are not sufficient to defeat certification of a class of plaintiffs who are affected by the policies and practices currently in effect. *See Amgen*, 133 S. Ct. at 1194-95 (holding that courts may consider "[m]erits questions ... only to the extent[ ]that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied"); *Zurn Pex Plumbing Prod.*, 644 F.3d at 613 (holding that a court's inquiry on a motion for class certification is "preliminary" and "limited").

In light of the common legal and factual questions at the heart of this litigation, the Court finds that the commonality requirement is satisfied.

### 3. **Typicality**

The typicality requirement is met when the claims or defenses of the representative party are typical of those of the class. Fed. R. Civ. P. 23(a)(3). In determining typicality, courts consider

whether the named plaintiff's claim "arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996). The requirement "is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer*, 64 F.3d at 1174.

Plaintiffs' claims and the claims of the proposed class arise from the same course of conduct—the maintenance (or lack) of adequate medical records, a system of oversight for outlying prescriptions of psychotropic drugs, and policies and procedures to obtain informed consent from neutral decision-makers. As children in CD's foster care custody who are or will be prescribed or administered psychotropic drugs, the named plaintiffs and the putative class members are all subject to the same policies and procedures, and therefore are all, allegedly, subject to a substantial risk of harm.

Defendants argue that the named plaintiffs' claims are not typical because each named plaintiff is subject to a unique defense. However, regardless of whether the named plaintiffs have mental or physical health problems that are unusually severe, or whether their juvenile court proceedings address psychotropic medications, or when each child came into CD's foster care custody,[3] each continues to be subject to the same policies and procedures—or lack thereof—that

---

[3] Plaintiff A.H.'s claim would only be barred by the statute of limitations if the alleged violations *ceased* more than five years ago. *See* Mo. Rev. Stat. §§ 516.120.4 (providing for five-year statute of limitations for personal injury claims) and 516.100 ("[T]he cause of action shall not be deemed to accrue when the wrong is done . . . , but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained."). Plaintiffs allege that Defendants continue to violate Plaintiff A.H.'s constitutional rights. Her claims therefore are not time-barred. *See Montin v. Estate of Johnson*, 636 F.3d 409, 415 (8th Cir. 2011) ("Not every plaintiff is deemed to have permanently sacrificed his or her right to obtain injunctive relief merely because the statute of limitations has run as measured from the onset of the objected-to condition or policy. . . . This is particularly true where it is appropriate to describe each new day under an objected-to policy as comprising a new or continuing violation of rights, as in the context of an

allegedly creates a substantial risk of harm. Plaintiffs are not litigating whether the named Plaintiffs should have been administered psychotropic drugs; rather, they are litigating whether Defendants are obligated to provide additional safeguards against the improper administration of psychotropic medications to children in foster care, an issue that equally concerns all of the named plaintiffs and the members of the proposed class. The typicality requirement therefore is satisfied. *See Lane v. Lombardi*, No. 2:12-CV-4219-NKL, 2012 WL 5462932 (W.D. Mo. Nov. 8, 2012) (finding typicality where plaintiffs' Section 1983 claim was "based on the same policy and proposed conduct of Defendants" as the claims of other putative class members); *Rentschler v. Carnahan*, 160 F.R.D. 114, 116 (E.D. Mo. 1995) (finding typicality requirement satisfied where plaintiffs and the putative class members were subjected to the "same allegedly unlawful policies and conditions" and their claims were "all based on the same legal theories, the same arguments of unconstitutionality").

### 4. **Adequacy**

Rule 23(a)(4) requires that the class representative and class counsel "fairly and adequately protect the interests of the class." The adequacy requirement is met where: "(1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously; and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *Carpe v. Aquila, Inc.,* 224 F.R.D. 454, 458 (W.D. Mo. 2004) (internal quotes omitted). This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997).

---

Eighth Amendment claim for cruel or unusual punishment or a discrimination claim alleging ongoing implementation of a discriminatory wage scheme.").

16

As a preliminary matter, the legal issues presented are the same for every potential plaintiff, so the Plaintiffs' interests are substantively identical to those of the other potential class members. *See Wal-Mart,* 564 U.S. at 349, n. 5 (noting that the requirements of typicality and adequacy "tend to merge").

Further, the parties stipulated to the appointment of the Next Friends representing the named plaintiff children (Doc. 61), and the Court so-ordered the appointments (Doc. 69). The Next Friends are participating in this litigation to improve the care of children in Missouri's foster care custody. *See* Doc. 36-1 (Declaration of Ericka Eggemeyer, Next Friend for M.B.), ¶ 3; Doc. 36-3 (Declaration of Kris Dadant, Next Friend for K.C.), ¶¶ 3-4. Defendants do not dispute that the Next Friends are capable and committed.

Moreover, defendants do not dispute that Plaintiffs' counsel can adequately represent the proposed class members. Plaintiffs' counsel have been prosecuting this action competently and vigorously. They are qualified and experienced, including with respect to issues surrounding children's rights and class actions. Doc. 113-12 (Declaration of Sara M. Bartosz in Support of Plaintiffs' Motion for Class Certification), ¶¶ 3-5; Doc. 113-13 (Declaration of Leecia Welch in Support of Plaintiffs' Motion for Class Certification), ¶¶ 2-6; Doc. 113-14 (Declaration of Scott T. Schutte in Support of Plaintiffs' Motion for Class Certification), ¶¶ 3-5; Doc. 113-15 (Declaration of John J. Ammann), ¶¶ 2-7. Before filing this lawsuit, Children's Rights attorneys spent nearly two years investigating the oversight of psychotropic medications in the Missouri child welfare system—testament to their diligence and dedication. Doc. 113-12 (Bartosz Decl.), ¶ 6. Counsel for the Plaintiffs have the resources required to represent the class. *See* Doc. 113-12 (Bartosz Decl.), ¶ 8; Doc. 113-13 (Welch Decl.), ¶ 7; Doc. 113-14 (Schutte Decl.), ¶ 6; Doc. 113-

15 (Ammann Decl.), ¶ 8. The proposed class counsel is well equipped to vigorously represent the plaintiffs in this action.

For these reasons, the Court finds that the adequacy requirement is satisfied.

### b. Rule 23(b)

A class must satisfy at least one of the requirements of Rule 23(b), in addition to the requirements of Rule 23(a), in order to merit certification. Fed. R. Civ. P. 23.

"Certification is appropriate under subsection (b)(2) if classwide injunctive relief is sought when the defendant 'has acted or refused to act on grounds generally applicable to the class.'" *DeBoer*, 64 F.3d at 1175 (quoting Fed. R. Civ. P. 23(b)(2)). "If the Rule 23(a) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2)." *Id.* (quotation marks and citation omitted). Moreover, "[b]ecause one purpose of Rule 23(b)(2) was to enable plaintiffs to bring lawsuits vindicating civil rights, the rule 'must be read liberally in the context of civil rights suits.'" *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980) (citation omitted).

Plaintiffs allege that Defendants, applying policies and practices uniformly across the class, "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). Plaintiffs seek "final injunctive relief or corresponding declaratory relief . . . respecting the class as a whole." *Id.* Because "a single injunction or declaratory judgment would provide relief to each member of the class," Rule 23(b)(2) is satisfied. *Dukes*, 564 U.S. 338, 360.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED. The Court certifies a class of plaintiffs consisting of:

> all children in Children's Division foster care custody who presently are, or in the future will be, prescribed or administered one or more psychotropic medications while in state care.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: July 19, 2018
Jefferson City, Missouri