# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

|  |  |
|---|---|
| M.B., et al., <br><br> Plaintiffs, <br><br> v. <br><br> Steve Corsi, et al., <br><br> Defendants. | No. 2:17-cv-04102-NKL |

**ORDER**

Plaintiffs, children in foster care, allege that Defendants, the Acting Director of the Missouri Department of Social Services and the Director of the Children's Division of the Missouri Department of Social Services ("CD"), have failed to implement a system of safeguards and oversight with respect to the administration of psychotropic drugs to Plaintiffs. Plaintiffs assert claims for violation of their substantive and procedural due process rights under the Fourteenth Amendment to the U.S. Constitution and seek declaratory and injunctive relief.

On July 19, 2018, the Court certified a class consisting of "all children in Children's Division foster care custody who presently are, or in the future will be, prescribed or administered one or more psychotropic medications while in state care." Doc. 183. On August 2, 2018, Defendants petitioned for appeal pursuant to Federal Rule of Civil Procedure 23(f). On August 22, 2018, the Eighth Circuit granted the petition for 23(f) appeal.

On September 6, 2018, Defendants moved for a stay pending appeal of the class-certification order. For the reasons discussed below, Defendants' motion to stay is denied.

1

I.  **<u>BACKGROUND</u>**

Plaintiffs assert that psychotropic drugs leave children vulnerable to various serious adverse effects, including hallucinations, self-harm and suicidal thoughts, and such life-shortening illnesses as type 2 diabetes, and therefore should be administered only when necessary.  The longer a child is on a given psychotropic medication, the greater the number of adverse effects.  Risks to children are compounded when children are subject to "outlier" prescribing practices—receiving too many psychotropic drugs or too high a dosage, or receiving drugs at too young an age.

Children in foster care are at increased risk of being improperly or unnecessarily administered psychotropic drugs.  Unlike biological parents, foster caregivers must rely on a child's health records to know her history and needs.  At the same time, frequent changes in placement often are accompanied by changes in a foster child's health care provider, disrupting the child's health care.

When the state removes children into foster care, it assumes an affirmative duty to act *in loco parentis* to keep those children safe.  Yet, according to Plaintiffs, children in Missouri's foster care custody who are prescribed or administered psychotropic drugs are exposed to a grave risk of severe physical and psychological harm because of the state's policies and practices.  Plaintiffs brought this action to remedy three alleged deficiencies in Defendants' policies, procedures, practices, and customs with respect to the administration of psychotropic drugs:  (1) failure to maintain, and to furnish to caregivers and prescribing physicians, up-to-date medical records detailing each child's physical and mental health history; (2) failure to ensure informed consent to the administration of psychotropic medication, both at the outset and as treatment continues; and (3) failure to ensure secondary review of all outlying prescriptions by a qualified, independent child psychiatrist.  According to Plaintiffs, despite the fact that CD is aware that the lack of a reasonable system of oversight and monitoring of the administration of psychotropic medications

2

to children in its custody poses a substantial and ongoing risk of harm to the children, Defendants have failed to address the risk.

After briefing on the class certification motion, CD issued a new "Informed Consent" policy, effective June 29, 2018. It specifies that making an informed decision "about behavioral health treatment or medications without undue influence means that the consenter is deciding based on what is best for the child, not because of pressure to consent to the medication or treatment services." The policy explains that "a decision must not be made based on a school's or other entity's insistence that a child take medication in order to participate or receive services." Doc. 202-7, p. 1. The policy further states:

> Parents often have important historical information about their children's health and valuable insights to aid decision-making. Resource providers have critical information about a child's daily functioning. While children are in the custody of the Children's Division, the Children's Division case manager shall be primarily responsible for granting informed consent for their care. Resource providers may give informed consent for routine or standard treatment.

*Id.* The policy authorizes only frontline practitioners who have successfully completed training to consent to non-routine treatments or services. *Id.*

Since July 2018, the Department of Social Services also has partnered with the Department of Psychiatry at the University of Missouri to "develop and implement innovative multi-system strategies to increase the safety and wellbeing of children and youth involved in child welfare and other related child and family serving systems." Doc. 202-6, p. 2. The center aims to "lead the nation in child welfare, health, and mental health integration." *Id.*

## II. STANDARD

Federal Rule of Civil Procedure 23(f) permits, but does not require, the Court to stay proceedings. *See* Fed. R. Civ. P. 23(f) ("An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders."). In evaluating whether a stay is

appropriate, the Court must consider: "(1) the likelihood that a party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 423 (8th Cir. 1996). "The movant must show that it will suffer irreparable injury unless a stay is granted." *Brady v. NFL*, 640 F.3d 785, 789 (8th Cir. 2011) (citing *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986)).

