1

2              IN THE UNITED STATES DISTRICT COURT FOR THE
                      WESTERN DISTRICT OF MISSOURI
3                           CENTRAL DIVISION

4
   M.B., by and through NEXT      ) Case No. 17-04102-CV-C-NKL
5  FRIEND ERICKA EGGEMEYER,       ) Kansas City, Missouri
   et al.                         ) November 20, 2019
6                                 )
            Plaintiffs,           )
7                                 )
   vs.                            )
8                                 )
   JENNIFER TIDBALL, et al.,      )
9                                 )
            Defendants.           )
10 _____ )
                             REDACTED
11            SEALED TRANSCRIPT OF SETTLEMENT CONFERENCE
                        AND FAIRNESS HEARING
12           BEFORE THE HONORABLE LAJUANA M. COUNTS
                   UNITED STATES MAGISTRATE JUDGE
13
   APPEARANCES:
14 For the Plaintiffs:            Ms. Samantha Bartosz
                                  Children's Rights, Inc.
15                                88 Pine Street, Ste. 800
                                  New York, NY  10005
16                                (646) 942-4252

17                                Ms. Leecia Welch
                                  405 14th Street, 15th Floor
18                                Oakland, CA  94618
                                  (510) 835-8098
19
                                  Mr. Scott T. Schutte
20                                Morgan Lewis
                                  77 West Wacker Drive
21                                Chicago, IL  60601
                                  (312) 324-1000
22
                                  Mr. John J. Ammann
23                                St. Louis Univ. Legal Clinic
                                  100 North Tucker
24                                St. Louis, MO  63101
                                  (314) 977-2796
25

```
 1

 2

 3
    For the Defendants:            Ms. Melanie Pennycuff
 4                                 Missouri Att. General's Office
                                   815 Olive Street, Ste. 200
 5                                 St. Louis, MO  63101
                                   (573) 291-9261
 6

 7

 8

 9

10

11  Court Audio Operator:          Ms. Traci Chorny

12

13

14

15

16

17  Transcribed by:                Rapid Transcript
                                   Lissa C. Whittaker
18                                 1001 West 65th Street
                                   Kansas City, MO  64113
19                                 (816) 914-3613

20

21

22

23

24
    Proceedings recorded by electronic sound recording, transcript
25  produced by transcription service.
```

1      (Court in Session at 9:05 a.m.)

2      THE COURT:  All right.  We are here on Case No. 17-

3 04102-CV-NKL, *M.B., et al. vs. Jennifer Tidball, et al*.  I would

4 ask for appearances from the plaintiffs' attorneys.

5      MS. BARTOSZ:  Good morning, Your Honor.  Samantha

6 Bartosz from Children's Rights on behalf of the plaintiffs.  And,

7 Your Honor, I'm joined by my co-counsel Leecia Welch from the

8 National Center for Youth Law, Scott Schutte for the firm of

9 Morgan Lewis, and John Ammann from the St. Louis University Law

10 Clinic.

11      THE COURT:  All right.  Thank you.  And for the

12 defendants?

13      MS. PENNYCUFF:  Melanie Pennycuff from the Missouri

14 Attorney General's Office, Your Honor, for the defendants.  And I

15 have with me the client representatives.

16      MR. GUTCHEN:  Mark Gutchen, Missouri Department of

17 Social Services, general counsel and --

18      MS. GENTLEMAN HOGG:  Lisa Gentleman Hogg of Department

19 of Social Services, special counsel for MO Healthnet.

20      MR. GUTCHEN:  Right.  And we haven't entered an

21 appearance formally on the case.  We're client representatives,

22 so.

23      THE COURT:  Okay.  All right.  Thank you.  Thank you.

24      MS. BARTOSZ:  Your Honor, if I may, I'll introduce the

25 Court to our next friend from the plaintiffs' side of this case.

1          THE COURT:  Yes.

2          MS. BARTOSZ:  Kris Dadant is here joining us today.

3          THE COURT:  All right.  Thank you.

4          MS. BARTOSZ:  And she appeared on behalf of the named

5    Plaintiff K.C.

6          THE COURT:  All right.  Thank you.  Welcome.  All right.

7    We are here for the final fairness hearing.  And this is pursuant

8    to a Rule 23(e) of the Federal Rules of Civil Procedure on

9    whether this settlement that has been reached and proposed is

10   fair and reasonable and adequate.  All right.  So, the Court -- I

11   just wanted to go over some of the procedural things that I know

12   that Judge Laughrey has already entered her preliminary order

13   approving the Settlement Agreement.  And that was filed on July

14   the 15th of 2019.  And that was setting up a notice that needed

15   to be sent out to the class as well as setting this date for the

16   final fairness hearing.  For this hearing, the -- to make the

17   ruling that it's fair, reasonable and adequate, this Court or the

18   District Court finally will make the ruling that the class

19   representatives and counsel have adequately been represented the

20   class, that the proposal was negotiated at arm's length, that

21   relief provided for the class is adequate taking into

22   consideration certain things.  And I know that's reflected in the

23   parties' motion -- joint motion for approval.  And then this

24   Court needs to make sure that the proposal treats the class

25   members equitably relative to each other.  So, I understand this

1  is more of an attorney-led type of hearing, and so I will have --

2  okay.

3          MS. BARTOSZ:  Your Honor, if I may?

4          THE COURT:  Bartosz.

5          MS. BARTOSZ:  Samantha Bartosz.

6          THE COURT:  Bartosz.  Yes.  All right.

7          MS. BARTOSZ:  Yes, Your Honor.  Thank you.  And if I

8  may, Your Honor?

9          THE COURT:  Yes.

10          MS. BARTOSZ:  Good morning.  It's nice to be here.

11          THE COURT:  Good morning.

12          MS. BARTOSZ:  And, Your Honor, the parties jointly are

13  appearing here today seeking final approval of the Settlement

14  Agreement they reached on behalf of a certified class of children

15  in Children's Division foster care custody, who presently are, or

16  in the future will be prescribed or administered one or more

17  psychotropic medications while in state care.  That is the class

18  on whose behalf we're seeking this Settlement Agreement and final

19  approval of it.

20          THE COURT:  Yes.

21          MS. BARTOSZ:  And as Your Honor has noted, Judge

22  Laughrey previously in July granted preliminary approval of the

23  settlement.  We're here today seeking final approval.  Your

24  Honor, it was back in June of 2017, June 12th to be precise, that

25  plaintiffs commenced this suit naming as defendants the Director

of the Children's Division of the Department of Social Services
and the Acting Director of DSS in their official capacities. The
Complaint basically stated two causes of action, both
constitutional in nature, one for alleged violation of
substantive due process rights, and one for alleged violations of
procedural due process rights. That Complaint was challenged on
a motion to dismiss. And the court entered an order sustaining
the substantive due process count, but dismissing from that count
the informed consent issue, but leaving the informed consent
issue alive through the procedural due process count. Your
Honor, what is this suit about? What did the Complaint allege?
Basically, that falls into three buckets. First, plaintiffs
allege that DSS was failing to maintain and furnished to care-
givers and prescribing physicians up-to-date medical records that
detailed each child's physical and mental health history. In
other words, sufficient information to make diagnostic decisions
and treatment decisions was not always available when the child
met with a mental health provider. Two, we allege that DSS was
failing to ensure informed consent to the administration of
psychotropic medications both at the outset of such treatment and
as the treatment continued. And finally, we allege that DSS was
failing to assure that there was secondary review of outlier
prescriptions by an independent child psychiatrist or other
qualified professional to assess whether there were any risks
that needed to be addressed. That was the basic outliner

framework of the Complaint.  Your Honor, I am pleased to report to the Court that the parties have reached a Settlement Agreement that very much addresses those areas raised by the Complaint. And if I may, I'd just like to list what I think are the key benefits or commitments that are made in the Settlement Agreement.  DSS has committed as follows: It will train all case management staff and resource providers in relation to psychotropic medications, how they affect the system, the risks, the benefits, making these people better informed as they work with children and doctors in an environment in which these drugs are administered.  Second, DSS is committed to maintain a comprehensive set of medical records so that they can be available to foster care providers in providing day-to-day care to children and as importantly, available to mental health professionals as they diagnose these children so that they are aware of the health history, the behaviors, everything a doctor would want to know in making a diagnosis and formulating a treatment plan, an especially important item, Judge, given the foster care milieu, if you will, in which children move from home to home to home unfortunately more frequently than we'd like. And their lives, including their mental health and medical histories, can become scattered as a result.  So, having a set of medical records and mental health records, that history that can be drawn upon is essential.  The state is committed to be on top of that.  Additionally, the state has agreed to build a secondary

1 review system.  What is that?  The state has contracted with the

2 University of Missouri Medical School to create standup -- what

3 is being called the Center for Excellence.  That center will have

4 multiple tasks that it undertakes.  But one key thing the center

5 will be doing is providing secondary reviews of outlier

6 prescriptions made to children.  They will be available up-front

7 at the time of initial diagnosis and prescription and later on as

8 the child is progressing on the prescription to take a look at

9 the underlying records, the child's health, the child's reaction,

10 and assure that there aren't risks that are being missed.

