| | |
|---|---|
| M.B., et al., | |
| Plaintiffs, | |
| v. | Case No. 2:17-cv-4102-NKL |
| Jennifer Tidball, et al., | |
| Defendants. | |

## ORDER

I.  **INTRODUCTION**

This class action was brought on behalf of children in foster care who alleged that Defendants, the Acting Director of the Missouri Department of Social Services and the Director of the Children's Division of the Missouri Department of Social Services, had failed to implement a system of safeguards and oversight with respect to the administration of psychotropic drugs to children in their custody. The Court certified a class consisting of "all children in Children's Division foster care custody who presently are, or in the future will be, prescribed or administered one or more psychotropic medications while in state care." Before dispositive motions were filed, however, the parties engaged in extensive mediation and ultimately reached an agreement settling the case. The settlement agreement includes specific "Commitments" by the state agencies with regard to training, monitoring, maintenance of medical records, review, informed consent, oversight, and enforcement. Doc. 280-1 (Settlement Agreement).

Plaintiffs' counsel, consisting of attorneys from various non-profit organizations and one major law firm, have moved for an award of $3,894,975.22 in fees (for 11,417.6 hours of work) and $132,907.56 in expenses. Plaintiffs' attorneys' work involved not only investigations and research undertaken before the case was filed, but also motion practice—some of which was

peculiarly necessitated by Defendants' decisions to move to dismiss the case, to appeal the Court's class certification decision, and to seek to stay the litigation in this Court pending resolution of their appeal from the class certification decision, as well as more minor matters such as oppositions to motions for appointment of Next Friends for the minor children and the voluntary withdrawal of a Named Plaintiff, as well as the filing of a discovery motion aimed at procuring private therapy notes for a child that the Court found were protected by the psychotherapist-patient privilege. No less important was the work Plaintiffs undertook to reach a comprehensive settlement with respect to complicated issues surrounding the administration of psychotropic drugs to children in Missouri's foster care system.

For the reasons, discussed below, Plaintiffs' motion for fees, Doc. 285, is granted in part.

## II.   **BACKGROUND**

### a.   **Pre-Filing Investigation**

Before filing this lawsuit in 2017, Plaintiffs' counsel conducted a nearly-two-year investigation into the oversight and monitoring of psychotropic medications in the Missouri child welfare system. Declaration of Samantha Bartosz in Support of Plaintiffs' Motion for Fees and Expenses (Doc. 285-2, "Bartosz Decl.") ¶ 29. During the investigation, Plaintiffs' counsel collected and reviewed publicly available information; researched applicable case law, statutes, and regulations; conducted extensive outreach to knowledgeable stakeholders, including through both telephonic and in-person interviews; and identified representative Named Plaintiffs and suitable Next Friends. *Id.* ¶ 30.

### b.   **Commencement of Lawsuit**

On June 12, 2017, Plaintiffs, by their Next Friends and through counsel, commenced this action—which they say is the first of its kind—against the Director of the Children's Division

("CD") of the Department of Social Services ("DSS") and the Acting Director of the Department of Social Services, each in their official capacities. Doc. 1. The complaint was over 45 pages in length. As amended on July 3, 2017, the complaint alleged substantive and procedural due process violations and sought declaratory and injunctive relief regarding at least three alleged deficiencies in Defendants' policies, procedures, practices, and customs with respect to the administration of psychotropic drugs: (1) failure to maintain, and to furnish to caregivers and prescribing physicians, up-to-date medical records detailing each child's physical and mental health history; (2) failure to ensure informed consent to the administration of psychotropic medication, both at the outset and as treatment continues; and (3) failure to ensure secondary review of all outlier prescriptions by a qualified, independent child psychiatrist. Doc. 22.

### c. **Motion to Dismiss**

On August 21, 2017, Defendants filed a motion to dismiss on the grounds of failure to state a claim and on the basis of the federal abstention doctrine articulated in *Younger v. Harris*, 401 U.S. 37 (1971). Doc. 33. After the matter was fully briefed (Docs. 35, 57, 67), the Court scheduled oral argument. Doc. 76. On January 8, 2018, the Court granted in part and denied in part the motion to dismiss, concluding that: (1) the *Younger* abstention doctrine did not apply; (2) Plaintiffs stated a plausible procedural due process claim; (3) Plaintiffs stated a plausible substantive due process claim, except that claims relating to informed consent in that cause of action were dismissed without prejudice; and (4) the claim for violation of the Federal Adoption Assistance and Child Welfare Act required dismissal because the statutes at issue did not confer a private right of action. Doc. 91.

### d. **Motions Concerning Appropriate Parties**

Separately, Defendants moved to dismiss certain unknown plaintiffs on the grounds that those plaintiffs were unidentifiable. Doc. 34. Plaintiffs opposed that motion. Doc. 46. Upon learning the identities of those Named Plaintiffs, however, Defendants subsequently moved to withdraw their motion to dismiss those plaintiffs. Doc. 48.

On August 23, 2017, Plaintiffs filed a motion to appoint Next Friends for the Named Plaintiffs. Doc. 36. Defendants filed a response in partial opposition, challenging the appointment of two of the Plaintiffs' proposed Next Friends. Doc. 45. After fully briefing Defendants' motion, including through a supplemental response in opposition filed by Defendants, Doc. 59, and a sur-reply filed by Plaintiffs, Doc. 66, the parties filed stipulations agreeing to the appointment of all Next Friends. Docs. 50, 56, 61, 68. The Court appointed Next Friends for the Named Plaintiffs per the stipulations. Doc. 69.

Defendants also challenged Plaintiffs' motion to dismiss a Named Plaintiff who inadvertently had been joined to the suit. Docs. 111, 124. After that motion was fully briefed (*see* Doc. 133), the Court granted Plaintiffs' motion for dismissal of the Named Plaintiff. Doc. 168.

### e. **Class Certification and Interlocutory Appeal**

On March 16, 2018, Plaintiffs filed their motion for class certification. Doc. 113. Defendants opposed the motion, challenging Plaintiffs' arguments regarding commonality, typicality, and adequacy as to each proposed class representative, including on the basis of each minor child's trauma history. Doc. 144. On July 19, 2018, following full briefing and oral argument, the Court granted Plaintiffs' motion for class certification, certifying a class consisting of "all children in Children Division foster care custody who presently are, or in the future will be,

prescribed or administered one or more psychotropic medications while in state care." Doc. 183, p. 19.

On August 2, 2018, Defendants requested permission from the Eighth Circuit to appeal the class certification order. Doc. 192-1. Plaintiffs timely opposed Defendants' efforts to challenge class certification. Still, the Eighth Circuit granted Defendants' petition for interlocutory appeal. Doc. 195 (Order, *M.B. v. Corsi*, No. 18-8009 (8th Cir. Aug. 22, 2018)).

Thereafter, Defendants moved to stay all proceedings and deadlines in this Court pending the Eighth Circuit's ruling on their forthcoming appeal of the class certification decision. Doc. 201. Defendants argued that they would be irreparably harmed absent a stay because "the enormous amount of work that [would need to] be done to complete discovery and get ready for trial [would] be wasted if the Eighth Circuit decide[d] to decertify or narrow the proposed class," and that, in contrast, "Plaintiffs have not shown a stay will inflict irreparable harm." Doc. 202, pp. 7-8. In response, Plaintiffs' counsel identified specific examples of class members—children in Defendants' custody—who had experienced and would continue to experience direct harm as a result of Defendants' alleged policies or procedures, or lack thereof. Doc. 210. After the motion was fully briefed, and after oral argument (Doc. 223), the Court denied Defendants' motion for a stay, finding that Defendants failed to show a likelihood of success on the appeal, failed to establish that they would be irreparably harmed absent a stay, failed to overcome Plaintiffs' showing that a stay would subject Plaintiffs to a greater risk of harm, and failed to show that a stay was in the public interest. Doc. 226.

Beginning on November 1, 2018 and continuing for three months, the parties fully briefed the appeal in the Eighth Circuit from the Court's class certification decision. *M.B. v. Corsi*, No. 18-2798 (8th Cir.). Per Defendants' formal request, the case was set for oral argument. Plaintiffs'

attorneys traveled to St. Louis for the oral argument on April 18, 2019. Attorney Schuster argued the case on behalf of the Plaintiffs-Appellees.

### f. **Fact Discovery**

In the interim, discovery continued. Defendants produced approximately 1.5 million pages of documents, which Plaintiffs reviewed. Bartosz Decl. ¶ 31. Many of the pages were maintained in hard copy and produced in formats that were not easily searched. *Id.* Moreover, the productions were disorganized, duplicative, and nonsequential. *Id.* Many of the files were produced as pages spanning hundreds or thousands of pages that needed to be manually disaggregated for review. *Id.* Plaintiffs also obtained and analyzed tens of thousands of pages produced from third parties. *Id.* Plaintiffs reviewed and produced approximately 50,000 pages of documents to Defendants. *Id.* ¶ 34.