### III. DISCUSSION

#### a. Whether Defendants Have Shown a Likelihood of Success on the Appeal

The "most important" of the four factors considered in determining whether to issue a stay is the "likelihood of success" on the merits of the appeal. *Brady*, 640 F.3d at 789. Defendants argue that they have raised "important and unsettled questions" regarding the Court's certification of the class of plaintiffs: (1) "what analysis and proof are necessary to conclude that a policy or practice puts every one of thousands of individual class members at a substantial risk of a constitutional-level injury"; (2) "what analysis and proof are needed to conclude that the strict 'cohesiveness' requirement imposed by rule 23(b)(2) has been satisfied"; (3) "what analysis and proof are required to conclude that all members of the putative class face substantial risks of concrete, particularized, and imminent constitutional violations"; (4) whether *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), upon which the Court relied in granting class certification, conflicts with *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); (5) whether the Court ignored "unique defenses" in certifying the class; and (6) whether the Court's class certification decision "create[d] undue pressure to settle . . . ." Doc. 202, pp. 3-5. Defendants insist that the fact that the Eighth

4

Circuit granted Defendants' request for leave to appeal pursuant to Rule 23(f) itself suggests a likelihood of success on appeal.

The Court previously rejected each of these arguments because this case concerns Defendants' policies, practices, and procedures—which apply to all of the class members, regardless of their individual circumstances. Particularly unconvincing are Defendants' arguments that "unique defenses" ought to have prevented class certification, and that the Court's certification of the class put "undue" pressure on Defendants to settle this matter.[1] Defendants did not raise a viable statute of limitations defense in this action for injunctive relief for constitutional violations, and any other purported "unique defense" is irrelevant to the question of whether Defendants' policies, practices, and procedures put the children in their care at a substantial risk of harm.

The Court thus does not believe that Defendants are likely to succeed—or even that they have a fair chance of success[2]—on the merits. The Eighth Circuit's grant of leave to appeal from

---

[1] The assertion that class certification has increased the pressure on Defendants to settle has nothing to do with the merits of class certification, and in any event, there is no evidence to support it. As discussed further below, although Defendants initially denied that Plaintiffs' discovery requests seek only information concerning Defendants' policies, patterns, and practices, they were not able to provide any examples showing otherwise. In short, there is no indication that the scope of discovery will change if the class is decertified. Thus, Defendants have not shown that class certification increased the financial burden that this lawsuit otherwise placed on them. To the extent that Defendants are concerned about "ongoing federal oversight," the concern is speculative. Even if the Court were to grant injunctive relief in this case, it would do so only if Defendants are found to have violated Plaintiffs' constitutional rights, and even in that circumstance, there is no indication that "ongoing" federal oversight would be required after the injunctive relief is fashioned. Furthermore, Defendants have not argued, let alone shown, that class certification has substantially increased the risk of oversight in this case concerning Defendants' policies and practices.

[2] In their reply, Defendants argue for the first time that the Court should apply the "fair chance of prevailing" test that the Eighth Circuit has applied in evaluating preliminary injunctions. However, the cases Defendants cite concern requests for preliminary injunctions. *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (stating that "district courts should still apply the familiar 'fair chance of prevailing' test where a *preliminary injunction* is sought to enjoin something other than government action based on presumptively reasoned democratic processes") (emphasis added); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.

5

the class certification order suggests that Defendants have a *possibility* of succeeding on the appeal, but it does not make success likely. The first and most important factor thus weighs in Plaintiffs' favor.

### b. Whether Defendants Will Be Irreparably Injured Absent a Stay

In addition, Defendants have failed to establish irreparable harm. Defendants argue that "[m]uch of the enormous amount of work that must be done to complete discovery and get ready for trial may be wasted if the Eighth Circuit decides to decertify or narrow the proposed class." Doc. 202, p. 7. However, Plaintiffs have stated that they "stand ready and willing to proceed with their individual claims for relief irrespective of the Eighth Circuit's decision." Doc. 210, p. 5. According to Plaintiffs, regardless of whether the class is decertified, the scope of discovery will not change.