11        THE COURT:  Okay.

12        MS. BARTOSZ:  That is being stood up.  And additionally,

13 DSS has committed to implement a rigorous informed consent and

14 youth assent process, including documentation so that practice

15 can be tracked in the aggregate.  And this is basically to assure

16 that for each and every prescription of a psychotropic medication

17 to a youth in foster care, there is a record of an actual

18 dialogue between doctor and consent giver that shows benefits

19 were discussed, risks were discussed, how the medication is to be

20 administered is discussed.  We see that record.  We know safety

21 has been taken into consideration in each and every case.  And

22 finally, Judge, DSS is committed to stand up with the state a

23 Psychotropic Medication Advisory Committee, which will provide

24 professional and technical consultation and policy advice on

25 issues relating to psychotropic medication.  We're very excited

1  about that.  It should provide great technical assistance in

2  implementing the reforms that I've just outlined.

3          THE COURT:  I just have a question.

4          MS. BARTOSZ:  Yes.

5          THE COURT:  So, the advisory committee, who will they be

6  composed of?  Have you talked about that?

7          MS. BARTOSZ:  Mr. Gutchen, can you help me?  I think

8  you've already stood up the committee.

9          MR. GUTCHEN:  Yes, Your Honor.  Actually the committee

10 has already met.  And again, the committee is going to meet, I

11 believe, on the 25th.  So, the committee under the Settlement

12 Agreement and it actually is going on right now, it's chaired by

13 a Circuit Court Judge Sue Crane who is going to start next week

14 but she's kindly taken on.  She's a judge with many years of

15 juvenile court experience.  We have several board-certified child

16 psychiatrists, including both our expert in this case, who is

17 with the University of Missouri College of Psychiatry.  Also, the

18 plaintiff expert in the case has kindly agreed to continue on and

19 is serving on our committee.  That's Dr. Bellonci from Harvard.

20 We've got several pediatricians.  We've got pharmacists.  We have

21 got three members -- three kids who are currently in foster care

22 who are very articulate and were very helpful in their

23 presentations at the last meeting that we had.  We have got a

24 representative from the Missouri Hospital Association, I believe

25 he is present today, who is going to be joining the committee

1   next week.  I think we've got two members from there.  We've got

2   some residential care providers.  We have got a parents' attorney

3   who represents the interests of the parents' attorneys.  We've

4   got a guardian *ad litem* who represents interests of children.

5   So, I think that covers most of them.  We tried to get a big

6   cross-section of the, you know, the groups that we -- the

7   stakeholders that we interact with on a daily basis to make sure

8   that the kids are getting the medical care that they need.

9          THE COURT:  All right.  Thank you.  That's a very

10  comprehensive committee.  All right.

11         MS. BARTOSZ:  Yes.  That committee will meet

12  periodically to stay on top of these issues, provide technical

13  assistance, so as this Settlement Agreement, should it be finally

14  approved, as it goes into implementation, we can, along the way,

15  as we collect data and study what is occurring out in the real

16  world, fine tune our approaches to implementing it as we go.  So,

17  it's excellent that we'll have the professional support from this

18  committee.

19         THE COURT:  All right.

20         MS. BARTOSZ:  Your Honor, this settlement was reached by

21  the parties in a very fully-informed and thoughtful way.  This

22  Settlement Agreement did not come quickly or by accident.  And

23  I'd like to address that in two ways for the record, Judge.  One,

24  how fully informed were we; and, two, what was the settlement or

25  mediation process.  There was certainly nothing approaching

1  anywhere near collusion in coming to this Settlement Agreement.

2  Your Honor, first of all, this agreement was reached late in the

3  litigation stages of this case.  Discovery had proceeded a long

4  way.  Plaintiffs had received approximately 1.5 million pages of

5  documents to review.  They produced an additional 50,000 or so

6  pages to defendants for their review.  So, there was plenty of

7  business record and other record reviews taken place to inform

8  counsel.  Additionally, the parties engaged in 50 fact and

9  30(b)(6) depositions of state officials and others and derived

10  great information from that that could be considered in talking

11  about a settlement.  Additionally, the plaintiffs had retained

12  experts in the fields of psychiatry, pharmacology and statistics,

13  as well as a medical provider, and submitted four expert reports

14  to the defendants as we were mediating this case that fleshed out

15  the issues in the case and the showings that plaintiffs

16  anticipated making were there a trial.  Suffice it to say,

17  through all of that effort these issues were well-known to both

18  sides of this case at many levels.  And the parties were in a

19  position to get together and really speak with confidence about

20  the matters on which we wanted to reach settlement and to do so

21  in a very informed way.

22       Your Honor, the mediation in this case at the end was

23  highly productive.  It took much time.  We're very pleased it

24  occurred.  And at this time, Judge, I would like to give thanks

25  to the court mediator here, Jill Morris, to whom this case was

1　referred.　And I think she's here hiding in the back of the

2　courtroom.

3　　　　　　　THE COURT:　Oh, she is.

4　　　　　　　MS. BARTOSZ:　Yeah.　But Ms. Morris provided incredible

5　assistance in mediating this matter.　Your Honor, the mediation

6　involved several trips to Kansas City.　We met in Ms. Morris's

7　offices here.　All the parties got together, both counsel and

8　client representatives.　And we took the issues up one at a time.

9　And, Your Honor, these discussions sometimes were most cordial.

10　Sometimes they were most contentious.　It wasn't necessarily a

11　straight line that got us here, but I think the point is we

12　wrestled over it and we thought hard and we weren't shy about

13　putting the issues on the table.　And we reached what we believe

14　to be consensus or compromise around key points that the state

15　could commit to undertake to assure safety for children in foster

16　care when it comes to psychotropic medications.　And we're glad

17　we went through that process.　And beyond having counsel and

18　clients, Your Honor, present for the mediation, the parties also

19　reached out to experts to address some of the issues with us as

20　we worked through them.　The state involved Dr. Laine Young-

21　Walker and Dr. Patsy Carter along the way.　Plaintiffs brought

22　Dr. Christopher Bellonci from Harvard into the conversations.

23　So, as we worked through the settlement issues, we were not only

24　informed by discovery we did, we were informed by professionals

25　in the field who could help us out.　So, that's the backdrop for

1  the settlement and I think manifestly it results from a well-
2  informed and thoughtful and deliberative process.

3        THE COURT:  I understand it took over a year for the
4  mediation.

5        MS. BARTOSZ:  Yeah.  It was probably 10-11 months.

6        THE COURT:  Okay.

7        MS. BARTOSZ:  And it was rigorous work.  Ms. Morris kept
8  us busy.

9        THE COURT:  Okay.

10       MS. BARTOSZ:  And we worked hard.  We exchanged a lot of
11  drafts, but we're I think both very pleased with the final
12  document.  Of course, as always, it required some compromise
13  between the parties on certain points.  And I won't represent to
14  the Court that we've reached the perfect agreement.  But we
15  didn't let the perfect get away -- get in the way of providing
16  real solid concrete benefits to the children and families in
17  Missouri.  So, we're pleased to have signed the agreement that we
18  have.

19       Your Honor, as part of the process leading up this
20  fairness hearing, notice has been given to absent class members,
21  other stakeholders where we've shared the Settlement Agreement
22  with them and they have been free to review that and submit
23  comments supporting the agreement, raising concerns, whatever
24  that might be.  We collected all those comments, shared them
25  amongst counsel, reviewed them, and we've presented them to the

1  Court with our motion.  Generally, Your Honor, these comments

2  were supportive of the idea of having more safeguards in place

3  for administering psychotropic drugs.  There are a couple of

4  comments, and I think we'll hear from stakeholders here today

5  that raised concerns, specifically with respect to informed

6  consent in emergency situations.  So, I tagged that issue for

7  Your Honor.  I think we'll hear from a stakeholder on that.  And

8  once we hear them, we're happy to respond and give our thoughts.

9  But that is the one challenge or concern that has been raised

10 that we're probably going to want to talk through a little bit

11 today.

12         THE COURT:  Okay.  So, was there just one --

13         MS. BARTOSZ:  I think there may be multiple people --

14         THE COURT:  Multiple.

15         MS. BARTOSZ:  -- who want to approach --

16         THE COURT:  Okay.

17         MS. BARTOSZ:  -- and address the Court.  But Mr. Al

18 Greimann --

19         MR. GUTCHEN:  We need to remember to tell them that the

20 courtroom changed so there might --

21         MS. BARTOSZ:  Yes, I will do that.  Mr. Al Greimann from

22 Royal Oaks Hospital will be here to address this informed

23 consent --

24         THE COURT:  Okay.

25         MS. BARTOSZ:  -- emergency issue.  And, Your Honor, just

1 as a housekeeping matter, this was originally noticed this

2 hearing for Judge Laughrey's courtroom.