For the fifty-four interrogatories (not including subparts) that Defendants propounded, Plaintiffs' drafted approximately one-hundred pages of responses. *Id.*

Plaintiffs took 15 depositions—six 30(b)(6) depositions and 9 other fact depositions—on topics including medical records, informed consent, and secondary review of psychotropic medications. *Id.* ¶ 35. Plaintiffs also defended the depositions of three Next Friends. *Id.*

Counsel for both sides participated in dozens of meet-and-confer conference calls to address such topics as the selection of email search terms and custodians as well as what Plaintiffs describe as "numerous delays and deficiencies in Defendants' responses to Plaintiffs' discovery requests," including "Defendants' fail[ure] to timely produce . . . clearly responsive emails for one of the Named Plaintiff's case managers." *Id.* ¶ 34.

Defendants sought the Court's intervention to compel the production of notes of confidential therapy sessions conducted between Named Plaintiff A.H. and her Next Friend, her

psychotherapist, after the parties' efforts to confer on the subject were unsuccessful. Doc. 127. Upon oral argument, the Court denied Defendants' request, holding that the psychotherapist-patient privilege applied and was not waived, and that any probative value in the material sought would be outweighed by the very serious harm to the child if the material were disclosed. *Id.* Following the ruling, Defendants availed themselves of the opportunity that the Court afforded (*see id.*) to submit limited briefing further arguing the issue. Doc. 138. Defendants also concurrently filed a motion for leave to create an appellate record regarding their request to compel production of A.H.'s therapy notes. Doc. 136. Both motions were fully briefed. Docs. 148, 151, 152, 153.

The Court denied Defendants' motion to compel production of the therapy notes in full, in two parts. First, the Court denied the motion to compel production of the therapy notes, except that the Court ordered Plaintiffs to furnish for *in camera* inspection notes from three specific dates. Doc. 161. Following its *in camera* review of those documents, the Court denied Defendants' motion to compel in full. Doc. 164. The Court granted in part and denied in part Defendants' motion to create an appellate record. Doc. 160.

### g.  **Expert Discovery**

To bolster their case, Plaintiffs retained four experts in the fields of child and adolescent psychiatry and pharmaceutical sciences. Bartosz Decl. ¶ 47. Each expert produced a detailed report covering topics of informed consent, oversight of psychotropic medication, medical records, and an in-depth review of voluminous Named-Plaintiff case files. *Id.* ¶ 38. Collectively, the Plaintiffs' experts' reports totaled more than one-hundred pages. *Id.* Plaintiffs' attorneys and paralegals gathered relevant materials for the experts to review, conferred in person and by

telephone with the experts to discuss their opinions, reviewed draft reports, and prepared the accompanying productions—thousands of pages of reliance materials and communications. *Id.*

**h. Settlement Efforts**

The parties first undertook mediation efforts, in accordance with the Notice of Inclusion in the Mediation and Assessment Program ("MAP"), with Professor James Levin at the University of Missouri School of Law in Columbia, Missouri, on October 2, 2017. Doc. 3. Although Plaintiffs prepared settlement proposals and materials in anticipation of the meeting, that first mediation session ultimately was not productive. *Id.* ¶ 40.

On June 14, 2018, this Court directed the parties to participate in mediation with Jill Morris, the Director of MAP for the Western District of Missouri. Doc. 174. Thereafter, under Director Morris's guidance, through four in-person meetings in Kansas City and dozens of telephone conferences between Plaintiffs' counsel on the one hand and Defendants, DSS, and CD staff on the other, the parties engaged in extensive mediation efforts over the course of nearly a year, covering every issue raised in the Complaint. Bartosz Decl. ¶ 41. Plaintiffs also held several internal meetings to review settlement proposals and discuss strategy. *Id.* Both sides brought in subject matter experts at various points to help address some of the clinical and technical aspects of the Agreement, and Plaintiffs' counsel expended time and effort consulting with these experts. *Id.* ¶ 42. The telephonic and in-person negotiation sessions typically included one or more counsel from the Missouri Attorney General's Office and one or more counsel from DSS's General Counsel's Office as well as at least two members of the DSS and CD leadership team. *Id.* ¶ 43. The parties exchanged approximately thirty drafts of various sections of the settlement agreement. *Id.* Finally, the parties reached a comprehensive Settlement Agreement. *Id.*

On May 28, 2019, the parties notified the Court that they had reached an agreement in principle to settle the case. Doc. 270. The Settlement Agreement, which resolves the remaining substantive and procedural due process claims that Plaintiffs and class members brought under the Fourteenth Amendment of the U.S. Constitution, was executed by the parties as of June 10, 2019. Doc 280-1. The Court preliminarily approved the Settlement Agreement on July 15, 2019. Doc. 282.

The parties notified the Eighth Circuit that a settlement agreement had been reached, resulting in an order from the Eighth Circuit staying the appeal pending this Court's decision on approval of the Settlement Agreement. Order, *M.B. v. Corsi*, No. 18-2798 (8th Cir. July 9, 2019).

The Court entered an order finally approving the class action settlement in December 2019. Docs. 317, 320. On January 31, 2020, the Eighth Circuit entered judgment dismissing the appeal in light of the settlement. Doc. 324.

### i. <u>Terms of the Settlement</u>

Through the Settlement Agreement, Defendants made substantive commitments in the following areas:

- Initial and ongoing training of case management staff and resource providers;

- Medication monitoring, including regular mental health assessments, medical examinations, and concurrent non-pharmacological treatment for Class members;

- Medical records, including system and reporting capabilities and commitments to comply with CD policy on the collection and distribution of medical and mental health records;

- Secondary review of designated prescriptions of psychotropic medications to Class members by a qualified, independent child and adolescent psychiatrist to ensure safety and appropriateness;

- Informed consent and youth assent to the administration of psychotropic medications to Class members, including specific policies and processes governing the provision of consent and assent and periodic review of consent;

- Establishment of a Psychotropic Medication Advisory Committee to provide professional and technical consultation and policy advice to DSS, CD, and the MO HealthNet Division of DSS on issues related to psychotropic medication; and

- Establishment of excessive dosage guidelines based on advice from and consultation with medical and clinical experts.

Doc. 280-1 (Settlement Agreement). Plaintiffs' counsel states that the Settlement Agreement "fully address[es] the concerns set forth in the Amended Complaint." Bartosz Decl. ¶ 44.

## III.  **ANALYSIS**

The Court may allow "the prevailing party" in certain civil rights actions to recover "a reasonable attorney's fee . . . ." 42 U.S.C. § 1988. A litigant is a "prevailing party" for attorneys' fees purposes "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit . . . ." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also Jenkins by Jenkins v. State of Mo.*, 127 F.3d 709, 714 (8th Cir. 1997) ("It is generally true that status as a prevailing party is determined on the outcome of the case as a whole, rather than by piecemeal assessment of how a party fares on each motion along the way."). Because Plaintiffs have prevailed on significant issues in this litigation they are entitled to attorneys' fees.

Defendants argue that the amount of the fees and expenses that Plaintiffs seek is unreasonable[1] The Court therefore turns to the issue of reasonableness.

### a.  **Fees**

The basis for any fee award under § 1988 is the lodestar calculation, the product of a reasonable hourly rate and the number of hours reasonably expended on the litigation. *See Hensley*, 461 U.S. at 433 ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a

---

[1] Defendants reserved their right to contest the amount of the fees. Settlement Agreement, Section II.P.

reasonable hourly rate."); *Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005) ("The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rates."). Thus, to determine whether the fees that Plaintiffs seek are reasonable, the Court must determine (1) a reasonable rate for the attorneys' time and (2) the number of hours reasonably expended on the litigation.

### 1. Reasonable Hourly Rates

#### A. Applicable Law

In the Eighth Circuit, "a reasonable hourly rate generally means the ordinary fee for similar work in the community." *Little Rock Sch. Dist. v. State Ark. Dep't of Educ.*, 674 F.3d 990, 997 (8th Cir. 2012) (quotation marks and citations omitted). The goal of the lodestar method is to "roughly approximate[] the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010).

The burden of establishing the appropriate rate rests on the fee applicant. *See Blum v. Stenson*, 465 U.S. 886, 895 n.11, 104 S. Ct. 1541, 1547 (1984) ("To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence— in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.").

#### B. The Rates Proposed

The parties dispute whether Plaintiffs' proposed rates are in keeping with local rates. The rates that Plaintiffs request and those that Defendants propose are shown below, from highest to lowest:

| Attorneys | Plaintiffs' Requested Rate | Defendants' Proposed Rate |
|---|---|---|
| Samantha Bartosz | $500 | $382 |
| Bill Grimm | $500 | $382 |
| Scott T. Schutte | $500 | $382 |
| Leecia Welch | $450 | $338 |
| John Ammann | $400 | $300 |
| Stephen Dixon | $375 | $281 |
| Elizabeth Gretter | $375 | $281 |
| Poonam Juneja | $375 | $281 |
| Aaron Finch | $325 | $244 |
| Catherine Frizell | $325 | $244 |
| Jonathan King | $325 | $244 |
| Courtney J. McCormick | $325 | $244 |
| Stephanie Schuster | $325 | $244 |
| Daniele Girard | $300 | $225 |
| Freya Pitts | $300 | $225 |
| Danielle Rosenthal | $300 | $225 |
| Ning He | $275 | $206 |
| Amanda Grill | $225 | $169 |
| Erin McGuinness | $225 | $169 |
| Jacqueline Stolzenberg | $225 | $169 |
| **Paralegals** | **Plaintiffs' Requested Rate** | **Defendants' Proposed Rate** |
| Genevieve Caffrey | $150 | $134 |
| Hailey Cherepon | $150 | $134 |
| Meghan Kacsmar | $150 | $134 |
| Kira Setren | $150 | $134 |

In short, Plaintiffs seek rates between $400 and $500 per hour for their most senior litigators, rates between $225 and $375 per hour for associates and staff attorneys, and the rate of $150 per hour for paralegals. Defendants seek to cap the attorney rates at $382 per hour and to reduce the other rates correspondingly.