Defendants argue that if the class were decertified, their discovery efforts would be far more limited because they would no longer need to inquire into the circumstances of each individual class member. They argue that the situation of one of the named plaintiffs establishes "how complexities and expenses geometrically expand as the number of plaintiffs moves from single digits to quadruple digits." Defendants suggest that the administration of psychotropic drugs to plaintiff ▇ may have been appropriate under the circumstances, and that psychotropic

---

1981) ("clarify[ing] the standard to be applied by the district courts of this circuit in considering requests for *preliminary injunctive* relief") (emphasis added); *James River Food Control Ass'n v. Watt*, 680 F.2d 543, 545 (8th Cir. 1982) (staying district court's injunction); *O'Toole v. City of Walnut Grove, Mo.*, 238 F. Supp. 3d 1147, 1149 (W.D. Mo. 2017) (considering whether to "issue a preliminary injunction"). Defendants have not cited any case considering a motion to stay a proceeding pending appeal that applied the "fair chance of prevailing" test, and the Court is not aware of any cases within the Eighth Circuit applying such a test. In any event, the Court need not decide whether the "fair chance of prevailing" test should apply in evaluating a motion for a stay pending appeal because, regardless of whether the "fair chance of prevailing" test applies, the factor of likelihood of success on appeal does not weigh in Defendants' favor.

6

medications may not be responsible for the symptoms in ▮ that Plaintiffs paint as adverse effects of the drugs. But this argument is premised on an incorrect assumption. The issue in this case is not whether it was appropriate for any of the named plaintiffs or members of the class to be administered psychotropic drugs. Rather, the question is whether Defendants are adequately *overseeing* the administration of psychotropic drugs to these children. Whether or not a given child should be administered such drugs is irrelevant to the question of whether CD has—and whether CD should have—adequate safeguards in place to ensure that the drugs are administered only when appropriate. Thus, Defendants' example does not establish that the scope of discovery will change if the class is decertified.

Outside of this meritless argument, Defendants have failed to specify—either in their papers, or even when asked directly during oral argument—how discovery in this case would be different if the class were decertified. Defendants argue that "completing discovery and preparing for trial on six due process claims – as opposed to more than 6,000 – would be materially different" (Doc. 202, p. 7), and that "Plaintiffs are not entitled to whatever discovery they want merely by saying '*Monell*'" (Doc. 222, p. 9). However, they have not identified a single discovery request that would become overly broad or unduly burdensome if the class were decertified. Indeed, Plaintiffs' counsel stated during argument that Plaintiffs' discovery requests do not seek case files for the approximately 3,000 children in the class, but instead seek business records and other documents and information concerning how and to what degree Defendants' policies and procedures are implemented—documents and information that, Plaintiffs insist, would be relevant regardless of whether the class is decertified. Defendants in effect did not contest Plaintiffs' assertion.