3          THE COURT:  Yes.

4          MS. BARTOSZ:  We've moved it.  I don't think the parties

5 are a hundred percent confident that everyone is aware of that

6 adjustment.  It may be that we have some folks at Judge

7 Laughrey's courtroom right now who wanted to address the Court.

8 And if we could go up and knock on that door and check we'll

9 hustle those people down.  But there may be a few, there may be

10 none, but we think we ought to check on that.

11          THE COURT:  You know, hopefully when people walked in

12 the CSOs, they didn't --

13          MS. WELCH:  Yeah.  We had to go get some people before

14 court started, Your Honor.

15          THE COURT:  Okay.

16          MS. WELCH:  So, there may be some lingerers up there.

17          THE COURT:  Okay.  So, I don't know if the doors were

18 closed to Judge Laughrey's courtroom, but you're more than

19 welcome to go and see if there are people who happen to go --

20          MS. CHORNY:  I'm instant messaging Judge Laughrey's

21 clerk to see if she can check for us.

22          THE COURT:  Okay.  So, we're having -- seeing if Judge

23 Laughrey's clerk can make sure as well that anyone who needs to

24 be down here will be down here for any comments.  Okay.  I'm

25 sorry to interrupt.

1      MS. BARTOSZ:  Oh, please, Judge.  Thank you.  Finally,

2  Your Honor, and I'll pass the baton to defense counsel, Melanie

3  Pennycuff, the Settlement Agreement is to be in the public

4  interest.  Your Honor, we think that is manifestly apparent in

5  this case.  All citizens of the State of Missouri have a keen

6  interest in the safety and health of the children of this state.

7  And a settlement that's designed to provide safeguards in

8  administering powerful psychotropic medications to kids, that's

9  something everyone in the state ought to care about.  I think

10  we're furthering an interest that will bring great good to the

11  State of Missouri and I think the public interest element is more

12  than adequately met.  And at that, Your Honor, I'll pass the

13  baton.

14      THE COURT:  All right.  Well, thank you.

15      MS. BARTOSZ:  Thank you.

16      THE COURT:  Thank you very much.  All right.  Ms.

17  Pennycuff.

18      MS. PENNYCUFF:  Your Honor, I'm Melanie Pennycuff for

19  the defendants.  I echo the comment of Ms. Bartosz.  Mark Gutchen

20  from DSS has been involved in this case from the beginning and I

21  believe has a couple of comments he would like to make, --

22      THE COURT:  Okay.

23      MS. PENNYCUFF:  -- if it please the Court.

24      MR. GUTCHEN:  Your Honor, thank you very much.  On

25  behalf of the Missouri Department of Social Services, we also

1   commend to this Court the proposed Settlement Agreement.  And I

2   will not repeat everything that was said because we

3   wholeheartedly join in everything that was said by plaintiffs'

4   counsel.  We appreciate the long, hard work and even the

5   occasional, not so occasional, vigorous discussion back and forth

6   over lots of different issues.  But we think that we've worked

7   out or we're confident that we have worked out a Settlement

8   Agreement that is in the best interest of everybody that we are

9   committed to serve, which is the children and the families of the

10  State of Missouri.  I think the only thing that I would add is as

11  we go -- went through the year of settlement discussions, and

12  some of them were every other week for multiple hours at a time,

13  so many, many hours were spent on settlement discussions, it

14  really became clear the complexity of the issues that we were

15  dealing with.  And I think it's important to note that there are

16  lots of different interests.  There are lots of different

17  stakeholders.  And the Department of Social Services really has

18  to take a very broad comprehensive view of obviously the best

19  interests and safety of the children are the paramount

20  consideration.  But in order to make sure that we do that, we

21  need to work with physicians.  We need to work with hospitals.

22  We need to work with psychiatrists and pharmacists and IT

23  specialists.  So, the settlement, you know, the Settlement

24  Agreement involves a lot of technical expertise from everybody

25  from physicians to technical experts in computer systems and

1  large computer systems.  So, I think it's important to note that

2  it's a really comprehensive proposal.  And the other thing is, is

3  that the Settlement Agreement sets out a process because making

4  sure that kids are safe and getting the appropriate care that

5  they need is a long-term, constant process of work.  The

6  standards of medical care and the knowledge in the medical

7  community change.  And the Settlement Agreement I think that

8  we've worked out reflects the fact that there needs to be that

9  technical expertise in a continuing, you know, a continuing

10 process of review.  And so, you know, we strongly believe that

11 this is in the best interest of the children.  It's in the best

12 interest of the public.  And again, we want to thank our

13 mediator.  I don't think we would have been able to do it without

14 her.  She's absolutely amazing.  We really appreciate all the

15 hard work and patience that she put into it on dealing with our

16 little temper tantrums at each other every once in a while.  But

17 she was a consummate professional and we really appreciate her

18 work.  And we really would request that the Court finally approve

19 the Settlement Agreement so we can go farther.  Thanks.

20         THE COURT:  All right.  Thank you.  Thank you.

21         MS. BARTOSZ:  Your Honor, may I make just a couple more

22 remarks --

23         THE COURT:  Yes.

24         MS. BARTOSZ:  -- about this Settlement Agreement, and I

25 think virtues of the agreement?  First of all, there's

1   transparency.  The parties have agreed to a process by which

2   periodic reports will be prepared measuring the progress made

3   toward fully implementing the commitments in the agreement.

4   There will be a data validator retained to assist in that matter.

5   And so this is a very good thing where sunshine is always

6   helpful.  And that will be sunshine not only between the parties

7   and the court but within the Missouri public.  So, I'm pleased

8   that that's a part of this agreement.

9        Additionally, Your Honor, the Settlement Agreement does

10  call for continuing jurisdiction by the court to enforce its

11  terms.  That said, the parties were thoughtful in framing how

12  disputes will be resolved should they arise along the way in

13  implementation.  And there are phases that have been defined

14  where the parties will take every opportunity to work them out

15  amongst themselves and keep this moving in a positive direction.

16  There are provisions that would take this to the federal courts

17  to resolve disputes, conduct enforcement.  We're hopeful that

18  that doesn't have to be the case, that we can have this

19  implemented in a smooth fashion where disputes are generally

20  resolved by the parties themselves by engaging with one another.

21  But I just wanted to describe that a bit for the Court.

22       THE COURT:  Okay.  So, for the jurisdiction, so that's

23  just ongoing jurisdiction for this -- for the court, right?

24       MS. BARTOSZ:  It would be --

25       THE COURT:  Not for a specific time frame but ongoing.

1     MS. BARTOSZ:  Continuing jurisdiction by the court to

2  enforce the terms of the agreement until such time as exit is

3  appropriate.

4          THE COURT:  Right.

5          MS. BARTOSZ:  Thank you, Your Honor.

6          THE COURT:  All right.  Thank you.  All right.  So, I

7  understand that there are people here from the class, or their

8  legal representatives that wanted to make comments to the Court

9  or be heard by the Court.  And just --

10         MS. BARTOSZ:  I think that is the case, Judge.  And we

11 haven't had a chance to kind of canvass the room to determine

12 exactly who is here.

13         THE COURT:  Okay.

14         MS. BARTOSZ:  And so could I ask, Your Honor, --

15         THE COURT:  Absolutely.

16         MS. BARTOSZ:  Could I get a show of hands of who would

17 like to approach the podium and address the Court?  One, two,

18 three, four.  We have five, six parties here, Judge.

19         THE COURT:  Okay.  All right.

20         MS. BARTOSZ:  And I don't know if we can let them come

21 up one at a time.  What is the Court's wish?

22         THE COURT:  One at a time.

23         MS. BARTOSZ:  Yeah.  Okay.  So, whomever wants to start,

24 please feel free to approach.  And so, I think what we'll have

25 each of you do as you approach to speak to the Court, please just

1  come to the podium, state your name and address yourself to the

2  Court, introduce yourself and then speak your mind.

3         THE COURT:  All right.  Good morning.

4         MS. XXXXXXXX:  I'll try not be nervous.

5         THE COURT:  Oh, relax.

6         MS. XXXXXXXX:  I did write a letter to Samantha and I

7  think it was presented to the Court.  My name is XXXXXXXX

8  XXXXXXXX.

9         THE COURT:  Okay.  All right.

10        MS. CHORNY:  I'm sorry.  What was your name?

11        MS. XXXXXXXX:  XXXXXXXX XXXXXXXX.

12        MS. CHORNY:  Thank you.

13        MS. XXXXXXXX:  Your Honor, I did write a letter to

14 Samantha Bartosz and got it to her.  And she's informed me that

15 it was presented to the Court.