## C. Comparable Rates and Other Evidence

In support of their position that their proposed rates are reasonable, Plaintiffs cite the *Missouri Lawyers Weekly* publication regarding billing rates. In August 2018, the publication

showed that the median rate for partners across all practice areas was $440 per hour in Kansas City and $380 per hour in St. Louis, with the highest rate for partners at $865 in Kansas City and $660 in St. Louis.  Doc. 285-4.  For civil rights and class action litigation specifically, the rates listed in the publication for partners range from $350 to $865 in Kansas City.  *Id.*  Of course, a partner might have just ten years of experience, while many of the plaintiffs' attorneys in this case have more than 30 years of experience.

For associates, the *Missouri Lawyers Weekly* study shows that the median rate across all practice areas was $333 per hour in Kansas City and $225 in St. Louis, with the highest rate at $475 per hour in Kansas City and $300 in St. Louis.  *Id.*  For civil rights and class action litigation, the rates listed in the publication for associates range from $290 to $475 in Kansas City.  *Id.*  The 2019 publication concerning rates shows that attorneys practicing "public interest class action" charged between $320 and $770 per hour, depending on their experience, and attorneys practicing class action/MDL charge rates ranging from $225 to $495.  Doc. 299-2 (Supplemental Declaration of John J. Ammann), Ex. A.  The median rate for attorneys (not broken down by partners and associates) for the entire state is $318.  Doc. 285-4.

For support staff, the median rate in 2018 was $120 throughout the state, with the highest rate at $275.  Doc. 285-4.  Notably, however, the broad term "support staff" includes not just paralegals, but also administrative or legal assistants.  Rates listed for paralegals who work on class action or civil rights cases specifically are between $215 and $275.  *Id.*

Plaintiffs also submit declarations of local attorneys attesting that their proposed rates are within the range of fees that local attorneys charge for comparable civil rights class action litigation.  John M. Kilroy, Jr., an attorney with more than forty years of experience, including in numerous class actions, who retired from Polsinelli, P.C. in 2019, states that he has "been involved

in many class action lawsuits . . . and in fairness hearings on reasonable rates charged by other lawyers in Kansas City and in other jurisdictions around the country," and also has "been involved in setting the rates charged by lawyers" at the two law firms at which he worked. Kilroy Declaration ¶¶ 2-6. Mr. Kilroy states that "[t]he standard hourly rate for lawyers and paralegals at Polsinelli, P.C. of similar years of experience is higher than the rates sought by plaintiffs." *Id.* ¶ 10. His own rate prior to his 2018 retirement was $585 per hour. *Id.* Mr. Kilroy further states that he "believe[s] the rates submitted by lawyers and paralegals with St. Louis Legal Clinic, the National Center for Youth Law, Children's Rights and Morgan Lewis & Bockius to be reasonable and consistent with standard rates charged by lawyers and paralegals of similar age and experience in the Kansas City area." *Id.* ¶ 11.

Similarly, Thomas Kennedy, an attorney with more than forty years of experience in civil rights, education rights, and public benefits cases in both Missouri and Illinois, states that his firm charges between $400 and $450 per hour for his time, between $300 and $350 for a partner with seven years of experience, $200 per hour for associates with one year of experience, and $125 to $150 for paralegals. His firm charges higher rates in contingent-fee cases because the attorney assumes the risk (as Plaintiffs' counsel did here) that he will not be compensated if the suit is unsuccessful. Mr. Kennedy's rates also, he says, are lower than those charged by Missouri lawyers because rates in Southern Illinois, where half of his firm's work is done, are lower than those in Missouri.

Plaintiffs also point out that courts have approved comparable or even higher rates in class actions and civil rights suits. *See Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198 (W.D. Mo. Mar. 14, 2017) (finding "average hourly fees" for class counsel that ranged from $261 to $897 to be reasonable because, although high, they were "not dissimilar to those hourly rates charged in

the Kansas City area" and were "indicative of counsel's extensive national experience in class action lawsuits"), *aff'd*, 896 F.3d 900 (8th Cir. 2018); *Albright v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*, No. 11CV01691 AGF, 2013 WL 4855304, at **8-9 (E.D. Mo. Sept. 11, 2013) (setting rates in class action at $500 per hour for each of the three lead counsel, $245 to $395 per hour for other attorneys, and $150 per hour for paralegals); *D.L. v. St. Louis City Pub. Sch. Dist.*, No. 17 CV 1773 RWS, 2019 WL 1359282, at *2 (E.D. Mo. Mar. 26, 2019) (approving rates of $300 and $400 where plaintiff had submitted evidence "demonstrating billing rates of $200-$350 for 'attorneys' or 'associates' practicing employment or civil rights law in the St. Louis metropolitan area and billing rates of $350-$500 for 'partners' practicing employment or civil rights law in the St. Louis metropolitan area") (citation omitted)).

Defendants have not submitted any declarations by local attorneys who deem Plaintiffs' fees unreasonably high. *Cf. Trinity Lutheran Church of Columbia, Inc. v. Comer*, No. 2:13-cv-4022-NKL, 2018 U.S. Dist. LEXIS 190824, at *15 (W.D. Mo. Nov. 7, 2018) (discussing declaration submitted by counsel for the defendants who had argued before the U.S. Supreme Court showing that his rates in private practice were substantially lower than those proposed by plaintiffs' counsel).

Defendants' argument that the Court should use rates from 2017 to determine the appropriate rates for Plaintiffs' counsel in this case because most of the litigation was conducted in 2017 ignores the facts and the law. First, the parties were litigating—including by briefing and arguing the class certification motion and then the appeal from the class certification decision, conducting discovery, and taking depositions—and actively negotiating the very complex settlement between 2017 and 2019. Indeed, the active litigation and negotiation post-dating 2017 is evidenced by the stark difference in hours billed before and after December 31, 2017. Plaintiffs

seek compensation for 3,116.0 hours of work in 2016 and 2017 and, in contrast, 8,301.6 hours of work in 2018 and 2019.

Moreover, the Supreme Court has noted that "compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed," *Missouri v. Jenkins*, 491 U.S. 274, 283 (1989), and paying current rates compensates for this different in dollar value. *See id.* at 283-84 ("We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute."); *Tussey v. ABB Inc.*, No. 06-CV-04305-NKL, 2015 WL 8485265, at *7 (W.D. Mo. Dec. 9, 2015) ("The Supreme Court has recognized that where there is a delay in an award of fees, '[c]ompensation for this delay is generally made "either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value."'" (quoting *Perdue*, 559 U.S. at 556)), *vacated and remanded on other grounds*, 850 F.3d 951 (8th Cir. 2017).

Not only do Defendants ask for application of an older set of rates in this case, but they also ask the Court "to use the *average* rates of Missouri attorneys to cap Plaintiffs' counsels' maximum hourly rate." Doc. 298, pp. 5-6 (emphasis added). Defendants do not explain why the average rate—which encompasses the rates of those with extensive experience and specialized knowledge and those who are fresh law school graduates—should be the ceiling for multiple attorneys who have more than 30 years of experience and, as discussed further below, specialized knowledge concerning children's and youth law, the complicated field of psychotropic drugs, and complex class action litigation. Defendants' argument for application of the average rate as a ceiling is contrary to the law on the subject. *See Hendrickson v. Branstad*, 934 F.2d 158, 164 (8th

Cir. 1991) ("In determining whether a fee is reasonable, 'the special skill and experience of counsel should be reflected in the reasonableness of the hourly rates.'") (citation omitted). The Court therefore will not cap rates at the "average" Missouri rate, but will consider each attorney's rate in light of his or her experience and Missouri fees for civil rights and class action litigation.

### D. Challenges in the Case Requiring Special Knowledge, Expertise, and Additional Resources

Plaintiffs' counsel argue that they would have been justified in seeking out-of-state, specialist rates for their work in this litigation. Determination of the appropriate rate by reference to "a national market or a market for a particular legal specialization" is permitted where local community rates would "not be 'sufficient to attract experienced counsel' in a specialized legal field . . . ." *Perdue*, 559 U.S. at 551. However, if "a local lawyer, adequately versed in civil rights litigation, would have sufficed to attain the result that [the party's attorney] received while charging the ordinary [local] rate," or if the party's attorney "did not display the excellence, or achieve the time savings, implied by [his] higher rate," the Court would be justified in basing a fee award on local market rates. *Id.*

While acknowledging that Missouri counsel was involved in the litigation, Plaintiffs argue that counsel specializing in representing children in the custody of state child welfare systems and with knowledge of psychotropic drugs, including its effects on children and oversight of the administration of the drugs, was critical. Local counsel, Attorney John Ammann of the St. Louis University School of Law, has attested that the law school had neither the resources nor the expertise to undertake this litigation on its own: specialized co-counsel was necessary. Doc. 285-4 (Declaration of John J. Ammann ("Ammann Decl.")) ¶¶ 9-10.