7

None of the cases that Defendants cited in arguing that the case should be stayed while the class certification order is appealed alleges constitutional or similar violations dependent on showing a pattern, practice, procedure, policy, or custom. *See Willcox v. Lloyds TSB Bank, PLC*, No. 13-00508, 2016 WL 917893, at *1 (D. Haw. Mar. 7, 2016) (alleging breach of contract); *Risinger v. SOC LLC*, No. 12-00063, 2015 WL 7573191, at *1 (D. Nev. Nov. 24, 2015) (alleging fraud); *IBEW Local 98 Pension Fund v. Best Buy Co.*, No. 11-429, 2014 WL 4540228, at *1 (D. Minn. Sept. 11, 2014) (alleging securities violations); *Reyes v. Educ. Credit Mgmt. Corp.*, No. 15-00628, 2018 WL 1316129 (S.D. Cal. Mar. 13, 2018) (alleging violations of the Telephone Consumer Protection Act and the California Invasion of Privacy Act—*see Reyes v. Educ. Credit Mgmt. Corp.*, No. 15-00628, 2016 WL 2944294, at *1 (S.D. Cal. May 19, 2016)); *Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-04984, 2016 WL 6082413, at *1 (N.D. Cal. Oct. 18, 2016) (alleging problems with mattresses sold by defendants); *Stuart v. State Farm Fire & Cas. Co.*, No. 14-4001, 2017 WL 5952872, at *1 (W.D. Ark. Jan. 25, 2017) (alleging breach of insurance policies and unjust enrichment); *Senne v. Kansas City Royals Baseball Corp.*, No. 14-CV-00608-JCS, 2017 WL 5973487, at *1 (N.D. Cal. May 5, 2017) (alleging claims under the Fair Labor Standards Act); *Perrin v. Papa Johns Int'l, Inc.*, No. 09-01335, 2014 WL 306250, at *1 (E.D. Mo. Jan. 28, 2014) (same); *Pena v. Taylor Farms Pac., Inc.*, No. 13-01282, 2015 WL 5103157, at *1 (E.D. Cal. Aug. 31, 2015) (alleging violations of California labor laws); *Ewing Indus. Corp. v. Bob Wines Nursery, Inc.*, No. 13-931, 2015 WL 12979096 (M.D. Fla. Feb. 5, 2015) (alleging violations of the Telephone Consumer Protection Act—*see Ewing Indus. Corp. v. Bob Wines Nursery, Inc.*, 795 F.3d 1324, 1325 (11th Cir. 2015)); *Gray v. Golden Gate Nat'l Recreational Area*, No. 08-00722, 2011 WL 6934433, at *2 (N.D. Cal. Dec. 29, 2011) (concerning disability access); *Richards v. Ernst & Young LLP*, No. 08-4988, 2012 WL 92738, at *1 (N.D. Cal. Jan. 11, 2012) (alleging

violations of California's overtime laws). While the scope of discovery in a case alleging labor law violations, for example, would be affected by a class certification decision, the same cannot be said in this case, in which, in order to succeed, Plaintiffs must establish that Defendants have a policy, pattern, custom, or practice of inadequately overseeing the administration of psychotropic medications to children in CD's custody.

In short, Defendants have failed to establish—either through examples of potentially overly broad discovery requests or through relevant case law—that the scope of discovery in this constitutional case would be different if the class were decertified. Because Defendants have not substantiated their argument that they will be prejudiced if discovery is not stayed, they have failed to establish irreparable harm. *See McAllister v. St. Louis Rams, LLC*, No. 16-172 SNLJ, 2018 WL 2180247, at *1 (E.D. Mo. Apr. 9, 2018) (denying defendant's motion to stay case, noting that "[a]ny discovery conducted . . . is unlikely to have been 'useless,' even in the event that the Eighth Circuit . . . reverses class certification, because such discovery would still be relevant to individual claims").[3]

### c. Whether the Stay Will Substantially Injure Plaintiffs

A threat to a constitutional right is generally presumed to constitute irreparable harm. *See Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) (holding, in voting rights case, that "when constitutional rights are threatened or impaired, irreparable injury is presumed" and denying defendant secretary of state's motion for a stay pending appeal); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (stating, in affirming preliminary injunction, that "it is

---

[3] To the extent that Defendants argue that deadlines for dispositive motions and trial briefs should be stayed, in light of the fact that those deadlines are months away (*see* Doc. 202, pp. 6-7), the request is premature.

the alleged violation of a constitutional right that triggers a finding of irreparable harm"); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary") (quoting Wright & Miller, Federal Practice and Procedure, § 2948 at 440 (1973)); *Hicklin v. Precynthe*, No. 16-01357-NCC, 2018 U.S. Dist. LEXIS 21516, at *32 (E.D. Mo. Feb. 9, 2018) ("[T]he deprivation of Ms. Hicklin's constitutional rights under the Eighth Amendment is alone sufficient to establish irreparable harm.").