16        THE COURT:  Yes.

17        MS. XXXXXXXX:  I just want to bring up one issue, the

18 consent when these children are put on the medications.  My

19 grandchildren, one of them was put on this medication -- one of

20 the medications that you're talking about and the case was still

21 open at the time.  My son was not informed that she was in the

22 hospital, didn't -- I guess what I want -- asking is do the

23 parents have any consent?  Or do they have to get their consent

24 to put them on these medications?  Should they be informed that

25 they're in the hospital and being put on them is my question or

1 issue that I --

2        THE COURT: Okay.

3        MS. XXXXXXXX: -- feel like needs to be addressed.

4        THE COURT: Okay. All right.

5        MS. XXXXXXXX: Thank you.

6        THE COURT: All right. Thank you.

7        MS. BARTOSZ: Thank you. And, Your Honor --

8        THE COURT: Do you want to respond after each?

9        MS. BARTOSZ: Yes.

10        THE COURT: That way we'll keep it straight.

11        MS. BARTOSZ: A quick response to that. The settlement

12 directly addresses the matter of parents of children in foster

13 care custody. And the informed consent process in the settlement

14 contemplates that the child's assigned caseworker will take the

15 lead in consenting to any prescription of the psychotropic

16 medication. However, the explicit terms state that the

17 caseworker within X time frame must reach out to the parents,

18 give notice that this issue is in play, listen to the parent.

19 Hopefully they come to agreement on the informed consent

20 decision, yes or no. If not, there is a process to handle that

21 dispute through an administrative process and land on the

22 appropriate decision for the child. So, the parent is integrally

23 involved in the informed consent decision and has an opportunity

24 to challenge decisions by the caseworker when they disagree with

25 it. So, we're hopeful that that concrete process in the

Settlement Agreement delivers certainty to the parties and provides for true fairness.

THE COURT: All right. Thank you.

MR. GUTCHEN: The only thing that I would add is that if a parent disagrees with a decision, both under current Missouri law, the parent does have the right to take seek judicial remedy in the juvenile court. So, there is both an administrative remedy and a judicial remedy so that parents could do that I'm pleased to announce that we've instituted and we've been doing a lot of these policies, and I've been going around the state and I've been very pleased to see that parents are really being a lot more involved than they have been in the past. So, we are absolutely committed to making sure that parents are involved in that process and consulted and, you know, so.

THE COURT: All right. Thank you.

MS. BARTOSZ: And, Your Honor, quickly, and Mr. Gutchen and I have discussed this on a few occasions. This agreement, beyond implementing legal commitments, in certain respects is a matter of changing culture. And so I think we're going to see compliance trend upward as we go through implementation. Part of that is going to be that we've done the appropriate public education, that people are buying in and acting consistent with the spirit of this agreement. So, I think there's going to be legal commitments met but there's going to be a gradual cultural change. And I think that's natural --

1          THE COURT:  Right.

2          MS. BARTOSZ:  -- in the way these things are

3    implemented.

4          THE COURT:  All right.  Thank you.  Ma'am.

5                    (Off Record Talking)

6          THE COURT:  Good morning.

7          MS. XXXXXXXXX:  Good morning, Your Honor.  My name is

8    XXXXXXXX XXXXXXXXX.  And I'm a witness to my son being on

9    psychotropic medications when he had no diagnosis at all.  And I

10   was not able to come to the hospital to see about him or to call

11   him.  The caseworker at that time, she stated that she was the

12   mother and she was able to consent for him to be on medications.

13   I was not allowed to have any medical history or anything that

14   was going on with my son.  And that worries me as well as other

15   parents need to stand up and address this type of thing.  Because

16   I have a friend that it happened to her, that her son was put in

17   foster care and misdiagnosed with epilepsy and they gave him

18   epilepsy drugs and misdiagnosed him.  And I wanted to know what

19   kind of efforts is the state going to make to improve this type

20   of thing from happening to innocent parents' children like mine.

21         THE COURT:  All right.  Thank you.  Thank you.

22         MR. GUTCHEN:  Ma'am, first of all, thank you for

23   addressing the Court.  And what I would ask, if you would like,

24   we've got some officials from Children's Division here.  And if

25   you would like to raise your concerns around children -- your

1  child, we'll get your name.  We'll get your information and we're

2  happy to talk after the hearing.  And if you would like some of

3  us to look at -- you know, look into your question and concern,

4  we'd be happy to address your situation directly.  We'd also be

5  very -- if you've got some -- the friend that you mentioned, we'd

6  certainly be happy to get -- give you some contact information so

7  that we can address your concern.  Because again, we think that

8  the Settlement Agreement that has been proposed is designed, and

9  I will say is that we have been, over the last year, implementing

10  changes to address the concern of the -- and I'm sorry, I missed

11  your name.

12          THE COURT:  XXXXXXXXX.  Ms. XXXXXXXXX.

13          MS. XXXXXXXXX:  XXXXXXXXX.

14          MR. GUTCHEN:  Ms. XXXXXXXXX, is that we have an informed

15  consent process that's being tracked and enforced.  We also have

16  instituted training for every single one of our case managers as

17  they're coming through.  And I believe that our training right

18  now is at a fairly substantial level at this point.  We're

19  tracking the numbers, you know, on training.  We've got two types

20  -- we've got several different types of training.  We've got an

21  annualized training.  But again, most importantly for parents,

22  part of the agreement and part of what we're committed to do is

23  to provide parents with information regarding their rights as

24  parents in the case, make sure that they understand, first of

25  all, that they need to be involved in the process of working

1    with, you know, working with the children, that they are also

2    informed that they have a right to a grievance if they disagree

3    and go through those steps.  And again, they do have the right if

4    they disagree or if they want to go to the court, under current

5    Missouri law, they can go through their counsel to the state

6    court and get relief directly from the judge as well.  So again,

7    we'd be very happy to address their concerns and, you know, after

8    the hearing we can get some information.  We're happy to do that.

9            THE COURT:  All right.  Thank you.

10           MS. BARTOSZ:  Yeah, Your Honor, just briefly to add to

11   Mr. Gutchen's remarks.  This settlement, of course, sets forth a

12   process for informed consent that individuals ought to follow.

13   And it assures that all interested parties are engaged and that

14   information is made available.  But beyond that, and I think this

15   is significant for the settlement, the settlement requires

16   documentation to be maintained as to this process which permits

17   aggregation of what's going on.  And not only assures that we can

18   measure progress towards this agreement and legal commitments,

19   but as importantly it's information that will be available within

20   Children's Division so it can study its operations, knows where

21   successes are, knows where there may be challenges to address and

22   day-to-day management is going to be in a position to be more

23   fully informed on these matters and do course corrections.  So, I

24   think the settlement very well addresses this matter and allows

25   for real improvement.

1    THE COURT:  All right.  Thank you.  Do we have another

2    person?  Good morning.

3    MR. GREIMANN:  Good morning, Your Honor.  Thank you for

4    the opportunity to provide testimony.  My name is Al Greimann.  I

5    am with Royal Oaks Hospital as the chief executive officer.

6    THE COURT:  What was your last name again?

7    MR. GREIMANN:  Greimann.  Good old German name.

8    THE COURT:  Okay.

9    MR. GREIMANN:  And I'm also an executive vice president.

10   MS. CHORNY:  Spell that name, please.

11   MR. GREIMANN:  Actually, if I could just provide you a

12   document afterwards, which is my written testimony, you'll have

13   that with my C.V.  Is that okay?

14   THE COURT:  Yes.  Yes.

15   MR. GREIMANN:  Okay.

16   THE COURT:  Thank you.

17   MR. GREIMANN:  Great.  So, I'm the CEO of the Royal Oaks

18   Hospital, which is a psychiatric facility located in the

19   community of Windsor, which is about an hour southeast of here.

20   I've been in that position since 1992.  And Royal Oaks Hospital

21   currently has 54 beds.  Of those 54 beds, 40 of them are for

22   treatment of children and adolescent patients.  I'm also with

23   Compass Health Network, which is the largest of the non-profit

24   community behavioral health organizations across the state.  And

25   we provide services in 47 of the Missouri counties.  And then

1    finally, I'm also the chair of the Missouri Hospital Association

2    Psychiatric Network, which basically is a network of all of the

3    psychiatric in-patient providers across the state that meet

4    periodically to talk about challenges and issues that we face as

5    hospitals in providing care for our patients.  And so I kind of

6    represent the provider community from that aspect.  And I want to

7    start by saying that, first of all, I commend both parties for

8    reaching this Settlement Agreement.  We're a firm believer in

9    informed consent.  And I would say to the parents and the foster

10   parents that are in the audience that, from our standpoint, we

11   truly believe that having parental involvement in the care of

12   kids is extremely important.  And so from an aspect of the

13   informed consent process, we're very much an advocate for that.

14   And we would want parents, foster parents, Children's Division

15   caseworkers to be involved in the care when we're providing that.