Mr. Ammann's co-counsel included attorneys from Children's Rights ("CR"), based in New York, New York, and the National Center for Youth Law ("NCYL"), based in Oakland,

California, each a nonprofit organization recognized as having a wealth of experience representing children in the custody of state child welfare systems. *See* Bartosz Decl. ¶¶ 2-4; Doc. 285-3 (Declaration of Leecia Welch in Support of Plaintiffs' Motion for Fees and Expenses ("Welch Decl.")) ¶¶ 2-4. In granting Plaintiffs' motion for class certification, the Court stated that "Plaintiffs' counsel . . . are qualified and experienced, including with respect to issues surrounding children's rights and class actions." Doc. 183, p. 17. Both organizations have successfully prosecuted numerous federal class action suits aimed at large-scale reform to ensure that child welfare systems are properly serving the needs of children in their care. CR and NCYL also have been among the leading advocates in the country focused on ensuring that children in foster care who are prescribed psychotropic medications are treated safely and are protected from the harmful effects of overmedication. Welch Decl. ¶¶ 4, 9-10, 30; Bartosz Decl. ¶ 3. CR has resolved multiple cases through settlements that directly address, among other issues, the oversight of psychotropic medications for foster youth. Bartosz Decl. ¶¶ 3-4. NCYL has led efforts to enact numerous laws increasing oversight in this area. Welch Decl. ¶ 9. NCYL also has used class action litigation to enforce children's rights regarding oversight of psychotropic medications in other custodial settings, including in immigration detention. *See Flores v. Sessions*, Case No. 85-CV-4544 (C.D. Cal. July 30, 2018), Doc. 470 (Order re: Plaintiffs' Motion to Enforce Class Action Settlement); *Lucas R. v. Azar*, 18-cv-5741 (C.D. Cal. Sept. 7, 2018), Doc. 81 (First Amended Complaint).

Local counsel, Mr. Ammann, states that "[t]he level of expertise that the attorneys from Children's Rights and the National Center for Youth Law have in issues involving children in foster care is unmatched in the country." Amman Decl. ¶ 8. He further states that "[n]one of the attorneys in our Clinic, including me, had the expertise in psychotropic medication to have undertaken this action without assistance from the other law offices." *Id.* ¶ 10. Similarly, counsel

from the law firm of Morgan Lewis stated that he "would not have felt comfortable prosecuting a case of this complexity without the subject matter expertise of [his] co-counsel from [CR] and [NCYL] as well as the expertise of John Ammann from the St. Louis University School of Law." Schutte Decl. ¶ 11.

Mr. Kennedy, the attorney unaffiliated with this case who has more than forty years of experience in civil rights, education rights, and public benefits cases in Missouri, attested that he is "aware of no law office in Missouri[] which could have brought this action without partnering with attorneys who have substantial experience in representing children in foster care and addressing systemic issues with child welfare systems." Kennedy Decl. ¶ 10.

Despite their expertise, the rates that the attorneys from each of these organizations propose to charge are lower than the rates they could reasonably claim in their home markets. *See, e.g.*, Welch Decl. ¶¶ 25-29 (noting that in 2014, a federal court approved the rate of $695 per hour for a NCYL attorney with 29 years of experience and $450 for an attorney with 6 years of experience, and collecting information regarding reasonable market rates in the San Francisco Bay Area); Bartosz Decl. ¶¶ 27-28 (noting that the National Law Journal's survey of billing rates shows national and New York City rates ranging from an average of $295 to $1,320 for partners and an average of between $200 and $1,025 for associates). Defendants' argument that Plaintiffs' counsel should not be permitted to "recruit" Missouri clients and then demand out-of-state rates (Doc. 298, p. 5) is not logical because Plaintiffs are not demanding out-of-state rates.

Because of the limited time and monetary resources at the disposal of the law clinic and nonprofit counsel and the burdens of class action litigation, Plaintiffs' counsel made efforts to partner with a private law firm capable of devoting additional time and resources to successfully litigate the case. Welch Decl. ¶ 31; Ammann Decl. ¶ 9. However, Plaintiffs' efforts to secure

counsel in Missouri or nationally that would take this case on either a *pro bono* or contingency basis were unavailing. Bartosz Decl. ¶ 53; Welch Decl. ¶ 31; *see also* Kennedy Decl. ¶¶ 10-11 (attesting that his firm was not available for this litigation and noting that the high demands for resources and time in this case, including expert costs that could not be recovered, made it highly undesirable from the perspective of private, for-profit law firms); *cf. Trinity Lutheran*, 2018 U.S. Dist. LEXIS 190824, at *9 (rejecting argument that plaintiffs' counsel were entitled to national, rather than local, rates where there was no suggestion that plaintiffs tried and failed to obtain local counsel). Ultimately, Plaintiffs retained the national firm of Morgan, Lewis & Bockius, through a partner based in Chicago, Illinois, as co-counsel. The Morgan Lewis attorneys propose rates for their time that are substantially lower than the rates they charge private clients. Declaration of Scott T. Schutte (Doc. 285-5) ¶¶ 17, 18.[2]

In light of the uniquely technical and complex issues involving science, policy and governance, civil rights law, and class action lawsuits that this case involved, it was not only reasonable, but appropriate for Plaintiffs to utilize counsel with specialized experience and knowledge in these areas, and it therefore is appropriate for that counsel to be compensated in accordance with the value they brought to the case. *See Stallsworth v. Staff Mgmt. SMX, LLC*, No. 17-CV-4178-NKL, 2018 WL 2125952, at *3 (W.D. Mo. May 8, 2018) ("The rate charged should also take into account the experience, skill, and expertise of the attorneys as well as the complexity, significance, and undesirability of the case"). Counsel without adequate resources, expertise, and experience would not have been able to reach the comprehensive settlement that Plaintiffs' counsel

---

[2] Retaining Morgan Lewis also came with some cost-savings, as the law firm provided infrastructure that Plaintiffs' counsel used to house, organize, and review the massive document productions in this case. Schutte Decl. ¶ 14. Morgan Lewis is not seeking reimbursement for those costs. *Id.*

reached here—a settlement that will improve the processes by which children in foster care are administered psychotropic drugs, reducing the risk of inappropriate and excessive medication. Thus, although the Court's rulings regarding rates will be in keeping with Missouri rates, they will take into account any unique experience, knowledge, or specialization that a given attorney brought to bear on this case.

### E. Rulings on Attorneys' and Paralegals' Reasonable Rates

Attorney Samantha Bartosz has more than 30 years of litigation experience. Currently CR's Deputy Director of Litigation Strategy, her experience includes serving as General Counsel of the Office of Administration within the Executive Office of the President and as a partner in the Chicago litigation firm Cahill, Christian & Kunkle Ltd. She has worked at CR, where her practice focuses exclusively on child welfare cases, for more than 16 years. She has served as counsel in a number of class actions alleging constitutional and federal statutory violations. Given her experience and expertise, and in light of the information presented regarding local rates in civil rights and class action matters—particularly the fact that partners working on class action suits I Missouri command over $550 an hour, and other federal courts in Missouri have awarded fees of $500 in class actions (*see Pollard*, 320 F.R.D. at 198; *Albright*, 2013 WL 4855304, at *8)—the Court finds Attorney Bartosz's proposed rate of $500 reasonable. *See Trinity Lutheran* (adopting Missouri Attorney General's proposed rate of $450 for opposing First Amendment litigator with 21 years of experience).

Attorney Bill Grimm was part of the "core team" from NCYL to work on this case. He was admitted to practice law in 1975, and thereafter worked for the Maryland Legal Aid Bureau, where he created a specialized child advocacy unit and served as director of the statewide program. He joined NCYL in 1988. He represented foster children in both individual juvenile court dependency proceedings and child welfare class action litigation, in federal district and appellate

courts. He was recognized as one of the preeminent children's law attorneys in the country. He was a leading advocate focused on ensuring that children in foster care are safely prescribed psychotropic medication and protected from the harmful effects of overmedication. He led multiple projects relating to psychotropic medication policy, resulting in the State of California enacting five NCYL-sponsored bills. In 2019, he was awarded the Mark Hardin Award by the American Bar Association Center on Children and The Law. In light of his depth of experience and expertise, Mr. Grimm's proposed rate of $500 is eminently reasonable.