Danger to health also generally warrants a presumption of irreparable harm. *See Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003) (finding, in case seeking to compel Nebraska agency to continue plaintiffs' Medicaid benefits, that "the danger to plaintiffs' health, and perhaps even their lives, gives them a strong argument of irreparable injury"); *Hiltibran v. Levy*, No. 10-4185-NKL, 2010 U.S. Dist. LEXIS 143363, at **18-19 (W.D. Mo. Dec. 27, 2010) (finding that "substantial risk of institutionalization" and likelihood that plaintiffs would "suffer from skin deterioration and infections" constituted risk of irreparable harm); *Heather K. v. City of Mallard*, 887 F. Supp. 1249, 1266 (N.D. Iowa 1995) (finding "irreparable harm" where "continued open burning pose[d] a very real health threat, possibly even a mortal threat, to Heather K. for which she has no adequate remedy at law"); *see also Majid Abdulla Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (noting that, "where the health of a legally incompetent or vulnerable person is at stake, irreparable harm can be established") (citing cases).

Here, Plaintiffs allege substantial threats to their constitutional rights and their health. They are foster children who claim to face the risk of severe physical and psychological harm because of Defendants' alleged failure to adequately oversee the administration of psychotropic drugs. Plaintiffs charge that Defendants' failure to maintain adequate medical records, to implement an

adequate informed consent policy, and to implement a system for flagging outlying prescriptions for review needlessly subjects Plaintiffs to the substantial risk of various serious adverse health effects. Defendants do not deny that these drugs are particularly potent when administered to children, and that they can have such adverse effects as psychosis, seizures, irreversible movement disorders, organ damage, suicidal thoughts, type 2 diabetes, aggression, and weight gain. Defendants also do not deny that the longer a child is on a given psychotropic medication, the greater the number of adverse effects.

As evidence of the risk of harm, Plaintiffs cite the fact that the now ███████ ████████ has started and/or stopped at least ten different psychotropic medications in the last three years. *See* Doc. 210-1, p. 1; Doc. 210-2, p. 3; Doc. 210-5, pp. 1-2. ███████ ████████████████████████ (Doc. 210-1, p. 1) ███████ ████████████ (Doc. 210-2, p. 1). ██ has experienced incidents of aggression, anxiety, tremors, fatigue, paranoia, and worsening depression (Doc. 210-4, at 1; Doc. 210-5, at 5, 8; Doc. 210-6, at 2; Doc. 210-7, at 1)—all of which may be attributable to psychotropic drugs (Doc. 209-2, at 36-42; Doc. 209-3, at 3-5; Doc. 209-4, at 1). Defendants argue that ██'s symptoms may not be the product of psychotropic drugs, but they present no definitive evidence suggesting that ██ is not at risk.

Defendants also present no argument as to why the Court should disregard other examples provided by Plaintiffs of children harmed or at risk of harm because of the purported lack of oversight of the administration of psychotropic drugs. *See* Doc. 210-8, at 1 ("[A]m very troubled by the ongoing amount of polypharmacy I see in patients, esp those in foster care. . . . The 11 1/2 yo with a BMI of 37.5 has Lamotrigene, Guanfancine, and Risperidone listed . . . . She was so sedated at 2 pm that I had a difficult time waking her up for an interview and exam. . . . If these

were my regular pts, I would be working very hard to find a child and adolescent psychiatrist to help reduce the medication burden but these girls were here for a very specific problem and likely will not receive their medical care in our office, so they will continue being at the mercy of adult providers who practice polypharmacy."); Doc. 210-11, p. 1 ("She is now 2 yrs and 11 months. her [*sic*] foster mother tells me that she has been on Risperdal 0.25 mg daily and clonidine 0.1 1/2 tab hs. cyberaccess [*sic*] only shows the clonidine, so I assume that the Risperdal is being purchased separate of the toddler's medicaid insurance. . . . I am afraid that this case illustrates what happens too often with children placed in care in our area. While I am (unfortunately) used to seeing older kids with polypharmacy, I don't think I have ever seen one quite as young as this toddler on polypharmacy. This feels so wrong! . . . I feel that we must have some sort of systemic response to this ever growing issue."); Doc. 210-12, p. 1 ("I agree that the system we had took too long, if we have custody and request a medication check the people doing that should be able to contact the facility and gain the information a lot faster than we can being the middle man. Because in one of their emails they stated the child could have <u>lithium toxicity</u>.") (emphasis in original); *id.,* p. 2 ("This is an appointment to see if this 6-7 year old boy is on too much medication. If he is on too much medication, every day that goes by gets worse and worse. . . . My clients have begged MCD for help for this for months and have received nothing. The lack of urgency is alarming and disturbing."); Doc. 210-9, p. 2 ("At about 7-8, taking too many meds in a.m. to count; at night taking maybe 8. When I was walking around in the a.m., don't remember it, I was a zombie. . . . they removed all my meds after I forgot to take them and I was doing better."); Doc. 210-13, at 2 ("He has an allergy to Seroquel resulting in 'Seizure like symptoms.' . . . This was not documented in the recent hospital records but he was on Levthyroxine 0.05mg per day upon admission around July or August."); Doc. 210-14, p. 1 ("They are very concerned about him being on these meds.