16   And so as they are having appointments with our psychiatry team

17   or with our other clinicians in our organization, we would

18   support the idea that they would attend those sessions and learn

19   about what's going on with their children and certainly be

20   educated about the risk and the benefits of medication use and

21   follow-up.  If there's side effects to those medications, we want

22   to know about that so that we have an opportunity to address that

23   with parents.  So, we want to be very transparent in working with

24   our Children's Division partners and the families that we serve

25   so that we can provide the best care for those patients.

1          What I really want to address is the issue of patients
2    coming into the psychiatric hospitals, and that is not for all of
3    the Children's Division admissions.  It's for basically a group
4    of them, which I would say is about half, 50 percent that are
5    admitted to the psychiatric hospitals across the state that are
6    admitted because of severe behaviors.  And typically that
7    involves physical aggression and self-harming behaviors that are
8    happening.  And when those patients are admitted, typically
9    that's because they failed in their placement where they're at.
10   Their aggression has caused -- has reached a level to where they
11   can no longer be managed in those settings.  And a lot of times
12   law enforcement is involved.  Those patients are taken to the
13   community hospital emergency rooms because there's no other real
14   opportunity to try to do an intervention with them.  And from
15   there they're transferred to the psychiatric hospitals.  I think
16   the plaintiffs' counsel made a comment to this.  This is what we
17   would determine to be really a psychiatric emergency, a case
18   where we need to get medications on board relatively quickly to
19   manage that aggressive behavior.  We do have the option under the
20   current protocol to utilize PRN medications, but that's more of
21   the after these incidents are occurred.  So, we really can't get
22   ahead of the aggression.  And that's the problem that we have.
23   Our recommendation is certainly if there is an opportunity to
24   expedite and get that informed consent and involve the parents
25   directly upon admission, that's what we would favor to do.  Our

1  goal again is to be very transparent in working directly with

2  parents and families and the Children's Division and trying to

3  keep them educated about what we as providers feel needs to

4  happen. But what we're finding is we're not getting that

5  response. And sometimes it's taking up to three to four to five

6  days before we're able to get consent. And in that time frame

7  oftentimes many of these children are ending up in physical

8  restraints. Multiple times we've had a number of a staff

9  injuries, other patients feeling threatened and wanting to leave

10 because of these types of behaviors. So, it's really problematic

11 for the psychiatric hospitals across the state. And in talking

12 to some of my colleagues because of this issue, I think some of

13 them are saying, you know, we are case-by-case beginning to deny

14 or refuse to admit these kids because we cannot manage their care

15 because of their aggressive behaviors. So, we are really wanting

16 to go on record to say that there needs to be a small change in

17 the protocol that looks at psychiatric hospitalization as

18 emergency situations. Again, we really would like to have

19 consent right from the beginning if the families could be

20 involved much quicker into this process. And we also believe

21 that we would like to have communication directly with the

22 parents so that we could express and educate them on the use of

23 these medications. I think that would be very helpful versus

24 having the caseworkers talk to the parents and then come back to

25 us with these consents. I think it would be better if there was

1  immediate two-way communication with the parents.

2          Again, I want to thank the Children's Division.  We have

3  had -- I've participated in several meetings with them and they

4  seem to be fully aware of this issue with the psychiatric

5  hospitals.  They've invited us to be a part of their advisory

6  committee, which I think will be very beneficial.  And, you know,

7  we're hopeful that through that communication we'll have the

8  opportunity to really work together and come up with a better

9  solution.

10          THE COURT:  All right.

11          MR. GREIMANN:  Thank you.

12          THE COURT:  All right.  Thank you.

13          MR. GREIMANN:  And I'd be happy to provide this if I

14  could step forward.

15          THE COURT:  Yes.  Yes, please.

16          MR. GREIMANN:  Thank you.

17          MS. CHORNY:  Thank you.

18          MS. BARTOSZ:  Your Honor, plaintiffs, and I'm sure

19  defendants as well wish to thank Mr. Greimann for those

20  thoughtful remarks.  And if I could address how the Settlement

21  Agreement deals with the situation that Mr. Greimann has

22  described.

23          THE COURT:  Yes.  Yes.

24          MS. BARTOSZ:  There is a general process form for

25  informed consent in this Settlement Agreement.  And I will right

away represent to the Court the Settlement Agreement does not put a time frame around that process. That process can take place in any number of ways and any number of situations. And there isn't necessarily a one-size-fits-all time frame that can be agreed to. And I will add that we're aware of no national guideline standards from standards-setting organizations, professional organizations that provide for any such timetable. So, that's not present here. We do expect that parties engaged in the informed consent process will do so diligently and try to move that long. That will not always mean that consent is delivered within the first half hour. It may take days. That is the reality. With respect to the issue raised by Mr. Greimann, the parties did contemplate that such a situation could take place and developed a provision within the agreement that we think adequately addresses this situation. And it is in the Settlement Agreement at Section E.1.L. It's titled "Emergencies." And it provides, and I'll quote, "Notwithstanding any other provision in this agreement, psychotropic medications may be administered by a qualified prescriber without informed consent in an emergency situation. An emergency situation occurs when the purpose of the medication is to protect the life, safety, or health of the child, to prevent serious harm to the child, or to treat current or imminent substantial suffering." And in this situation where there is such an emergency, even if informed consent has not been attained, this provision permits the medical treater to go ahead

1  and administer the drug because the child has an immediate need.

2  To document that in the file, the justification for it and we're

3  quite sure that the doctors would have a medically reasonable

4  justification. And then to give notice to the caseworker and

5  others so they're aware of that and discussion can be had about

6  where to take the process from there. But we've built into the

7  agreement a safety valve, if you will, for these emergency

8  situations so psychotropic medications can be brought to bear and

9  children can immediately be put on such a treatment course. We

10 believe that really addresses the situation in a way that is

11 flexible enough to make a difference in reality. And we are

12 trusting both parties, the doctors, in their judgment, and it's

13 well-informed judgment and they're well-trained and we believe

14 they're trying their mightiest to be sure, but to make that

15 judgment when such emergency exists and then to take action, or

16 where there may be more time for consideration of whether or not

17 the drug approach makes sense. But that's what the agreement

18 provides.

19         THE COURT: All right. Thank you. Yes.

20         MR. GUTCHEN: I don't want to repeat what was just said

21 because on behalf of defendants, we certainly agree with what was

22 said. I would just say I think that this really illustrates the

23 complexity and the number of different stakeholders that the

24 Department of Social Services and stakeholders such as the

25 Missouri Hospital Association, all of us have to deal every day.

1   And that's why the flexibility of this agreement involving the
2   advisory committee is so important.  The issue of emergencies is,
3   in fact, the main topic of conversation or one of the main ones
4   on the agenda next week.  And we certainly recognize that as an
5   issue and it's something that will require, as Ms. Bartosz said,
6   a culture change on all parts.  I mean, we are absolutely
7   committed to make sure that we balance the interests of the
8   parents who have a keen interest in the safety of their children
9   with a need to address medical emergencies.  Sometimes it's very
10  difficult to reach parents on very short notice.  So, we think
11  that the Settlement Agreement reaches the appropriate balance.
12  But it's going to be a lot of work and we are absolutely
13  committed to be doing -- in the work on the long haul so that all
14  of our kids make sure that they get the right medication at the
15  right time.  And so --

16          THE COURT:  All right.  Thank you.  I think there was
17  one other person.

18          MS. BARTOSZ:  And, Your Honor, as our next individual
19  approaches, we did go downstairs to check, and I think through
20  that and I checked in the downstairs lobby, we may have a couple
21  more individuals who wish to approach.

22          THE COURT:  Okay.  All right.  Good morning.

23          MS. XXXX:  Good morning, Your Honor.  Thank you for
24  hearing this.  I am Reverend XXXXXX XXXX.  And I am here because
25  my relationship with XXXXXX, who is also going to be speaking to

you this morning, started about three years ago. I was first her
CASA and then my husband and I became here foster parents and
we'll soon become her guardian. The issue that I'd like to speak
on this morning has to do with the fact that XXXXXX was over-
medicated for about 2½ years. She was also kept in a locked
facility and her only crime was trying to get away from an
abusive and negligent mother. When we first got to know XXXXXX,
she was someone who had a great deal of difficulty waking up in
the morning, going to sleep at night and maintaining through the
day. Her issue was trying to deal with some anger that any adult
in this room would have found difficult to deal with. And so the
situation came about that she was medicated with three times as
much medication as she needed. When she came into our home and
we took her to a private physician, and the physician was
presented with the list of medications that she was on, it was
very difficult for that physician to understand how that ever
could have happened. Today, XXXXXX is on absolutely no
medication at all. She is a straight-A student. She does still
have a little bit of problem waking up in the morning. Not much.
She gets herself up and goes to school. She's a straight-A
student and plans on becoming an attorney working with social
justice issues for children. And we are so very proud of her.
But what was done to her by over-medicating her and, in fact,
even starting her on birth control that at the age of 13 in a
Missouri Girls Town, I don't understand the reason for that, but

1  it has certainly had an effect on her hormonally and for whatever

2  issues she's going to face after that.  The other issue is that

3  she was also allowed to gain 100 pounds while she was in their

4  care.  Part of that was self-medicating herself with food to deal

5  with the issues and the anger that she was trying to deal with.