Attorney Scott T. Schutte has been practicing law for nearly 25 years. After completing a federal district court clerkship, he worked at Jenner & Block and then Howrey LLP before joining Morgan Lewis in 2011. He has spent much of his legal career handling class actions and other complex litigation. He frequently lectures on issues relating to Federal Rule of Civil Procedure 23 and state law analogs. He and two of his partners co-authored the American Bar Association's "Practitioner's Guide to Class Actions." Given his experience and expertise, but in light of the fact that Mr. Schutte is not as experienced as the two most senior attorneys in this case, the Court finds that a rate of $475—which is markedly lower than his standard rate of $935—reasonable.

Attorney Leecia Welch is the Senior Director of Child Welfare and Legal Advocacy at NCYL. She graduated from law school in 1996. Prior to joining NCYL in 2004, she worked as a senior associate at Morrison & Foerster LLP in San Francisco, California, and as an associate at Perkins Coie in Seattle, Washington. She has spent most of her career representing children and youth in cases enforcing their statutory and constitutional rights. She has been lead or co-counsel in multiple federal court class actions. She has received court-approved legal fees in a class action filed in the United States District Court for the Western District of Washington at the rate of $595. She is part of the "core team" at NCYL to have worked on this case. In light of her extensive

experience and expertise in children's law and class actions, and in view of Missouri rates for partners in class action and civil rights litigation, Ms. Welch's proposed rate of $450—which is significantly lower than the $595 court-approved rate at which she was compensated in another case—is reasonable.

Attorney John Ammann has practiced litigation for more than 30 years. He completed two state appellate court clerkships after law school before working as a staff attorney with Land of Lincoln Legal Assistance Foundation in Illinois. He worked as a supervisor for 25 years and served as Director for 17 years in the Legal Clinic at Saint Louis University School of Law, which has five full-time attorney faculty members and 200 law students each year. Until his recent retirement, he served as the McDonnell Professor of Justice in America Society, a chaired full professorship, at the university. He has been co-counsel for plaintiffs in numerous civil rights cases, most of which sought injunctive relief, in both federal and state court. Given his lengthy civil litigation experience and qualifications, his proposed rate of $400, which is around the median rate for St. Louis partners, and lower than the median rate for Kansas City partners, is reasonable.

Attorney Stephen Dixon has practiced law for over 30 years, including more than ten years with CR. He has worked as an adjunct professor, having co-founded the juvenile law clinic at the Louisiana State University Law Center. However, his efforts in this case were directed primarily at recruiting, retaining, and maintaining relationships with the Named Plaintiffs and their Next Friends. As such, although his years of experience would suggest a higher rate, Plaintiffs have proposed a rate of $375 per hour for Mr. Dixon's time. Although Mr. Dixon's efforts may have been important to Plaintiffs' success, given that his work involved more client relations than pure litigation, the Court finds that $300 is an appropriate hourly rate for his time. *See Gonzales v. United States*, No. 00-CV-60 WPJ/RS ACE, 2006 WL 8444388, at *13 (D.N.M. Mar. 13, 2006)

(reducing attorney's rate where "she was primarily doing client development work"); *Trinity Lutheran*, 2018 U.S. Dist. LEXIS 190824, at *22 (finding $300 rate appropriate for attorney who focused principally on public relations matters rather than litigation).

Attorney Elizabeth Gretter has practiced litigation for over ten years, first at Bingham McCutchen LLP in New York, New York, and then, since 2011, with CR. At CR, she has litigated federal civil rights cases and negotiated multiple settlements and worked with public officials to design, monitor, and measure systemic reform. Given her experience and expertise, and prevailing rates for civil rights attorneys in Missouri, the Court finds a rate of $350 reasonable for Ms. Gretter's time.

Attorney Poonam Juneja is part of the "core team" from NCYL to work on this case. Including federal district court and appellate clerkships, she has been practicing law for more than ten years, focusing on class action litigation. Prior to joining NCYL, she worked at Public Counsel and the Southern Poverty Law Center. Ms. Juneja received court-approved legal fees in a class action filed in the United States District Court for the Western District of Washington at the rate of $425. Given Ms. Juneja's experience and expertise, and rates charged by civil rights and class action attorneys in Missouri, the Court finds that the rate of $350—which is lower than the court-approved $425 rate she received in another case—is reasonable for Ms. Juneja's time.

Attorney Stephanie Schuster has been practicing law for eight years. Since the filing of the motion for attorneys' fees, Ms. Schuster has been promoted to partner in Morgan Lewis's Appellate Practice Group. Her practice covers complex appellate, class action and regulatory matters. She has worked on appeals in the Second, Fourth, Fifth, Eighth, Ninth, and Eleventh Circuits. Her primary role in this litigation was to work on Defendants' interlocutory appeal of the Court's class certification ruling. She argued the appeal in this case before the Eighth Circuit.

Given her appellate practice expertise and the fact that her role was limited to appellate work, her proposed rate of $325—which is far lower than her standard rate of $700 per hour—is reasonable.

Attorney Aaron Finch has practiced law for more than seven years with CR, litigating federal civil rights class actions and negotiating and monitoring settlements. Given his experience and specialization, and the fact that the median rate across all practice areas in Kansas City was $333 per hour and rates in civil rights and class action litigation range from $225 to $475 per associate, the Court finds that a rate of $300 is reasonable for Mr. Finch's time.

Attorney Catherine Frizell also has been practicing law for more than seven years, including more than six years as a staff attorney for the Legal Aid Society in Brooklyn, where she has represented children and young adults in family court proceedings and monitored agency compliance with court orders. In light of her experience and specialization in law relating to children and youth, but considering the range of associates' rates in civil rights and class action matters, the Court finds that a rate of $300 is reasonable for Ms. Frizell's time.

Attorney Jonathan King has practiced law for more than six years, with five years of experience at the New York office of Venable LLP. Mr. King also has a Master's Degree in Childhood Education. He has worked at Children's Rights since 2018. In light of his years of experience in legal practice and his special knowledge of children's issues, the Court finds that a rate of $300 is reasonable for Mr. King's time.

Immediately after attorney Daniele Girard graduated from law school in 1989, she practiced law at Cravath, Swaine & Moore LLP in New York, New York. She then worked as a staff attorney at North Carolina Prisoner Legal Services, Inc., where she litigated class action and civil rights claims. Since 2016, she has worked as a staff attorney with CR. Because she did not actively practice law for several years, Plaintiffs have reduced her rate relative to her years since

graduation from law school. In light of Ms. Girard's qualifications and prevailing rates in Missouri, the Court finds Ms. Girard's proposed rate of $300 to be reasonable.

Attorney Freya Pitts is part of the "core team" from NCYL to have worked on this case. She began her legal career clerking for federal district and appellate court judges. She has been practicing law since for more than six years, focusing on class action litigation. Prior to joining NCYL, she worked at Disability Rights Advocates, where she sought to advance the rights of children and youth with disabilities through impact litigation. Given her experience and expertise, her proposed rate of $300 is reasonable.

Attorney Danielle Rosenthal completed federal district court and appellate clerkships following her 2013 graduation before practicing appellate and trial litigation in Washington, D.C., for three years. Since she joined CR in 2018, she has worked on investigations and class actions on behalf of foster-care children. Given her experience, the Court finds Ms. Rosenthal's proposed rate of $300 reasonable.

Attorney Courtney J. McCormick has practiced law for nine years. She practices primarily in Morgan Lewis's toxic tort defense practice. Because her role in this litigation involved primarily document review and deposition preparation, the Court finds that a rate of $275—which is lower than the $375 rate she ordinarily commands, as well as the $325 rate Plaintiffs propose—is reasonable for Ms. McCormick's time.

Attorney Ning He graduated from law school in 2015. He practices primarily in Morgan Lewis's Securities Enforcement and Litigation Group, managing complex government investigations. He was the lead Morgan Lewis associate in this litigation. Given his experience and in light of prevailing rates for Missouri civil rights and class actions, the Court finds that a rate

of $250—which is significantly lower than his standard rate of $550—is reasonable for Mr. He's time.

Attorney Erin McGuinness graduated from law school in 2012. She also has a Master's Degree in Public Administration. Prior to joining CR in 2016, she worked as a staff attorney for the Frank H. Hiscock Legal Aid Society in Syracuse, New York, and also worked in private practice. Because Plaintiffs have already reduced her proposed rate in light of the fact that, although she uses her skills in active litigation, she works principally as a senior policy analyst, and in light of her legal experience, her proposed rate of $225 is reasonable.

Attorney Amanda Grill has been practicing law since 2017, when she joined NCYL. As a law student, she participated in the Child Advocacy Law Clinic, working as guardian ad litem for parents and youth in Child Protective Services cases. Before her legal career, she worked as a high school teacher through Teach for America. Because Ms. Grill's legal experience is not extensive, the Court reduces her rate to $200.

Attorney Jacqueline Stolzenberg has worked at NCYL since her 2018 graduation. In law school, she was a Bergstrom Child Welfare Law Fellow and participated in several clinics focused on protecting the rights of children and families. Although Ms. Stolzenberg has some experience in children's law, because she has practiced law for less than two years, the Court reduces her rate to $200.