They feel he is over medicated. They say he is sleepy, he drools, his hands shake, etc. . . . [I]t was decided that they needed to get a second opinion. . . . They also stated that CD has not scheduled the appointment with their psychiatrist. They stated it can take as long as 2 months to get an appointment with a psychiatrist."); Doc. 210-15, p. 1 ("It was discovered his levels were such that he was experiencing Lithium toxication. [Patient] was then airlifted to Cardinal Glennon Children's Hospital in order to undergo dialysis. He was placed in the intensive critical unit."); Doc. 210-16, p. 2 ("[Patient] was found to have high Lithium levels in her blood on or around 1-30-16 following regular blood level testing and was expressing homicidal and suicidal thoughts with a plan in mind for those thoughts."); Doc. 210-17, p. 1 ("Once the ambulance arrived . . . Great Circle staff reassured her that everything would be okay and that she needed to get her medications straightened out so that she wouldn't have all that anger and wanting to hurt herself and others.").[4]

Defendants point to two changes that they insist address Plaintiffs' concerns: their new "Informed Consent" policy and their new partnership with the Department of Psychiatry at the University of Missouri. However, Defendants do not suggest that they have taken steps to improve the purported deficiencies in their medical record management. They also do not argue that the informed consent policy assuages all of Plaintiffs' concerns about Defendants' consent policies. Moreover, Defendants do not suggest that the new partnership with the University of Missouri provides for a second opinion where outlying prescriptions are concerned. In short, Defendants have failed to overcome Plaintiffs' showing that a stay of these proceedings would subject them to a greater risk of harm.

---

[4] In light of the fact that discovery is ongoing, and this is a motion for a stay, rather than, for example, a motion for summary judgment, Plaintiffs were not required to present sworn testimony substantiating the facts evidenced by the documents they submitted in opposition to Defendants' motion. The referenced documents appear to have been produced by Defendants, and Defendants do not deny their authenticity.

13

Defendants argue that the Eighth Circuit is likely to decide the pending appeal fairly quickly, so any stay is likely to be of short duration. Doc. 202, p. 9. However, in *Postawko v. Missouri Department of Corrections*, a case that Defendants liken to this one, the Eighth Circuit granted permission to appeal the class certification order on September 19, 2017. Well over a year later, no decision has issued. The prospect of a delay of more than a year in this case only underscores the risk of harm to Plaintiffs in the absence of expedient litigation.[5]

### d. Where the Public Interest Lies

As discussed above, Defendants have not shown that they would suffer any prejudice if the case were not stayed at this time. For the same reason, there is no indication that permitting this case to proceed as scheduled would result in a waste of judicial resources. As such, there is not as yet any risk that public funds would be wasted in this litigation. On the other hand, there is no dispute that the public has an interest in a prompt resolution of this case concerning whether Defendants' oversight of the administration of psychotropic drugs to children in Missouri's foster care is constitutionally adequate. *See* Doc. 222, p. 11 ("Protecting foster children is indisputably important and in the public interest."). Thus, the public interest does not weigh in favor of a stay.

### e. Balancing the Factors

The Court ultimately "must consider the relative strength of the four factors, 'balancing them all.'" *Brady*, 640 F.3d at 789. Here, all of the factors weigh in favor of not staying this proceeding.

---

[5] Contrary to Defendants' contention, there is no inconsistency between Plaintiffs' counsel's having sought relatively short extensions of time in this case for good reasons, and having agreed to relatively short extensions of time requested by Defendants (a courtesy lawyers typically extend to one another), and their refusal to agree to an indefinite stay of these proceedings.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for a stay pending appeal is DENIED. If any party believes that a stay of post-discovery deadlines is warranted, he or she may move at the appropriate time to stay those deadlines pending appeal.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: October 29, 2018  
Jefferson City, Missouri