6  And I claim that that is negligence on their part.  She is

7  obviously having to deal with that today and as we are working on

8  that to help her regain her health and her body after that.  And

9  when -- the night that we got to pick XXXXXX up to take her home

10 with us and the medications were given to us, there was one of

11 the psychotropic medicines that was missing 30 days' worth.  And

12 because she could not just not take it, we had a devil of a time

13 trying to get it because Medicaid had already paid for it.  And

14 we had to find another physician who could remedy the situation.

15 And I spent a day at the pharmacy trying to get that taken care

16 of.  And so the control of the medication is at question for me.

17 And those are the issues that I want to present.  And I think

18 XXXXXX also wants to speak with you if that's all right?

19          THE COURT:  Yes.

20          XXXXXX:  Hi, Your Honor.  My name is XXXXXX XXXXXXXX.

21          THE COURT:  Okay.

22          XXXXXXXX:  One of the issues, I think there's two, that

23 I would like to address is educating whenever the children are

24 given their meds.  When I was given or prescribed my medications,

25 they never told me the risk.  And I feel like another issue would

1  be the quantity of medication given to a child and the -- like if

2  there's a certain quantity of one medication, I don't feel that

3  children should be put on more than what is needed. And I was

4  put on, I think, three medications for -- they were an

5  antidepressant. And so I feel like that could have been too much

6  for one issue.

7                    (Off Record Talking)

8              XXXXXX: I think that's it. Thank you, Judge.

9          THE COURT: All right. Thank you. Thank you so much.

10 I don't know if we had any response to that comment.

11         MS. BARTOSZ: Yes. Your Honor, first of all, we wish to

12 thank our friends here for coming to court today and sharing that

13 story. And, Your Honor, that's the very kind of difficult and in

14 some ways tragic circumstances that this Settlement Agreement is

15 designed to prevent.

16         THE COURT: Right.

17         MS. BARTOSZ: And we're glad that the story has been

18 shared and that we're all aware of the situations we're talking

19 about and how important it is that we together get on top of it.

20 So, I share my thanks. Your Honor, there were two issues raised.

21 One had to do with getting information to the youth, himself or

22 herself, in relation to if you take this drug, here is what you

23 can expect. Here are the intended benefits. Here are the risks.

24 Here is the array of side effects that you may experience. This

25 agreement, Your Honor, in Section E.2 provides a process for

1  informed assent, A-S-S-E-N-T, a process by which the youth is
2  fully engaged in the informed consent process and told here are
3  the benefits, here are the risks, et cetera. And so there's a
4  commitment to really include the children in this process and
5  have them feel that they've got a degree of ownership in their
6  life, a very important thing. And so we're very pleased to have
7  those provisions in the agreement.

8      A second issue that was raised was the quantity of
9  medications that can be administered. Your Honor, under Section
10 E -- K -- E.1.K.D, I think I got that right, there is a provision
11 that sets forth a mandatory secondary review process for
12 prescriptions that are in excess of dosage guidelines. And so we
13 are trying to, through this agreement, get on top of situations
14 where high dosages have been prescribed for a child. These
15 prescriptions, Judge, by the way, are not always in accordance
16 with an FDA guideline. These are often off-label prescriptions.
17 That's just the reality. And for some of these medications there
18 are established dosage guidelines. For others that's a little
19 less certain. But in this agreement we've included a provision
20 to get on top of that and target those prescriptions that seem to
21 be high in dosage and get them a secondary review to assure
22 safety.

23         THE COURT: All right. Thank you.
24                 (Off Record Talking)
25         MR. GUTCHEN: So, we're using, just again, I don't want

1  to repeat what was said, but one of the things that I think is
2  important to note that we're using Medicaid claims data so that
3  when somebody goes to a -- well, I'll step back. We look at the
4  data when somebody goes to a pharmacy, fills a prescription, we
5  have information on the back end so that we can identify kids
6  when the prescriptions are filled, what the prescription level
7  is. So, we're looking at this point to address directly the
8  concerns. So again, thank you for raising that concern because
9  it is a legit -- it is a legitimate concern and we've been
10 addressing it. And we appreciate that you came in here today to
11 explain -- to explain your concerns. It was -- and you did it
12 really well, so it was very clear. You raised a very important
13 issue. And so we're looking at that particular issue both at the
14 front end with training our workers to identify what excessive
15 dosages are. And, in fact, that's a really complicated issue,
16 because there is a lot of doctors who don't necessarily agree on
17 what an excessive dosage is. So, one of the things that the
18 PMAC, the advisory committee, one of their charges is to develop
19 excessive dosage guidelines. And that's a very complicated
20 process that we have to use psychiatrists and pharmacists and
21 folks. So, that is built into that agreement so that we can
22 measure both at the front end and the back end to try and catch
23 those. And again, I would like to echo the importance of making
24 sure that the youth who were in the system are involved in the
25 process of and communicating with their physicians, and for the

Children's Division and our caseworkers to support the kids in making sure that they feel empowered to raise their concerns. It'll also involve giving the kids -- they also have the right to file a grievance if they disagree with that, with a decision on their own medications. And we're trying to involve the children's guardian *ad litems* in the system. So, we hope through the increased involvement of parents, which is going on, by the way right now, we've been doing it over the past six months. We're actually implementing -- we didn't wait to start to implement all this. We are now implementing it and we've been implementing a lot of this over the last year. So, we're hoping that kids will have a lot bigger voice in their own medication. So, we agree with you and we hope that we will be addressing the issues that you raise because they're very important. So, thank you for raising them.

THE COURT: All right. So, we have two more for comments.

MR. GUTCHEN: Your Honor, I think there's four or five more actually, so.

THE COURT: Oh, okay.

MR. GUTCHEN: If I may, Your Honor, if I could ask if you want people to line up so we'll have an idea of how many we have. Is that all right?

THE COURT: All right. So, anyone who is making a comment come forward so we can make sure. All right. Good

1  morning.

2        MS. XXXXXXXX:  Good morning.  My name is XXXXX XXXXXXXX.

3  I'm the mother of three children who are currently in custody of

4  Clay County DFS.  Before I start I'd actually like to tell you

5  about my daughter.  XXX has always been very hyperactive, very

6  playful ever since she was a baby.  When she got put into

7  custody, they didn't ask me about that about her.  She can't

8  focus because of that hyper-activeness.  And I was aware of that

9  before she got placed into custody and she had seen a therapist

10  prior who said that she didn't need medication.  When she was

11  with me, we did yoga every morning to keep her calm and it worked

12  fine.  I put her in music classes and dance and it worked fine.

13  The foster care parent that they placed her with happened to be

14  my biological mother who had over-medicated myself when I was a

15  child.  I had feared that she would do this to XXX because XXX

16  had some of the issues that I did as a child.  And my fear came

17  true.  They over-medicated her with Adderall after I protested.

18  Clay County has a CASA worker instead of a child *ad litem*.  And I

19  told her multiple times please try yoga classes, something

20  alternative.  So, my question is could there be alternative means

21  instead of medicating them because I know Adderall didn't work

22  with me.  And from what I heard from XXX's school and when she

23  got placed with my father instead of my mother, they all said she

24  was like a zombie and I've noticed it.  And I saw her last

25  Thursday.  She barely talks anymore.  And that's not like my

1 daughter.  She -- normally you can't get her to stop, so.

2          THE COURT:  Okay.  All right.  Thank you.

3          MR. GUTCHEN:  Your Honor, again, we really appreciate

4 the comments.  And one of the provisions in the Settlement

5 Agreement, and again, I don't remember which number it is --

6          MS. BARTOSZ:  Yes.

7          MR. GUTCHEN:  -- because it's quite long.  But one of

8 the provisions in the Settlement Agreement indicates -- is a

9 commitment and an indication that we want to look at alternative

10 to medication therapies before they are actually utilized.

11 Sometimes medication is appropriate.  Sometimes reasonable people

12 can disagree as to what the therapy is.  But I tell you one thing

13 that we don't agree -- that we all agree on is that only

14 medication when it's necessarily should -- medically necessary

15 should be applied.  So, we have a commitment to look and to work

16 towards using non-medication-assisted therapies.  So, hopefully

17 that will address some of the concerns that you raised.