Because The 2018 *Missouri Lawyers Weekly* survey concerning billing rates shows that paralegals who work on class action or civil rights cases specifically receive between $215 and $275 and hour, and because the median rate of $120 for support staff in Missouri includes not only paralegals but other types of support staff that may be less skilled, the Court finds that Plaintiffs' proposed rate of $150 for each paralegal is reasonable.

The table below shows the Court's rulings concerning the rates for each biller:

| Name | Law School Grad. Year | Requested Hourly Rate | Rates Set by Court |
|---|---|---|---|
| Samantha Bartosz | 1986 | $500 | $500.00 |
| Bill Grimm | 1975 | $500 | $500.00 |
| Scott T. Schutte | 1995 | $500 | $475.00 |
| Leecia Welch | 1996 | $450 | $450.00 |
| John Ammann | 1984 | $400 | $400.00 |
| Elizabeth Gretter | 2009 | $375 | $350.00 |
| Poonam Juneja | 2009 | $375 | $350.00 |
| Stephanie Schuster | 2011 | $325 | $325.00 |
| Stephen Dixon | 1987 | $375 | $300.00 |
| Aaron Finch | 2012 | $325 | $300.00 |
| Catherine Frizell | 2012 | $325 | $300.00 |
| Jonathan King | 2012 | $325 | $300.00 |
| Daniele Gerard | 1990 | $300 | $300.00 |
| Danielle Rosenthal | 2013 | $300 | $300.00 |
| Freya Pitts | 2013 | $300 | $300.00 |
| Courtney J. McCormick | 2010 | $325 | $275.00 |
| Ning He | 2015 | $275 | $250.00 |
| Erin McGuinness | 2012 | $225 | $225.00 |
| Amanda Grill | 2017 | $225 | $200.00 |
| Jacqueline Stolzenberg | 2018 | $225 | $200.00 |
| Genevieve Caffrey | Paralegal | $150 | $150.00 |
| Hailey Cherepon | Paralegal | $150 | $150.00 |
| Meghan Kacsmar | Paralegal | $150 | $150.00 |
| Kira Setren | Paralegal | $150 | $150.00 |

## 2. Whether the Hours Expended Were Reasonable

The Court next must review the hours expended by the attorneys to ensure that they are reasonable. "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed." *Hensley*, 461 U.S. at 433. Inadequate documentation requires reduction of the fee award. *Id.* Furthermore, the Court "should exclude from this initial fee calculation hours that were not 'reasonably expended.' Cases may be overstaffed, and the skill and experience of lawyers vary widely." *Id.*, at 434 (citation omitted).

"Billing judgment" is just as important here as it is in the private sector. *Id.* (stating movant must make "a good faith effort to exclude from [the] fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission") *Hensley*, 461 U.S. at 434. "Hours that are not properly billed to one's client also are not properly billed to one's *adversary* pursuant to statutory authority." *Id.*

Here, Plaintiffs have made several efforts to ensure that the time for which they seek compensation is neither redundant nor unreasonable. They engaged outside consultant Sterling Analytics, at their own expense, to assess and audit the fees they billed in order to try to submit "only those fees and costs that would be considered reasonable in accordance with the Model Rules of Professional Conduct, ABA Formal Opinions, and judicial decisions from the state of Missouri and the Eighth Circuit." Declaration of Sterling Analytics, Doc. 285-1 ¶ 1.

Even prior to submitting time and expense slips to Sterling, Plaintiffs' attorneys "removed a significant number of hours and expenses from their slips based on their own professional knowledge and sound judgment regarding a reasonable fee submission and billing practices." *Id.* ¶ 4. CR removed over 2,500 hours, amounting to $616,341 in billing entries, from its time and travel slips. *Id.* For example, Attorney Frizell reviewed a class certification memo drafted by an

intern, but the intern's time has not been billed.  Doc. 285-1, p. 46.  Attorney Amman removed entries for time he spent on regular team phone calls to reduce overstaffing concerns.  NCYL did not bill for several timekeepers and reduced its timeslips by approximately 275 hours.

Plaintiffs' counsel also encouraged paralegals to do work that even a lower-level attorney might have been asked to complete, such as cite-checking drafting of purely administrative filings, such as motions for extensions, and even research.

Because Plaintiffs did not know if they would be compensated for their efforts in this case, they had an incentive to be efficient.  *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees.  The payoff is too uncertain, as to both the result and the amount of the fee.  It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning.  By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker."); *Tussey v. ABB, Inc.*, Case No. 06-4305-NKL, 2019 WL 3859763, at *5 (W.D. Mo. Aug. 16, 2019) ("Class Counsel brought this case without guarantee of reimbursement or recovery, so they had a strong incentive to keep costs to a reasonable level, and they did so.").

Still, Defendants raise multiple issues in arguing for a reduction in the hours.  The Court considers these arguments below.

### A.  The Number of Attorneys

Defendants argue that Plaintiffs' hours should be reduced because they seek compensation for twenty attorneys from four organizations, which "reflects significant overstaffing, inefficiency and redundancy of effort."  Doc. 298, p. 7.  However, after Defendants' counsel suggested at oral argument that Plaintiffs had employed far more attorneys to work on this case than had Defendants,

30

Defendants acknowledged in a supplemental response that more than 30 attorneys worked on this matter in some capacity on behalf of one or more of the Defendants. Doc. 310. Defendants argue that that number was inflated because of turnover at the office, that most of their attorneys participated to only a "limited" extent, and that only four attorneys "actively" worked on this case at a time. *Id.* However, the fact that Defendants had five "temporary document review attorneys," five other Assistant or Deputy Attorneys General who were involved with depositions, discovery disputes, answering the complaint, and details of the settlement agreement, and eleven additional attorneys who served as representatives and "subject matter experts" for the defendants demonstrates that this case was sufficiently complicated and time-intensive as to warrant the participation of numerous attorneys, including several who were "experts" in the relevant issues and fields.

Nonetheless, while staffing a case with multiple attorneys across multiple organizations is not unreasonable, it necessarily carries inefficiencies that should be addressed through the exercise of billing judgment. One of the natural consequences of so many lawyers working on a single case is a large volume of times entries for coordination between and consultation among counsel. Plaintiffs conducted team teleconferences, including attorneys from each of the organizations representing Plaintiffs, weekly. Defendants' complain that these meetings are an example of Plaintiffs' spending "excessive" hours discussing case status and strategy.

Plaintiffs' counsel also have billed time spent preparing attorney engagement agreements and co-counsel agreements. *See, e.g.*, Doc. 285-2, p. 52; Doc. 285-3, p. 42. New attorneys brought into the case spent time getting up to speed on the facts. *See, e.g.,* Doc. 285-3, p. 42 (multiple time entries discussing the review of background materials); Doc. 285-5, p. 10 (same).

Because of these inefficiencies inherent in cases that are staffed by multiple attorneys from multiple organizations—inefficiencies reflected in the time entries—the Court applies a 10% reduction to the hours (outside of time spent traveling) of the attorneys alone.[3]  *See Quigley v. Winter*, 598 F.3d 938, 958–59 (8th Cir. 2010) (reducing hours by one third for "duplicative work, in part caused by transitions in the attorneys of record"); *Albright v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*, No. 11CV01691 AGF, 2013 WL 4855304, at *4 (E.D. Mo. Sept. 11, 2013) (reducing hours "to account for the inefficiencies engendered by the involvement of three law firms in the case").

### B.  Attorney Stephen Dixon's Time Entries

Defendants object to being billed for the 378.1 hours, including approximately 80 hours of travel time, that Attorney Dixon billed to this matter, which time largely was spent recruiting, retaining, and maintaining Named-Plaintiff and Next-Friend relationships.

Plaintiffs reply that Attorney Dixon's work was "vital," ranging from "(a) initially being retained by the Named Plaintiffs and their Next Friends and capturing the facts surrounding their experiences, (b) countering legal challenges by Defendants to the adequacy of the Named Plaintiffs or Next Friends to appear in this litigation on behalf of the class, (c) addressing Defendants' unilateral decision to deny certain of the Next Friends access to the child on whose behalf they appeared and ameliorating the potential harmful impact of that state action, (d) preparing certain Next Friends for their appearances at depositions and mediation sessions, (e) continually apprising the Next Friends of the status of ongoing mediation efforts and proposals, consulting on strategy, and obtaining authority as needed along the way to reach agreement on terms, and (f) routinely advising and consulting with the Next Friends as to the status of the litigation and strategic

---

[3] Because Attorney Ammann stated that he did not bill for the weekly team conferences, the Court will not reduce his time on this basis.

decisions being made to propel it forward." Plaintiffs argue that "skilled interviewing and trust building is vital to creating and maintaining relationships with Next Friends in this type of litigation involving sensitive knowledge and the power of the state," and that in-person meetings and phone calls are required for these purposes.

Given the sensitive nature of the issues at the center of this litigation—including not only children's health and the often-taboo subject of psychiatric and psychological issues, but also complicated and even fragile relationships between, on the one hand, "stakeholders," whether they are foster care givers, healthcare providers, family members, or case managers—and, on the other hand, the State, which holds the power to sever the relationships between the adults and the vulnerable children for whom they care, Plaintiffs' efforts to meet with "stakeholders" in person to gain their trust and collect information relevant to this lawsuit were reasonable and appropriate.