18          THE COURT:  All right.

19          MS. BARTOSZ:  And, Your Honor, I'll simply add, not to

20 be a smarty pants, Mr. Gutchen, the section for the record is

21 Section E.1.J.6 that addresses this issue.

22          THE COURT:  All right.

23          MS. BARTOSZ:  Thank you.

24          THE COURT:  All right.  Thank you.  So, the next person.

25          MS. XXXXXXX:  I have several concerns, Your Honor.

1 Number one --

2        THE COURT:  Could you state your name, please, for the

3 record.

4        MS. XXXXXXX:  XXXXXX XXXXXXX and my daughter is XXXXXXX

5 XXXXXXX and I am her adopted grandmother.

6        THE COURT:  Okay.  Thank you.

7        MS. XXXXXXX:  Okay.  What I believe is, first of all,

8 that she was given too many drugs.  That's number one.  Number

9 two, they didn't allow me contact with her for six months.  They

10 alienated her, isolated her.  She seems -- she's exhibited sexual

11 problems and they've given her -- they put a chip, a birth

12 control chip in her arm which adds more hormones.  She was in the

13 stage of developing.  I feel like her development has been

14 damaged.  I think that her personality has been damaged.  I feel

15 that they have -- they keep trying -- they keep changing the

16 medicines.  They want to give her things that are not FDA

17 approved.  They keep changing them.  They keep increasing the

18 dosages.  They weren't letting me talk to her.  And they've been

19 giving her so many medicines that they would make her be

20 compliant with them.  So, now she's alienated from her family.

21 She doesn't seem to have her own persona.  She doesn't seem to be

22 able to think for herself.  It seems like they're putting things

23 in her mind.  She's not allowed to write to me unless they read

24 the letters first.  When I send her a letter or something I have

25 to bring it to the caseworker and then she looks it over and then

1 she supposedly sends it on and they look it over at the

2 Turnaround Ranch before they ever give it to her.  And it takes

3 up to a month and longer for her to receive anything that I send

4 her.  Also, she seems to not be a person anymore.  It seems like

5 they've taken away her persona.  And I think they have damaged

6 her development with all these drugs and they keep changing them,

7 keep increasing them, and they did it without a psychiatric

8 evaluation.

9         THE COURT:  All right.  Thank you.  Thank you, Ms.

10 XXXXXXX.

11         MS. XXXXXXX:  Thank you.

12         MR. GUTCHEN:  So, first of all, thank you again for your

13 comments.

14         MS. XXXXXXX:  Oh, one more thing.  She doesn't know

15 what's the pros and cons of any of these medications.

16         THE COURT:  Okay.

17         MR. GUTCHEN:  And again, for folks who have spoken who

18 have concerns, we'd be happy to take your names and if you have

19 concerns, we'd be happy to listen to them and check, you know,

20 check on the individual cases.  What I would say, Your Honor, is

21 that the Children's Division is and has been and continues to be

22 committed to make sure that children receive the appropriate

23 psychiatric evaluations and medical evaluations before any

24 medications are prescribed.  We don't have any children -- I hope

25 I can confidentially say we do not have any children in our care

1  who have not been -- the medications have not been prescribed by
2  a certified physician.  So, you know, we do make sure that we
3  have medications.  But again, in what we've tried to set out in
4  this Settlement Agreement is, you know, is reasonable people can
5  disagree on what is an appropriate course of treatment in a very
6  difficult situation.  The other thing I'd like to say is one of
7  the things that we're trying to do, Judge, and I don't think
8  we've talked about it yet, is trauma informed care.  And one of
9  the things that's really -- really what that means is there has
10 been a growing recognition in the community of psychiatrists and,
11 you know, child welfare community that children react sometimes
12 differently than adults when they've been subjected to trauma,
13 including the trauma of being removed from their family.  So, as
14 counsel had talked about earlier, we're working through a culture
15 shift.  And it's not only a cultural shift in the child welfare
16 community but it's also in the medical community about how best
17 to address the needs of children in -- who have been traumatized.
18 And so sometimes that's medication, sometimes not.  But this is
19 an era of medical reform, a medical -- an era of child welfare
20 reform so that we're trying to identify these issues and work
21 them through.  And these are very difficult issues for children
22 and families.  We try and make the right decisions.  And the key
23 I hope is is that with this agreement is we have a commitment to
24 make sure that we're listening.  We might not always agree in the
25 end.  And ultimately, if there is an disagreement, the juvenile

1  court judge that's over the particular case does have the

2  authority to say yea or nay on a particular medication. But I

3  think it's important to hear the comments today and try and make

4  sure that we're addressing them. And even if we don't ultimately

5  agree, that we're listening respectfully to everybody's point of

6  view and hopefully the court -- the juvenile court makes the

7  right decision for the kids.

8              THE COURT: All right. Thank you.

9              MS. BARTOSZ: And additionally, Judge, the Settlement

10  Agreement provides a series of processes and documentation

11  requirements and secondary review requirements where there is

12  several levels to catch problematic prescriptions should they

13  take place. And so this agreement is designed to not allow any

14  pucks to get past the goaltender into the net, so to speak, and

15  hopefully we'll be very good at doing that. But it's designed to

16  have every prescription that may be outlier addressed and spoken

17  about very carefully. And, Your Honor, as a quick housekeeping

18  matter, --

19              THE COURT: Yes.

20              MS. BARTOSZ: -- some of the individuals that have

21  approached to speak with Your Honor today have spoken about

22  individualized circumstances regarding named children. And we

23  have a contained audience here within this courtroom. But I

24  think before any transcript made it into the public way, we may

25  want to consider doing certain redactions for privacy purposes.

1        THE COURT:  Yes.  Yes.  I agree.  I agree.  Sir.

2        MR. XXXXXXXXX:  Good morning, Your Honor.

3        THE COURT:  Good morning.

4        MR. XXXXXXXXX:  My name is XXXXXX XXXXXXXXX.  I'm the

5 father of XXXXXXXX XXXXXXXXX.

6        THE COURT:  Uh-huh.

7        MR. XXXXXXXXX:  The grandparent of some kids that have

8 been taken away from the house.  It's been a year today since my

9 son XXXXXXX has been on medication.  The child never had a

10 problem.  He was good in school and everything else.  He had

11 talent and he never had a problem.  And I don't know how he was

12 diagnosed.  For some reason, for whatever came out of his mouth

13 they said that he needed to be on medication.  Now, when I see

14 him at the visitation, it hurts me.  My heart goes out to my

15 daughter.  We've come this far here today not for -- nothing

16 funny, this is not no laughing matter.

17        THE COURT:  Right.

18        MR. XXXXXXXXX:  Something has to break.  I think that

19 instead of drugging the kid up, over-medicating him there should

20 be an alternative.  There should be an alternative.  So, I don't

21 think there's no reason why he should be isolated from his

22 mother.  She can't speak to him.  She don't know what kind of

23 drugs he's taking.  Every time I see him he's flashing his eyes,

24 but he, you know, he's just not the same.  And I don't think he's

25 exaggerating or trying to be a little pity party, but I know this

1  is not my son.  He's 12 years old.  And it's hurt me in my heart.

2  My heart goes out to all mothers that's concerned about their

3  kids.  I think this has been -- gone too far already.

4          THE COURT:  All right.  Thank you.

5          MR. XXXXXXXXX:  Thank you for allowing me to talk.

6          THE COURT:  Oh, you're fine.  Thank you.  Thank you so

7  much.  Okay.

8          MR. GUTCHEN:  Judge, again, thank you very much.

9          THE COURT:  I think it's kind of been addressed, so

10 we'll have the last person.

11         MS. XXXXX:  I'm sorry, Your Honor.

12         THE COURT:  You're fine.  What's your name?

13         MS. XXXXX:  XXXXXX XXXXX.

14         THE COURT:  Okay.

15         MS. XXXXX:  I know very well what everyone is speaking

16 here about today.  My nephew got put on the Good Samaritan's Boys

17 Ranch.  And he become a vegetable.  As far as medication, we're

18 still not able to get that list.  A lot of his documents has

19 disappeared since we got him off the ranch.  He is a vegetable.

20 He's 18 years old.  He's scared to come out behind four walls.

21 He's not sociable anymore.  He trusts no one.  The psychiatrist

22 said he's traumatized and there's probably nothing we can do for

23 the rest of his life.  So, I ask you, Your Honor, please allow

24 the parents to have some say because it's not that baby's fault.

25 He's already been drug away from his home, from his family and

1   all that he knows.  What gives a state worker, a child service

2   worker the right to step in and say I'm his guardian.  Please

3   take that into consideration.