Because the Court has already reduced Mr. Dixon's proposed hourly rate to account for the fact that he spent most of his time on client development and management efforts, the Court sees no need to reduce on the same basis the number of hours he worked.

Nonetheless, several of Mr. Dixon's time entries are vague. *See, e.g.,* Doc. 285-2, p. 67 ("Electronic mail to MO legal team"), p. 96 ("Electronic mail with client"), p. 105 ("Telephone call with client"), p. 115 (same), p. 121 ("Legal analysis and email to team"), p. 140 ("Electronic mail to co-counsel"), p. 141 ("Telephone call with team"), p. 144 ("Electronic mail to co-counsel"). Because Plaintiffs bear the burden of establishing that the fees they seek are reasonable, failure to submit sufficiently detailed descriptions for such entries warrants reducing the associated time. *See, e.g., Trinity Lutheran*, 2018 U.S. Dist. LEXIS 190824, at *41 (reducing hours where "multiple time entries . . . reference[d] communications with other attorneys without specifying the subject"); *Craig v. District of Columbia*, 197 F. Supp. 3d 268, 280 (D.D.C. 2016) (finding

"insufficiently detailed" "many entries perfunctorily stat[ing] that counsel 'e-mailed' or sent an 'email to' someone, had a 'phone discussion w/' someone, or 'reviewed and responded to' an e-mail or a document") (citations omitted). Accordingly, the Court reduces Attorney Dixon's hours by 25%.

### C. Travel Time

Defendants argue that the Court should disallow the New York and California attorneys' 814.4 hours spent traveling to and from Missouri. Plaintiffs seek only half of their proposed rates for their travel time. Still, the travel time alone, according to Defendants, amounts to $158,822.88. Defendants argue that "it was unnecessary for out-of-state attorneys to litigate this wholly Missouri case" and that the out-of-state attorneys should have relied on local counsel to take the numerous depositions conducted in Missouri.

Because this case involved complicated and sensitive factual matters involving science, including medicine, psychiatry, pharmacology, psychology, behavioral sciences, and health, as well as privacy, children's and youth-related issues, social services, and public policy, Plaintiffs' attorneys' decisions to rely on attorneys from the organizations with experience and expertise in these topics was reasonable. Nor could local counsel at Saint Louis University reasonably have been expected to singlehandedly take some fifteen depositions. Moreover, Plaintiffs have limited their fee and expense reimbursement requests to no more than two attorneys for each deposition.

CR indicates that it is "customary and routine" for its attorneys to devote travel time to preparing for or following up on the work that they traveled to Missouri to complete. *See* Supplemental Declaration of Samantha M. Bartosz (Doc. 299-4) ¶ 6. Still, if travel time were devoted to other case-related tasks, the Court would expect that the billing entries would so reflect.

On the other hand, some portion of the travel time—such as passing through security, checking into flights or hotels, or car travel to or from airports—will not be conducive to working

at all and the attorney should be compensated for the time that she is not able to devote to legal work.

The Eighth Circuit has "long recognized a presumption that a reasonable attorney's fee includes reasonable travel time billed at the same hourly rate as the lawyer's normal working time, absent a showing the award would be unreasonable, for example, because the lawyer did not customarily charge clients for travel time." *Ludlow v. BNSF Ry. Co.*, 788 F.3d 794, 803-04 (8th Cir. 2015) (internal quotation marks and citations omitted). Similarly, the Eighth Circuit recently stated that where, as here, "out-of-state counsel have their fees reduced to a local rate, such a rate may be awarded for all legal work including travel time when that is the practice in the relevant market." *Safelite Grp., Inc. v. Rothman*, 759 F. App'x 533, 536 (8th Cir. 2019). Defendants have not presented evidence that local attorneys do not bill for travel time. *See id.*

In light of the fact that Plaintiffs have already halved their bill rate for travel time, and their consultant has reduced the number of travel-related hours for which they seek compensation, the Court finds that no additional reduction in travel time is warranted.

### D. Block Billing and Vague Entries

Defendants argue that, "even after Sterling Analytics recommended various eliminations, reductions and limitations, the request for attorney fees is still problematic in that there are numerous incidents of block billing (especially in the billing entries of Morgan Lewis) [and] vague or non-specific entries generally (and specifically in the billing entries of Children's Rights regarding 'stakeholders') . . . ." Doc. 298, p. 11.

The practice of block-billing—putting multiple tasks in one time entry without specifying how much time was devoted to each task—is not necessarily problematic in and of itself. *See Nassar v. Jackson*, 779 F.3d 547, 554 (8th Cir. 2015) (finding no abuse of discretion where district court did not reduce award for "block-bill[ing]," despite the defendant's argument that the practice

prevented "meaningful analysis of the time spent on each discrete task"). This Court previously has stated that "block-billing is problematic only where the hours billed for multiple tasks appears excessive, or where billed time needs to be eliminated for certain tasks . . . ." *Washington v. Denney*, No. 14-CV-6118-NKL, 2017 WL 4399566, at *6 (W.D. Mo. Oct. 3, 2017); *see also Nathanson v. Diversified Adjustment Serv., Inc.*, No. 18-CV-3102 (PJS/ECW), 2019 WL 4387960, at *5 (D. Minn. Sept. 13, 2019) (same) (quoting *Washington*, 2017 WL 4399566, at *6). Plaintiffs' counsel have already engaged a consultant to identify problematic billing practices of this sort. *See* Doc. 285-1, ¶ 3 ("Sterling submitted to Clients our expert opinions regarding which tasks were improperly billed, unreasonable, or required additional detail to justify and substantiate the work performed."). In the face of Plaintiffs' compelling showing, Defendants have not pointed to any examples of Plaintiffs' counsel spending an inordinate amount of time on any given task. They claim only that the billing entries of Morgan Lewis "especially" contain numerous incidents of block billing. The Court, having reviewed in detail the Morgan Lewis time entries for block billing, has found nothing to suggest that the billers allocated an unreasonable period of time to any group of tasks.

As for Defendants' complaints about Plaintiffs' use of the term "stakeholders," Plaintiffs explained their wording choice as follows:

> This approach to time entries is intentional to protect attorney work product gathered over the course of the litigation and to reduce the possibility that some form of retaliation – as occurred here in the instance of children's access to certain Next Friends being denied by Children's Division officials – is exacted on individuals who have provided information to support the reform effort.

Doc. 299-4 (Supplemental Declaration of Samantha M. Bartosz in Support of Plaintiffs' Motion for Fees and Expenses) ¶ 8. Particularly in light of Plaintiffs' statement that children's access to certain Next Friends was denied by Children's Division officials, possibly in retaliation for the

Next Friends' cooperation in this case, Plaintiffs' efforts to protect the identities of the Next Friends and potential witnesses with whom they spoke are reasonable.

Still, some additional information, even in general terms, concerning the subject of the communications with stakeholders would have made evaluation of some of the time entries easier. For example, Plaintiffs might have explained the purpose as "intake," or "gathering information concerning potential witnesses" or "collecting information for purposes of discovery." Instead, many entries merely mention a call, correspondence, or meeting with a stakeholder without specifying the purpose or subject of the communication. *See, e.g.*, Doc. 285-2, p. 80 ("Call with stakeholder re: case."), p. 98 ("stakeholder meeting with CF"), .p. 121 ("Call w stakeholder"); Doc. 285-3, p. 45 ("Attend Stakeholder Meetings"); p. 82 ("Conversation with stakeholder"). In light of the vagueness in some descriptions of the subjects of the stakeholder communications, the Court reduces the attorneys' hours, outside of travel time, by an additional 5%.

### E.  Specific Time Entries Modified by the Court

Although Defendants have not identified any specific time entries that warrant reduction or elimination, the Court, having reviewed Plaintiffs' time entries, has identified a handful of instances in which reductions are warranted.

First, matters relating to "press" releases are not appropriately billed to Defendants. *See, e.g.*, Doc. 285-2, p. 61 ("Meet with HA and EGH to discuss MO press release"); *id.*, p. 62 ("Work on complaint and complaint-related press issues - incorporate edits, conversations with SB"). While such efforts may be an important component of the work that the children's and youth law organizations perform, because they may be useful in effecting public policy change, they are not properly billable to Defendants as litigation costs. *See Trinity Lutheran*, 2018 U.S. Dist. LEXIS 190824, at *29 ("Fees for time spent discussing media matters cannot be shifted to Defendant."); *Halderman v. Pennhurst State School & Hosp.*, 49 F.3d 939, 942 (3d Cir. 1995) (noting that "the

proper forum for litigation is the courtroom, not the media," and precluding recovery for "hours of 'work related to writing press releases, speaking with reporters and otherwise publicizing'" matters under litigation). Accordingly, the Court has reduced the hours in the lodestar calculation slightly to exclude time spent working on press releases (.5 hours on 8/24/16, .3 on 5/30/17, .5 on 6/7/17).