4           THE COURT:  All right.  Thank you.  Thank you, Ms.

5   XXXXX.

6           MS. CHORNY:  Judge.

7           THE COURT:  Oh, I'm sorry.  We have one more.  Okay.

8           MR. SUROFF:  Good morning, Your Honor.

9           THE COURT:  Good morning.

10          MR. SUROFF:  My name is Dave Suroff and I'm an attorney

11  who works in Jackson County on a pro bono basis where I represent

12  parents in abuse and neglect cases and termination of parental

13  right cases and other ones sometimes.  I represent children in

14  juvenile delinquency matters, juvenile status matters.  I'm also

15  a guardian *ad litem* for children.  I'm also a guardian *ad litem*

16  for parents who -- adults who have cognitive issues.  I

17  apologize.  I went to the wrong courtroom.  I did not know it

18  changed here so I missed the first ten minutes.  And I also

19  apologize because I have not read the Settlement Agreement.  And

20  I did not came here with a plan to speak, I just came to observe

21  and I did not come with any agenda.  But I had some thoughts as I

22  was listening to everything that I just wanted to share.  I've

23  noticed over the last year a marked improvement in something, and

24  that is, where any of my cases where a child is needing a medical

25  procedure, the Children's Division worker, they don't turn the

case over to, they get one of the attorneys involved in the case, and that attorney reaches out to the parties and asks for their opinion on that medical procedure prior to filing a motion. And in Jackson County the family court administrative judge decided that all those motions would be heard by him regardless of what division or commissioner the case is in front of. And it seems like that process has gone very well. But I also know that Children's Division workers, at least lately it seems like, have been dropping like flies. Every week I have a case where I'm finding out that the worker has changed because the worker has quit. And it's not just Children's Division, it's also the contract agencies. There's like three or four in the Jackson County area. And so I've had lots of situations over the last 4½ years where I've had cases where a child has been hospitalized either for a medical procedure or psychiatrically and the parents weren't told, the parents' attorney wasn't told. We come into court, and this just happened three weeks ago. We come into court and the parents were told that one of the daughters was hospitalized psychiatrically. It's the first they knew about it and they broke down in court. The first I knew about it, the first the court knew about it. I have cases where children go on the run and I'm the -- I'm their attorney and I'm the last one to be told weeks later. In fact, sometimes it takes a week to even tell the juvenile officer, so they don't even get a request for capias order to the judge. So, I've seen these lapses a lot

1  where people that should know, either beforehand or after-hand

2  don't know until it's too late about whatever is going on.  And

3  so anyone that's been in a professional environment knows that

4  policies and procedures are only as good as the people on the

5  front line that are using them and to make sure that that they're

6  following them and that we have supervisors that are implementing

7  them correctly on the front end and then monitoring the

8  compliance of them on the back end.  And so I'm not here to

9  disparage anybody.  I'm here because I was just listening to

10  everything that was being said.  And I just have some -- I'd just

11  like to hear some comments how are we are going to ensure that

12  these overworked, underpaid, dropping-like-flies caseworkers are

13  doing the things that the policies say that they need to do so

14  that everyone is properly informed, including the parents'

15  attorneys, including the child's guardian *ad litem*, including a

16  parents' guardian *ad litem* if they happen to have one.  So, it's

17  just concerns.  It's just comments.  And I wanted to pose them to

18  see what kind of responses they provide.

19        THE COURT:  All right.  Thank you.

20        MR. SUROFF:  Thank you, Your Honor.

21        MR. GUTCHEN:  So, Your Honor, again, thank you very much

22  for your comments.  And I will say that turnover is and has been

23  a challenge for the Department of Social Services, including in

24  Jackson County.  I think that's an acknowledgment of, first of

25  all, how difficult the work that our front-line staff have to do,

the quantity of the work.  And also as indicated by the, you
know, what the statements of some of the youth and the parents
and relatives how emotionally difficult the work is.  And it's
very difficult for our staff to do that work.  So, it is a very
difficult challenge.  The Children's Division is working on that.
We have our Children's Division director is here today.  He's
been listening to all the comments.  We've got staff here who are
certainly taking that issue to heart.  I will say that the
Children's Division team are continuously, and have been
continuously working on recruitment, on training, and, you know,
it is a challenge.  But I can say that we have been doing over
the last year with respect to psychotropic medications is, first
of all, the discussions that we've had around implementation and
in the drafting of the Settlement Agreement, the issues around --
the challenges of recruitment and retention, making sure that
we're not putting -- that we're not putting unreasonable burdens
on the Children's Division staff in the field, those were one of
the, probably I'll say, most hotly debated issues because, you
know, again, we are putting a lot of work on our workers.  So, we
are very aware of these issues.  It is something that requires
constant work and monitoring.  And it's not easy but I'm -- we
certainly are doing the absolute best we can, you know, to work
through those issues.  And you're right.  We have instituted some
change -- we tried to institute some changes in the last year.
We're hoping that as some -- as the new policy -- some more

1  policy, more training comes through for the workers through this

2  process that, you know, that some issues will be addressed and

3  it's -- child welfare is a constant, hard amount of work.  And,

4  you know, all of us in the system have to do the best we can to

5  listen and to work together, so.

6      THE COURT:  All right.  All right.  Well, I thank

7  everyone for their comments.  You know, I think they were very

8  helpful, and the responses to those comments from everyone.  So,

9  in looking at the proposed settlement and the comments and

10 responses, this Court believes that all of the -- all of the

11 factors under the Rule 23 of the Federal Rules of Civil Procedure

12 that those have been met, that this settlement would be -- is

13 fair, reasonable, and adequate.  And so this Court will be

14 presenting a Report and Recommendation to Judge Laughrey for her

15 to make the final order approving the settlement.  Now, once that

16 Report and Recommendation is done there's usually a 14-day time

17 period for objections.  And I don't know if either party would

18 waive that or if that's an issue at all?  Otherwise, you would

19 have to wait 14 days and then Judge Laughrey would make her

20 final --

21      MR. GUTCHEN:  Yeah.  Yeah.  We can waive it.  Yeah.

22      THE COURT:  -- final order.

23                (Off Record Talking)

24      MR. GUTCHEN:  Defendants would waive any 14-day.

25      THE COURT:  Okay.

1    MS. BARTOSZ:  Plaintiffs would agree to such a waiver of

2    the 14-day period.

3    THE COURT:  All right.  And you said as well from the --

4    okay.  So, both parties are waiving the 14-day time period for

5    the objections to the Report and Recommendation to Judge Laughrey

6    but -- so, that will speed the process along so that the final

7    agreement, Settlement Agreement will be in stone and we can move

8    forward.  This is such a weighty issue and very important, you

9    know, to the community, to everyone.  And it was very educational

10   for me.  And I think everyone has put forth the great effort to

11   make sure that the process works for the kids, for the parents,

12   for the social workers, for the state, for everyone.  And so I

13   really want to commend everyone for working together,

14   particularly I know the mediation, for Jill Morris taking the

15   time and her expertise and her care that she does in medications

16   to make sure that this came to fruition.  So, thank you to

17   everyone.  All right.  So, I think that concludes our -- you had

18   some final comments or --

19   MS. BARTOSZ:  Just a couple housekeeping matters, if I

20   may?

21   THE COURT:  Okay.

22   MS. BARTOSZ:  May I just approach?  First of all, we've

23   submitted together with the motion for final approval a proposed

24   form of order.  And that order does not have in it language with

25   respect to dismissal.  And it may be that we can talk about that,

1  amend it, include that language and proffer a revised order to

2  the Court.  I just wanted to alert the Court to that.

3              THE COURT:  That would be great.

4              MS. BARTOSZ:  And additionally, this may actually be a

5  couple of matters that are for Judge Laughrey.  But the state

6  filed yesterday papers with respect to a pending motion for fees.

7  Plaintiffs anticipate a short response to that by Friday, maybe

8  Monday.  There's no schedule.  I can safely say by Monday we can

9  do that and so we will do so.

10             THE COURT:  Okay.

11             MS. BARTOSZ:  And we will be getting to the Court as

12  well a form of notice on the attorney's fees issue and we will do

13  that forthwith as well.

14             THE COURT:  All right.  Thank you.  Thank you so much.

15  Well, thank you to everyone for being here and the Court will be

16  in recess.  Thank you.

17             MR. GUTCHEN:  Thank you, Your Honor.

18             MS. BARTOSZ:  Thank you, Judge.

19                     (Court Adjourned at 10:30 a.m.)

20

21

22

23

24

25

1

2

3

4

5

6

7        I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceeding in the
8   above-entitled matter.

9

10        /s/ Lissa C. Whittaker          November 25, 2019
          Signature of transcriber            Date
11

12            *  *  *  *  *  *  *  *  *  *  *

13

14        I certify that the foregoing is a true and correct copy of
the transcript originally filed with the Clerk of the Court on
15   11/25/19, and incorporating redactions of personal identifiers
requested by the following attorneys or record:  Melanie
16   Pennycuff and Elizabeth Pitman Gretter, in accordance with
Judicial Conference policy.  Redacted characters appear as an "X"
in the transcript.
17

18        /s/ Lissa C. Whittaker          January 10, 2020
          Signature of transcriber          Dated
19

20

21

22

23

24

25