On one occasion, an attorney billed .8 hour for "Attention to state request for additional pages for MTD." *Id.*, p. 69. The Court has reduced the time billable for this simple, administrative task. *See Trinity Lutheran,* 2018 U.S. Dist. LEXIS 190824, at *37 ("The Court reduced time billed that seemed excessive for the listed task(s).").

### F. Volume Discount

Finally, Defendants ask the Court to apply a "volume discount" of 50% to the remaining hours. The primary reason Defendants cite in requesting a volume discount is that the fees are paid by state and local taxpayers. Taxpayers of some sort typically bear the cost of litigation in civil rights cases when the plaintiff succeeds. If a special discount were warranted for that reason alone, then the legislature would have built a discount into Section 1983. However, the legislature did not do so.

The Court sees no basis for further discounts. Plaintiffs have already reduced their fees— in consultation with a hired consultant—by more than 22%. Plaintiffs spent significant time investigating and researching this case even before it was filed,[4] reviewed or indexed 1.5 million

---

[4] Notably, "Section 1988 does not limit fee awards to work performed after the complaint is filed, but allows recovery of fees for time spent beforehand investigating facts and researching the viability of potential legal claims." *McDonald v. Armontrout*, 860 F.2d 1456, 1462 (8th Cir. 1988). The Eighth Circuit expressly permits recovery of fees "for 'research or investigation done in connection with' a related proceeding, to the extent it 'proved directly relevant to the successful prosecution of the later civil rights' action." *Id.* (citation omitted). Plaintiffs' having initiated this action with a detailed, 45-page complaint, flush with facts specific to the Named Plaintiffs, the alleged policies and practices at issue, medical information, and complex theories of constitutional

pages of documents, conducted multiple depositions, drafted 100 pages of interrogatory responses, engaged in extensive motion practice (much of which was necessitated by Defendants' strategic choices), and worked with experts whose opinions are summarized in reports exceeding 100 pages. This case, a class action alleging constitutional violations based on state policies and procedures, or lack thereof, regarding the administration of psychotropic medications to children in the state's foster care system, was complex both in procedure and substance. A case of this duration, complexity, scope, and importance is bound to be time-intensive.

The fact that CR and NCYL now seek fees that exceed the total fees they were awarded in prior years does not indicate that a fair award of fees in this case would represent a windfall. As Defendants themselves point out, this case, which Plaintiffs describe as the first of its kind, required three years of work, including two years of pre-filing investigation and research (only one of which is being billed here). The reason the fees are so high is because the case was unusually challenging and vigorously defended. Defendants were entitled to vigorously defend themselves, but they cannot now reasonably complain that the hours Plaintiffs expended to counter Defendants' efforts were ill spent. *See Weitz Co. v. MH Washington*, 631 F.3d 510, 530 (8th Cir. 2011) (stating that defendants "cannot litigate tenaciously and then be heard to complain about the time necessarily spent overcoming [their] vigorous defense") (quotation marks and citation omitted).

---

liability that largely survived a motion to dismiss presenting issues of first impression is proof that their pre-filing efforts were an important part of their success in this case. *See* Doc. 1 (Complaint for Injunctive Relief and Declaratory Relief and Request for Class Action). The Court previously noted that counsel's having "spent nearly two years investigating the oversight of psychotropic medications in the Missouri child welfare system" was "testament to their diligence and dedication." Doc. 183, p. 17.

Nonetheless, Plaintiffs have billed for only one of the two years they spent preparing to initiate this case.

### 3. Lodestar Calculation

With the adjustments to the billing rates and hours of Plaintiff's counsel discussed above,

the lodestar calculation is as follows:[5]

| Name | Law School Grad. Year | Rates Set by Court | Non-travel Hours (before discount) | Travel Hours (before discount) | Total Fees (after discount) |
|---|---|---|---|---|---|
| Samantha Bartosz | 1986 | $500.00 | 1333.97 | 92.43 | $590,044.75 |
| Bill Grimm | 1975 | $500.00 | 415.00 | 85.60 | $197,775.00 |
| Scott T. Schutte | 1995 | $475.00 | 314.20 | 0.00 | $126,858.25 |
| Leecia Welch | 1996 | $450.00 | 628.89 | 9.41 | $242,668.38 |
| John Ammann | 1984 | $400 | 185.90 | 0.00 | $70,642.00 |
| Elizabeth Gretter | 2009 | $350.00 | 2217.54 | 167.26 | $727,795.86 |
| Poonam Juneja | 2009 | $350.00 | 618.50 | 39.50 | $190,916.25 |
| Stephanie Schuster | 2011 | $325.00 | 87.20 | 0.00 | $24,089.00 |
| Stephen Dixon | 1987 | $300.00 | 298.00 | 80.10 | $70,125.15 |
| Aaron Finch | 2012 | $300.00 | 244.86 | 23.64 | $65,984.82 |
| Catherine Frizell | 2012 | $300.00 | 433.19 | 105.71 | $126,320.30 |
| Jonathan King | 2012 | $300.00 | 386.87 | 39.03 | $104,506.00 |
| Daniele Gerard | 1990 | $300.00 | 291.80 | 46.60 | $81,399.00 |
| Danielle Rosenthal | 2013 | $300.00 | 800.72 | 17.18 | $206,760.25 |
| Freya Pitts | 2013 | $300.00 | 262.50 | 40.30 | $72,982.50 |
| Courtney J. McCormick | 2010 | $275.00 | 51.20 | 0.00 | $11,968.00 |
| Ning He | 2015 | $250.00 | 175.90 | 0.00 | $37,378.75 |
| Erin McGuinness | 2012 | $225.00 | 148.47 | 0.23 | $28,420.50 |
| Amanda Grill | 2017 | $200.00 | 463.30 | 9.40 | $79,701.00 |
| Jacqueline Stolzenberg | 2018 | $200.00 | 92.00 | 0.00 | $15,640.00 |
| Genevieve Caffrey | Paralegal | $150.00 | 345.74 | 0.06 | $51,865.50 |
| Hailey Cherepon | Paralegal | $150.00 | 236.99 | -0.09 | $35,542.00 |
| Meghan Kacsmar | Paralegal | $150.00 | 453.21 | 0.09 | $67,988.00 |
| Kira Setren | Paralegal | $150.00 | 175.20 | 0.00 | $26,280.00 |
| **TOTALS** | | | 10,661.15 | 756.45 | **$3,253,651.25** |

---

[5] Although Plaintiffs offered to charge half of their rates for travel time, they did not break the hours they presented to the Court down into travel time and non-travel time. The Court used the following algebraic equation to determine the hours attributable to travel and to other billable time:

$$\text{non-travel time} \;=\; \frac{\text{total proposed fee}}{(.5 \times \text{proposed hourly rate})} \;-\; \text{total proposed hours}$$

The Court finds that the fee produced through the lodestar calculation, with the specific discounts discussed and reflected above, is fair. *See Stallsworth*, 2018 WL 2125950, at *1 ("There is a strong presumption that the lodestar calculation represents a reasonable fee award.") (citing *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992)); *see also Perdue*, 559 U.S. at 552 (stating that "the lodestar method yields a fee that is presumptively sufficient to achieve [the] objective" of "induc[ing] a capable attorney to undertake the representation of a meritorious civil rights case"). This case was both important and complicated, in terms of the facts and associated sensitivities, the science and associated complexities, and the law. Plaintiffs who have "won excellent results," as Plaintiffs have done here, are "entitled to a fully compensatory fee award . . . ." *Jenkins,* 127 F.3d at 716.

### b. **Expenses**

Defendants acknowledge that "Plaintiffs are entitled to reimbursement for '[r]easonable expenses of the kind a law firm would ordinarily bill to its client.'" Doc. 298, p. 14 (quoting *Barrett v. Claycomb*, No. 11–CV–4242–NKL, 2013 WL 6920860 at *4 (W.D. Mo. Dec. 9, 2013); *see also Sapa Najin v. Gunter*, 857 F.2d 463, 465 (8th Cir. 1988) ("Reasonable expenses of litigation incurred by counsel on the prevailing side can be awarded as part of the fees due under Section 1988.").

Plaintiffs' counsel seek $132,907.56 in expenses. This figure was reduced by $98,518.04—42.6%—following review by Sterling Analytics.

Defendants ask that all of the travel expenses be disallowed. However, Defendants provide neither legal nor factual grounds to discount Plaintiffs' travel expenses. The Eighth Circuit has expressly held that "travel expenses for attorneys" are among "expenses that a law firm normally would bill to its client" and therefore are "properly characterized as part of an attorney's fees

award."  *Williams v. ConAgra Poultry Co.*, 113 F. App'x 725, 728 (8th Cir. 2004).  Plaintiffs

therefore are entitled to reimbursement of their reasonable travel expenses.

Having reviewed the itemized lists of expenses submitted by Plaintiffs' counsel, the Court

sees no reason for disallowing any expense.

## IV.    <u>CONCLUSION</u>

For the reasons discussed above, the Court grants in part and denies in part the motion for

fees and expenses.  The Court awards to Plaintiffs' counsel a total of $3,253,651.25 in fees and

$132,907.56 in expenses.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated:  <u>April 3, 2020</u>
Jefferson City, Missouri